# Exhibit B

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

U.S. BANK TRUST COMPANY, NATIONAL
ASSOCIATION, in its capacities as Trustees,

Plaintiffs,

v.

DISH DBS CORPORATION, DISH NETWORK
L.L.C., ECHOSTAR INTERCOMPANY
RECEIVABLE COMPANY L.L.C., DISH DBS
ISSUER LLC, and DBS INTERCOMPANY
RECEIVABLE L.L.C.,

Defendants.

Index No. _____

**COMPLAINT**

---

U.S. Bank Trust Company, National Association, solely in its capacities as Trustee under each of (i) that certain Secured Indenture dated November 26, 2021 by and among DISH DBS Corporation as issuer, U.S. Bank Trust Company, National Association, as successor trustee and successor collateral agent, relating to DBS's 5.75% Senior Secured Notes due 2028, and (ii) that certain Indenture dated June 13, 2016 by and among DBS, as issuer, and U.S. Bank Trust Company, National Association, as successor trustee, relating to DBS's 7.75% Senior Notes due 2026 (in such capacities, the "Plaintiffs" or "Trustees"), bring this action at the direction of the holders of the majority of the outstanding principal amount of notes issued and outstanding under these indentures against DISH DBS Corporation ("DBS"), EchoStar Intercompany Receivable Company L.L.C. ("EchoStar Receivable"), DISH Network L.L.C. ("Network LLC") DISH DBS Issuer LLC ("DBS Issuer"), and DBS Intercompany Receivable L.L.C. ("DBS InterCo Sub"). In support hereof, Plaintiffs allege as follows:

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## NATURE OF THE ACTION

1.     This is an action for declaratory judgment under NY CPLR § 3001 and actual and constructive fraudulent transfers under Colorado Uniform Fraudulent Transfer Act ("CUFTA") §§ 38-8-105(1)(a)-(b) and 38-8-106(1).

2.     Through a brazen series of related transactions, EchoStar Corporation ("EchoStar") transferred billions of dollars of assets from DISH Network Corporation ("DISH Network") and its subsidiary, DBS, out of the reach of existing creditors, in exchange for *nothing*.  Defendants then offered the stolen property back to creditors of DISH Network and DBS, but only on the condition that they accept steep discounts on their claims.  Defendants' offer was rejected. Through this action, Plaintiffs now seek to recover those wrongfully acquired assets.

3.     The scheme was concocted to attempt to protect EchoStar's controlling shareholder, Charles Ergen, in the event Defendants cannot manage their upcoming debt maturities and need to reorganize.  The risk is real—EchoStar's, DISH Network's, and DBS's auditors issued going concern qualifications, highlighting the uncertainty around the Defendants' financial condition.  Realizing the risk that Ergen's equity interests in DISH Network (and DBS) were in peril, Ergen and EchoStar transferred the various assets to a holding company that Ergen controls—one with no material outstanding obligations.

4.     The scheme appears to have begun around the time EchoStar amended the terms of its merger with DISH Network, causing DISH Network to be a subsidiary of EchoStar (instead of the other way around, as had been originally contemplated).  As a result, none of the value of the merger would be available to support DISH Network's obligations to creditors.  Then, in January 2024, just a few days after the amended merger closed, EchoStar ransacked its new subsidiary: EchoStar (i) caused DISH Network to transfer spectrum licenses—a portion of which EchoStar valued at $9 billion—to a direct, wholly owned subsidiary of EchoStar, (ii) rerouted a $4.7 billion

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2     Case 1:24-cv-03646   Document 3-2   Filed 05/13/24   Page 4 of 41

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 04/26/2024

intercompany loan from DBS to a direct, wholly owned subsidiary of EchoStar, and (iii) siphoned *three million* DISH TV (as defined below) subscriber contracts from DBS and handed them over to a newly-created subsidiary, DBS Issuer, thereby placing the assets outside of the reach of DBS's existing creditors.

5.     In exchange, EchoStar and the other transferees paid DBS and DISH Network nothing—not one dollar—for the transferred assets.

6.     But this was just the beginning.  A few days after looting DBS and DISH Network of billions of dollars' worth of assets, EchoStar announced distressed, coercive exchange offers that sought to induce holders of notes issued by DBS and DISH Network to exchange their notes for new notes issued by the entities holding the transferred assets.  DBS's and DISH Network's bondholders' reaction was immediately negative, leading EchoStar to terminate one of the two exchanges.  Despite EchoStar's intent to proceed with the second exchange, the majority of bondholders refused to participate as of the exchange's expiration date.  Thus, having no choice, EchoStar terminated the second exchange offer as well.

7.     EchoStar has suggested that these transactions were completed to "further unlock incremental strategic, financial and operating flexibility for its business following completion of [EchoStar's] merger with DISH Network Corporation," but this is absurd.  The transfers caused DBS and DISH Network to lose *billions of dollars'* worth of assets for *no consideration whatsoever*.

8.     The transactions are exactly what they appear to be: bad faith maneuvers designed to hinder, delay, and defraud creditors of DBS and of DISH Network, lower the trading price of those creditors' bonds, and divert value from creditors to shareholders.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

9.      The Trustees have been directed to seek declaratory judgments that the transfers breached multiple provisions of the DBS Indentures (as defined below) and that the transfers are intentional and constructive fraudulent transfers.  The transfers have already caused the holders of DBS's and DISH Network's debt substantial harm: the bond prices for debt issued by DBS and by DISH Network have plummeted, and rating agencies have downgraded DBS's creditworthiness out of concern that its creditors, including Plaintiffs, may no longer have recourse to the stolen assets.

10.     Accordingly, Plaintiffs seek a judgment (a) declaring that DBS breached the DBS Indentures, (b) avoiding and unwinding the transfers made by or on behalf of DBS that were announced on January 10, 2024 as actual and/or constructive fraudulent transfers, and (c) awarding damages and other and further relief as may be appropriate.

## THE PARTIES AND RELATED ENTITIES

11.     U.S. Bank Trust Company, National Association is a national banking association formed under the laws of the United States with its principal place of business in Portland, Oregon.  It appears in this action solely in its capacities as Trustee under each of the DBS Indentures (as defined below), pursuant to the terms of which it has been directed to bring this lawsuit and make the allegations contained herein by respective majorities of the holders of the DBS 5.75% Secured Notes and the 2026 DBS Unsecured Notes (each as defined below).[1]  The Trustees state these allegations on behalf of and at the direction of such holders.  The Trustees bring this action for the benefit of all the holders of those notes and allegations of injury or damage to Plaintiffs include injury or damage to all holders.

---

[1]    All the allegations in this Complaint are made solely in the Trustees' capacities under the DBS Indentures (defined below) and are not made individually or as trustee under any other indenture.  The Trustees bring this action in a representative capacity.  U.S. Bank Trust Company, National Association is not a holder of the Notes issued under the DBS Indentures.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

12.     Defendant DBS is a Colorado corporation with principal offices in Colorado. It is an indirect, wholly owned subsidiary of DISH Network. DBS, through its subsidiaries, operates the pay-tv segment of DISH Network's business under two separate brands: DISH TV and SLING TV. The DISH branded pay-tv service ("DISH TV") consists of, among other things, Federal Communications Commission licenses authorizing DBS to use direct broadcast satellite and Fixed Satellite Service spectrum, its owned and leased satellites, receiver systems, broadcast operations, a leased fiber optic network, in-home service and call center operations, and certain other assets utilized in its operations. The SLING branded pay-tv services ("SLING TV") consists of, among other things, multichannel, live-linear and on-demand streaming over-the-top Internet-based domestic, international, and Latino video programming services. Combined, DISH TV and SLING TV's almost nine million pay-tv subscribers in the United States accounted for roughly 99% of annual revenue for DISH DBS and roughly 76% of revenue for DISH Network in 2023. An aggregate consumer base of that size drives significant value.

13.     Defendant EchoStar Receivable is a Colorado entity that was formed in January 2024 and has its principal offices in Colorado. It is a wholly owned subsidiary of EchoStar.

14.     Defendant Network LLC is a Colorado entity with principal offices in Colorado. It is a wholly owned subsidiary of DBS.

15.     Defendant DBS Issuer is a Delaware entity that was formed in January 2024. It is a wholly owned, direct subsidiary of Network LLC and a wholly owned, indirect subsidiary of DBS.

16.     Defendant DBS Interco Sub is a Colorado entity that was formed in January 2024 and has its principal offices in Colorado. It is a wholly owned subsidiary of DBS.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

17.     Non-party EchoStar is a Nevada corporation with principal offices in Colorado.  It operates two business segments: the Hughes segment—which provides broadband satellite technologies and broadband internet products and services—and the EchoStar Satellite Services segment—which provides satellite services on a full-time and/or occasional-use basis to U.S. government service providers, internet service providers, broadcast news organizations, content providers, and private enterprise customers.

18.     Non-party EchoStar Wireless Holding L.L.C. is a Colorado entity with principal offices in Colorado.  It is a wholly owned subsidiary of EchoStar.

19.     Non-party DISH Network Corporation is a Nevada corporation with principal offices in Colorado.  It is a wholly owned subsidiary of EchoStar.  DISH Network operates two primary business segments—pay-tv services and wireless internet services—which provide the vast majority of its current revenue.  The wireless business segment provides nationwide prepaid and postpaid retail wireless services.  DISH Network is in the process of leveraging the spectrum assets it controls to build its own 5G Network.  Until then, it relies on external mobile network operators—T-Mobile and AT&T—to provide network services for its retail wireless business.

20.     Non-party Sling TV Holding L.L.C. ("Sling Holding") is a Colorado entity with principal offices in Colorado.  It is a wholly owned subsidiary of DBS.

21.     Non-party Sling TV Purchasing L.L.C. ("Sling Purchasing") is a Colorado entity with principal offices in Colorado.  It is a wholly owned subsidiary of DBS.

22.     Non-party Sling TV L.L.C. is a Colorado entity with principal offices in Colorado. It is a wholly owned subsidiary of DBS.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

23.     Non-party Sling TV Gift Card Corporation (together with Sling Holding, Sling Purchasing, and Sling TV L.L.C., the "Sling TV Subsidiaries) is a Virginia corporation with principal offices in Colorado.  It is a wholly owned subsidiary of DBS.

## FACTUAL ALLEGATIONS

### I.     EchoStar Launched DISH Network

24.     The DISH Network brand began in 1996, when EchoStar Communications Corporation ("ECC"), a telecommunications company founded by Charles Ergen, launched the DISH brand to market satellite-delivered digital television.  In 2007, ECC announced it would spin off (the "Spin-Off") its technology and infrastructure assets into EchoStar, a separate company, and that the remainder of the company would continue under the name DISH Network Corporation.  The Spin-Off completed on January 1, 2008, and DISH Network operated as an independent, publicly traded company until the end of 2023.  After the Spin-Off, however, EchoStar and DISH Network remained under the common control of Charles Ergen, who was the Chief Executive Officer and Chairman of the board of directors of DISH Network at the time.

25.     DBS was formed in 1996 as a wholly owned subsidiary of ECC.  In connection with the Spin-Off, DISH Network contributed certain satellites, uplink and satellite transmission assets, real estate, and other assets and related liabilities, including $1.0 billion of cash, to EchoStar.  After the Spin-Off and ECC's renaming, DBS continued as a subsidiary of DISH Network.

26.     DBS operates the pay-tv segment of DISH Network's business, which currently accounts for the vast majority of DISH Network's yearly revenue.  In 2023, the pay-tv segment accounted for roughly 76% of the company's total revenue *and 100% of its operating income*.  The pay-tv segment, however, has struggled in recent years.  In 2023, the pay-tv segment generated $11.6 billion in revenues, a 7.5% decrease from 2022.  As of December 31, 2023, DBS had

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

8.53 million pay-tv subscribers in the United States, including 6.471 million DISH TV subscribers and 2.06 million SLING TV subscribers.  DBS's business continues to decline because, among other reasons, the continued proliferation of high-speed internet accessibility.  Indeed, DBS's subscriber count declined 8.9% in 2022 and 12.6% in 2023.

27.    The following chart illustrates a simplified corporate structure of DISH Network as of June 2023:



## II.    DBS Issues Notes

28.    From 2014 through 2021, DBS issued a series of unsecured notes, including: (a) $2.0 billion aggregate principal amount of 5.875% senior unsecured notes due November 15, 2024, governed by that certain indenture dated as of November 20, 2014; (b) $2.0 billion aggregate principal amount of 7.75% senior unsecured notes due July 1, 2026, governed by that certain indenture dated as of June 13, 2016 (the "2026 DBS Unsecured Notes"); (c) $1.0 billion aggregate

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

principal amount of 7.375% senior unsecured notes due July 1, 2028, governed by that certain indenture dated as of July 1, 2020; and (d) $1.5 billion aggregate principal amount of 5.125% senior unsecured notes due June 1, 2029, governed by that certain indenture dated as of May 24, 2021 (the foregoing notes, collectively, the "DBS Unsecured Notes").

29.     In total, DBS incurred $6.5 billion in debt by issuing the DBS Unsecured Notes, $6.48 billion of which remained outstanding as of December 31, 2023.

30.     Then, on November 26, 2021, after issuing the DBS Unsecured Notes, DBS issued two series of secured notes, including: (a) $2.75 billion aggregate principal amount of 5.25% Senior Secured Notes due December 1, 2026 (the "DBS 5.25% Secured Notes"); and (b) $2.5 billion aggregate principal amount of 5.75% Senior Secured Notes due December 1, 2028 (the "DBS 5.75% Secured Notes" and together with the DBS 5.25% Secured Notes, the "DBS Secured Notes").  As of December 31, 2023, all $5.25 billion aggregate principal amount of the DBS Secured Notes remained outstanding.

31.     The DBS Secured Notes are guaranteed by various subsidiaries of DISH Network, including Network LLC, DISH Operating L.L.C., Echosphere L.L.C., DISH Network Service L.L.C., DISH Broadcasting Corporation, DISH Technologies L.L.C., and Sling TV, and are secured by substantially all existing and future tangible and intangible assets of DBS and the guarantor subsidiaries on a first priority basis, subject to certain exceptions.

32.     The indentures for the DBS 5.75% Secured Notes and the 2026 DBS Unsecured Notes (together, the "DBS Indentures") are governed by New York law.

33.     DBS used the proceeds from the DBS Secured Notes to make an intercompany loan to DISH Network pursuant to a Loan and Security Agreement dated November 26, 2021 (the "InterCo Loan").  The InterCo Loan generated interest income for DBS and was secured by the

9

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

9 of 40

cash proceeds thereof and an interest in any wireless spectrum licenses acquired by DISH Network using such proceeds.

34.     The InterCo Loan was a significant development for investors and for rating agencies in their evaluation of the credit quality of DBS and the value of the DBS Unsecured Notes.  On November 8, 2021, Moody's said in a release with respect to the ratings of DISH Network and DBS (and their various debt instruments):

> The affirmation of DBS's CFR is due to the neutralizing effect of the intercompany loan on the impact from the new debt issuance . . . We anticipate that the intercompany loan terms will be structured to effectively mirror or exceed the cost of the new secured notes and link DBS more closely to DISH [Network] but will fall far short of a full bilateral guarantee and consolidation of the two credits. The downgrade of the existing senior unsecured notes at DBS is caused by the issuance of the new secured notes, which will result in contractual subordination of the unsecured notes and potential disproportionate loss absorption relative to the new secured notes if a bankruptcy were to occur. However, we note that the unsecured notes will be contractually senior to the new secured notes with respect to certain realizations under the intercompany loan and any collateral pledged as security for the intercompany loan.[2]

35.     Moody's press release reflected the concern that DBS investors (particularly holders of DBS Unsecured Notes) had with respect to DBS's incurrence of additional secured debt. To partially allay those concerns, DBS lent the proceeds from the DBS Secured Notes to DISH Network via the InterCo Loan.  DBS excluded the InterCo Loan from the definition of "Collateral" in the security agreement for the DBS Secured Notes.  In turn, the holders of the DBS Secured Notes agreed to subordinate their right to repayment to the holders of the DBS Unsecured Notes with respect to the proceeds of the InterCo Loan.

---

[2]     Moody's Ratings, *Moody's downgraded DISH Network's CFR and unsecured notes to B2; affirmed DISH DBS's B2 CFR, downgraded its unsecured notes to B3, and assigned a Ba3 rating to its new secured notes*, MOODY'S (Nov. 8, 2021), https://www.moodys.com/research/Moodys-downgraded-DISH-Networks-CFR-and-unsecured-notes-to-B2-Rating-Action--PR_457797.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

10

### III.    The Capital Structure and Financial Condition of DBS and DISH Network

36.    Due to the issuance of the DISH Network convertible notes, the DISH Network secured notes, the DBS Unsecured Notes, and the DBS Secured Notes, DISH Network had incurred over *$20 billion* in debt.

37.    Consistent with the above, the following table lists DISH Network's various liabilities as of March 31, 2023:

## CAPITAL STRUCTURE

| Tranche | Amount |
|---|---|
| 5.250% Senior Secured Notes | $2,750 |
| 5.750% Senior Secured Notes | 2,500 |
| **Total DISH DBS Secured Debt** | **$5,250** |
| 5.875% Senior Notes | 2,000 |
| 7.750% Senior Notes | 2,000 |
| 7.375% Senior Notes | 1,000 |
| 5.125% Senior Notes | 1,500 |
| **Total DISH DBS Debt** | **$11,750** |
| 11.750% Senior Secured Notes | 3,500 |
| **Total DISH "TopCo" Secured Debt** | **$3,500** |
| 2.375% Convertible Notes | 1,000 |
| 0% Convertible Notes | 2,000 |
| 3.375% Convertible Notes | 3,000 |
| **Total DISH "TopCo" Debt** | **$9,500** |
| Other Notes Payable | 126 |
| Finance Lease Obligations | 166 |
| **Total Consolidated Debt** | **$21,542** |

38.    Prior to January 10, 2024, approximately $5 billion of certain DISH Network convertible notes were trading between 52 and 61 cents on the dollar (yielding between approximately 27% and 32%), indicating that the market believed such notes would not be repaid in full.

39.    Like DISH Network's notes, DBS's funded debt was also trading well below par prior to January 10, 2024.  Indeed, even before EchoStar rerouted $4.7 billion of the InterCo Loan

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

away from DBS (as described in more detail below), the DBS Secured Notes were trading as low as 78 cents (yielding approximately 12%) and the DBS Unsecured Notes were trading as low as 50 cents (yielding approximately 25%). Notably, only a few months ago, DISH Network recognized the difficult financial market and its place in it, noting that there is a "narrow path" to achieve financial stability.

## IV.    EchoStar Merged with DISH Network

40.    Roughly 15 years after the Spin-Off, on August 8, 2023, DISH Network and EchoStar entered into an agreement to re-merge the two companies and their subsidiaries. The original plan for the merger was for DISH Network to acquire EchoStar, with EchoStar surviving as a wholly owned subsidiary of DISH Network. Under that plan, all outstanding EchoStar stock would be converted into the right to receive DISH Network stock of equivalent value.

41.    On October 2, 2023, however, the parties entered into an Amended and Restated Agreement and Plan of Merger (the "Amended Merger Agreement"), which reversed the original merger's structure. Under the Amended Merger Agreement, EchoStar would acquire DISH Network, with DISH Network surviving as a wholly owned subsidiary of EchoStar. Accordingly, the Amended Merger Agreement provided for the conversion of outstanding DISH Network stock into EchoStar stock. On December 31, 2023, DISH Network and EchoStar merged as contemplated in the Amended Merger Agreement: EchoStar acquired DISH Network, and DISH Network survived as EchoStar's subsidiary.

42.    The purported justification for the Amended Merger Agreement was to "unlock incremental strategic, financial and operating flexibility," and was first considered by DISH Network's board in August 2023.[3] In fact, the reversal was the first step in a scheme to avoid

---

[3]    DISH Network Corp., Current Report (Form 8-K), Exhibit 99.1 at 1 (Jan. 10, 2024).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

12

repaying creditors of DBS and DISH Network. By having DISH Network become a subsidiary of EchoStar, it ensured that none of EchoStar's value would be available to pay creditors of DISH Network and its subsidiaries (including DBS). This intent is evidenced by the Asset Transfers (as defined below) themselves and the language used to describe them: "EchoStar . . . announced today the completion of a series of strategic transactions to further ***unlock incremental strategic, financial and operating flexibility*** for its business."[4] The merger facilitated the Asset Transfers that harmed Plaintiffs and can be viewed—together with the Exchange Offers (as defined below)— as one step in a single, integrated transaction and scheme to defraud creditors.

## V.    EchoStar Announced Asset Transfers that Transfer and Unencumber Assets in Violation of the Indentures and Applicable Law

43.    Mere days after the merger was consummated, it became clear that EchoStar, DBS, and DISH Network's goal was to defraud creditors. On January 10, 2024, EchoStar issued a press release (the "January 10 Press Release") setting forth a series of transactions (the "Asset Transfers") completed by EchoStar and its subsidiaries, including DISH Network and DBS.

44.    According to the January 10 Press Release, the Asset Transfers included the following transactions:

- DISH Network transferred certain of its unencumbered wireless spectrum licenses, including AWS-4, H-Block, CBRS, C-Band - Cheyenne, 12GHz, LMDS, 24 GHz, 28 GHz, 37GHz, 30GHz and 47GHz, under the umbrella of a newly formed subsidiary, EchoStar Wireless Holding L.L.C., a direct wholly owned subsidiary of EchoStar (the "DISH Network Spectrum Transfer");

- DBS designated DBS InterCo Sub as an unrestricted subsidiary for purposes of the relevant indentures governing such entities and transferred a portion of the receivable in respect of the InterCo Loan owed by DISH Network (valued at approximately $4.7 billion) (the "Assigned InterCo Loan") to DBS Interco Sub, which then assigned its rights as lender thereunder to EchoStar Receivable, a direct wholly owned subsidiary of EchoStar, such that amounts owed in respect of the Assigned InterCo Loan will now be paid by DISH Network to EchoStar Receivable (the "InterCo Loan Transaction"). In other words, the InterCo Loan Transaction

---

[4]    *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

resulted in DBS transferring an approximately $4.7 billion asset to a newly created wholly owned subsidiary of EchoStar for EchoStar's benefit;

- DBS transferred approximately three million DISH TV subscribers to a newly formed subsidiary, DBS Issuer, and designated it as an unrestricted subsidiary for purposes of the relevant indentures governing such entities (both the transfer and designation, the "<u>DBS Subscriber Designation</u>"); and

- DBS designated the Sling TV Subsidiaries—which appear to hold the Sling TV business—as unrestricted subsidiaries for purposes of the relevant indentures governing such entities (the "<u>Sling TV Designation</u>" and together with the Interco Loan Transaction and the DBS Subscriber Designation, the "<u>DBS UnSub Transactions</u>").

## VI.   EchoStar Announced Exchange Offers and Consent Solicitations Related to DISH Network's Funded Debt

45.   The nature of the fraudulent transfers became even more evident just a few days later when EchoStar announced its plan to engage in coercive exchange offers at the expense of the creditors.  On January 12, 2024, EchoStar announced that it had commenced offers to exchange (the "<u>EchoStar Exchange Offer</u>") any and all of the DISH Network convertible notes, each for 10.00% Senior Secured Notes due 2030 to be issued by EchoStar (the "<u>EchoStar Notes</u>"), pursuant to the terms described in a preliminary prospectus and consent solicitation statement, dated January 12, 2024.

46.   The EchoStar Exchange Offer was conditioned upon, among other things, at least a majority of the outstanding principal amount of the applicable notes being validly tendered and not properly withdrawn prior to the expiration date.  The expiration date for the EchoStar Exchange Offer was February 9, 2024.

47.   The EchoStar Notes were to be guaranteed on a senior secured basis by EchoStar's indirect subsidiary, DBSD Corporation ("<u>DBSD</u>"), and secured by first priority liens on the 20 MHz of AWS-4 spectrum (consisting of 10 MHz of N70 and 10 MHz of N66) held by DBSD and EchoStar's indirect subsidiary, DBSD Services Limited.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

14

48.     EchoStar estimated that the fair market value of the collateral securing the EchoStar Notes was approximately $9 billion.

49.     Notably, the EchoStar Exchange Offer only contemplated issuing EchoStar Notes with an aggregate principal amount equal to approximately 51% or 61% of the existing DISH Network convertible notes.  This enormous discount evidences DISH Network's insolvency and inability to pay these debts in full as they mature.  Further, S&P indicated that the Asset Transfers and the EchoStar Exchange Offer were a "selective default" of DISH Network's obligations and that the affected securities would be rated as in default if the EchoStar Exchange Offer closed.[5]

50.     Concurrently with the EchoStar Exchange Offer, EchoStar solicited consent to amend the terms of the DISH Network convertible notes and indentures governing such notes to "eliminate certain events of default (including any cross-defaults related to any payment, bankruptcy or other defaults of any DISH subsidiary) and substantially all of the restrictive covenants" therein.[6]  Specifically, the proposed amendments sought to:

- eliminate the "merger covenant" (Article 11), which sets forth requirements that must be met for DISH Network to consolidate, merge, or sell all or substantially all its assets;

- eliminate the reporting covenant (section 4.06(a)-(c)), "which requires DISH Network to provide certain periodic reports to noteholders;"

- eliminate the following events of default: section 6.01(e) (failure to comply with Article 11), section 6.01(g) (cross-defaults), and 6.01(j) (judgment defaults); and

- revise the definition of "Significant Subsidiary" to exclude DBS and its subsidiaries.[7]

---

[5]     Chris Mooney & Allyn Arden, *Dish Network and Dish DBS Downgraded To 'CC' On Announced Distressed Exchange, Outlook Negative; Debt Ratings Lowered*, S&P Global Ratings (Jan. 16, 2024), https://disclosure.spglobal.com/ratings/es/regulatory/article/-/view/type/HTML/id/3112495.

[6]     EchoStar Corp., Current Report (Form 8-K), Exhibit 99.1 at 2 (Jan. 16, 2024).

[7]     EchoStar Corp., Registration Statement (Form S-4), at 86 (Jan. 16, 2024).

15

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

51.     Holders of the DISH Network convertible notes could not (a) consent to the proposed amendments without tendering the applicable DISH Network convertible notes in the relevant exchange offer, or (b) tender DISH Network convertible notes of any series for exchange without consenting to the proposed amendments therefor.

52.     EchoStar recognized that "[t]hese amendments will permit [EchoStar] to take certain actions previously prohibited and that could increase the credit risk with respect to DISH Network, and might adversely affect the liquidity, market price and price volatility of the existing notes or otherwise be adverse to the interests of the holders" of the existing DISH Network convertible notes.[8]

53.     EchoStar stated that the purpose of the EchoStar Exchange Offer was to "further advance[] EchoStar's objective of realizing on the synergistic opportunities of the combined business to utilize its valuable portfolio of spectrum and other assets to optimize its capital structure to position the business to execute on its strategic goal of becoming the premier provider of terrestrial mobile, satellite connectivity, and content services."[9]   In reality, however, the EchoStar Exchange Offer was nothing more than an attempt to avoid repaying its existing creditors by taking assets away and holding them hostage.

54.     By February 9, 2024—the expiration date of the EchoStar Exchange Offer—the majority of noteholders had refused to participate in the exchange.  Having no choice, EchoStar terminated the EchoStar Exchange Offer.

---

[8]     *Id.* at 30.
[9]     EchoStar Corp., Current Report (Form 8-K), Exhibit 99.1 at 1 (Jan. 16, 2024).

16

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## VII. EchoStar Announced Exchange Offers and Consent Solicitations Related to DBS's Funded Debt

55.    On January 16, 2024, EchoStar and DBS Issuer announced another exchange offer, this time by DBS Issuer (the "DBS Exchange Offer" and, collectively with the EchoStar Exchange Offer, the "Exchange Offers") to issue new senior secured notes of DBS Issuer ("DBS Issuer Notes") in exchange for the DBS Unsecured Notes.  EchoStar expected the DBS Exchange Offer to close on February 12, 2024.

56.    Under the terms of the DBS Exchange Offer, DBS Issuer offered to exchange up to (a) $1 billion aggregate principal amount of the 5.875% senior unsecured notes due 2024 for Series 2024-1 Class A-1 10.00% Senior Secured Notes due 2030 and (b) $3 billion aggregate principal amount of the 7.75% senior unsecured notes due 2026, 7.375% senior unsecured notes due 2028, and 5.125% senior unsecured notes due 2029, each for 2024-1 Class A-2 10.00% senior secured notes due 2034.  The DBS Exchange Offer contemplated that the later-dated DBS unsecured notes would be exchanged at a significant discount to par as reflected in the table below.  As is the case with DISH Network, the massive discounts requested from holders of these notes reflected that DBS is insolvent and unable to pay those debts as they come due.  The table also shows that the offer prices for the later-dated DBS unsecured notes were lower than the trading prices of those bonds the day before the Asset Transfers were announced.  This demonstrates that the DBS Exchange Offer was priced *specifically* to take advantage of the drops in price precipitated by their fraudulent transfers.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

| Maturity | Pre-Transfer Price (1/9/24) | Post-Transfer Price (1/16/24) | *Change* | Tender Price . . . | *. . . compared to 1/9/24* |
|---|---|---|---|---|---|
| 2026 | **$69.75** | $56.25 | ($13.50) | $66.00 | **($3.75)** |
| 2028 | **$58.00** | $40.38 | ($17.63) | $50.00 | **($8.00)** |
| 2029 | **$50.00** | $36.50 | ($13.50) | $43.00 | **($7.00)** |

57.     The DBS Issuer Notes would have been secured by the assets of DBS Issuer, including the approximately three million DISH TV subscribers that DBS had transferred to DBS Issuer, as described in the January 10 Press Release.

58.     Concurrently with the DBS Exchange Offer, EchoStar, through DBS Issuer, solicited consents from the holders of each series of the DBS Unsecured Notes to amend the terms of the applicable series of such notes and corresponding indentures to, among other things, "eliminate certain events of default (including any defaults related to any payment default or acceleration of certain indebtedness and defaults related to the bankruptcy of DBS and substantially all of the covenants" in each such indenture and the DBS Unsecured Notes of the applicable series.[10]  Specifically, the proposed amendments sought to eliminate the following provisions:

- Section 4.03 – Reports;

- Section 4.04 – Compliance Certificates;

- Section 4.07 – Limitation on Restricted Payments;

- Section 4.08 – Limitations on Dividend and Other Payment Restrictions Affecting Subsidiaries;

- Section 4.09 – Limitation on Incurrence of Indebtedness;

- Section 4.10 – Asset Sales;

- Section 4.11 – Limitation on Transactions with Affiliates;

- Section 4.12 – Limitation on Liens;

---

[10]     EchoStar Corp., Current Report (Form 8-K), Exhibit 99.2 at 2 (Jan. 16, 2024).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

- Section 4.13 – Additional Subsidiary Guarantees;

- Section 4.15 – Offer to Purchase Upon Change of Control Event;

- Section 4.16 – Limitation on Activities of the Company;

- Section 4.18 – Accounts Receivable Summary;

- Section 4.19 – Dispositions of ETC and Non-Core Assets (for purposes of the 5.875% Senior Notes Indenture and the 7.75% Senior Notes Indenture)

- Section 4.19 – Dispositions of DTLLC and Non-Core Assets (for purposes of the DBS Indentures governing the 5.125% DBS Unsecured Notes and the 7.375% DBS Unsecured Notes);

- Section 4.20 – Payments for Consent; and

- Section 5.01 – Merger, Consolidation or Sale of Assets (with respect to requirements specified in clauses (c) and (d) thereof).

59.    Holders of the DBS Unsecured Notes could not (a) consent to the proposed amendments without tendering the applicable DBS Unsecured Notes in the relevant exchange offer or (b) tender DBS Unsecured Notes of any series for exchange without consenting to the proposed amendments therefor.

60.    On January 29, 2024, after the market reacted negatively to the exchange offer, EchoStar terminated the DBS Exchange Offer.

## VIII.    After the Exchange Offers Fail, EchoStar Disclosed Going Concern Qualification

61.    Undeterred by the market's overwhelmingly negative reaction to the Exchange Offers, on information and belief, EchoStar seeks to raise new capital using the raided property as collateral.  In EchoStar's 10-K filing for the 2023 fiscal year—its first financial filing since its merger with DISH Network—EchoStar disclosed that, together with its subsidiaries, including Hughes, DBS, and Dish Network, it had about $2.4 billion in cash and cash equivalents ("Cash on Hand") as of December 31, 2023.  But the company also disclosed that it had $951 million and

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

$1.98 billion of debt maturing in March and November 2024, respectively, and is "forecasting negative cash flows" in 2024.

62.     In the same filing, EchoStar stated that it intended to use its Cash on Hand to pay the March 2024 debt maturity.  Accordingly, on March 12, 2024, a wholly owned subsidiary of EchoStar paid "approximately $1 billion" to purchase the wholly owned subsidiary of DISH Network holding DISH Network's 700 MHz spectrum licenses.[11]  DISH Network then used the proceeds of that transaction to pay the remaining balance of $951 million debt maturing in March 2024.

63.     EchoStar's 10-K filing for the 2023 fiscal year also disclosed that "[b]ecause [EchoStar] do[es] not currently have committed financing to fund [its] operations for at least twelve months from the issuance of these consolidated financial statements, substantial doubt exists about [EchoStar's] ability to continue as a going concern."[12]  In particular, the company does not possess sufficient liquidity to pay both the $2 billion unsecured notes issued by DISH DBS due in November 2024 and subsequent interest on its other outstanding debt.  Like EchoStar's auditors, DISH Network's and DBS's auditors also made the same disclosures expressing substantial doubt as to whether these entities could continue as a going concern.  In other words, the auditors believe that DBS lacks the liquidity to pay its debts as they come due.

## IX.     The Asset Transfers Were Made for No Consideration and Are Designed to Hinder, Delay, and Defraud Plaintiffs and DBS's Other Creditors

64.     These Asset Transfers, together with the amended merger structure, were all part of a broader bad faith scheme that included the transfers by DBS and were designed to enrich shareholders to detriment of the creditors, including the holders under the DBS Indentures.

---

[11]     DISH Network, Annual Report (Form 10-K), Notes to Consolidated Financial Statements at F-94 (Mar. 29, 2024).

[12]     EchoStar Corp. Annual Report (Form 10-K), Index to Consolidated Financial Statements at F-10 (Feb. 29, 2024).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

65.     Through the DISH Network Spectrum Transfer and the InterCo Loan Transaction, DISH Network and DBS transferred a substantial portion of their assets—including wireless spectrum licenses and $4.7 billion of receivables—to newly-created unrestricted subsidiaries of EchoStar for *no consideration*.

66.     The DISH Network Spectrum Transfer resulted in DISH Network transferring the relevant spectrum—a portion of which EchoStar valued at $9 billion in the January 12 press release—for *nothing* in return.  It did not pay down indebtedness of DISH Network.  It did not enhance the equity value of its subsidiary.  Nor did it even receive an intercompany claim in return.  Under *any* measure, the DISH Network Spectrum Transfer was a gratuitous transfer.

67.     The InterCo Loan Transaction resulted in approximately $4.7 billion of receivables being transferred to EchoStar (via a newly created, wholly owned subsidiary EchoStar Receivable) for *nothing* in return.  It was not used to pay down indebtedness of DBS.  It did not enhance the value of its subsidiary.  Nor did it even receive an intercompany claim in return.  Under *any* measure, the InterCo Loan Transaction was a gratuitous transfer.

68.     Further, the DBS Subscriber Designation and the Sling TV Designation significantly harmed DBS and the holders under the DBS Indentures as well.  The DBS Subscriber Designation resulted in DBS transferring a substantial portion of its subscriber base—over three million customers—to an unrestricted subsidiary, thereby placing those assets beyond the reach of its creditors.  The sole purpose of this transfer was to limit or eliminate creditor recovery of these valuable assets.  The DBS Subscriber Designation is another intentional fraudulent transfer by DBS in furtherance of EchoStar's scheme.

69.     Ultimately, DBS's total aggregate subscriber base drives its value.  It is widely acknowledged in the pay-tv industry that an increase in subscribers results in a non-linear increase

21

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

in value—and vice versa—due to additional bargaining power and a reduction in operating leverage. This is especially relevant to negotiating programming costs, which is the largest variable cost for DBS. Accordingly, once that subscriber base is disaggregated—as the DBS Subscriber Designation did here—the value of that subscriber base decreases, particularly considering the risks and uncertainty associated with the ultimate disposition of the transferred subscribers from the perspective of existing creditors or any potential new investor in DBS. The transfer of more than a third of those subscribers to an unrestricted subsidiary destroys value due to both the revenue loss and the disaggregation of the subscriber base and constitutes a fraudulent transfer. The harm from this fraudulent transfer is compounded by the Sling TV Designation, which designated the Sling TV Subsidiaries as unrestricted subsidiaries, further reducing the amount of assets from which Plaintiffs can recover.

70. The Asset Transfers are deeply prejudicial to Defendants' creditors. The Asset Transfers were made without the transferor entities receiving reasonably equivalent value—they received no value at all. And the Asset Transfers rendered the transferor entities insolvent. Thus, the Asset Transfers constitute constructive fraudulent transfers as against the holders of notes issued and outstanding under the DBS Indentures.

71. The Asset Transfers are also transfers made with the intent to hinder, delay, and defraud DBS's creditors, including the holders of the DBS 5.25% Secured Notes and the 2026 DBS Unsecured Notes. DBS, being controlled by its dominating parent company, EchoStar, and EchoStar's dominating shareholder, Charles Ergen, concocted this scheme to avoid paying creditors in full and instead divert value to EchoStar and Ergen.

72. The Asset Transfers bear a number of other badges of fraud that demonstrate the Asset Transfers were effectuated to benefit equity at the expense of creditors. They were made to

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

insiders for no consideration, rendered DBS insolvent, and resulted in new entities obtaining title to property despite the transferring entities retaining control of the property for the transferors' use.  Further, upon information and belief, they were designed to drive down the prices of the bonds issued under the DBS Indentures to avoid having to repay them in full and to capture discount by EchoStar.

73.     S&P's downgrade of DISH Network's credit rating confirms as much.  On January 16, 2024, S&P said what any reasonable observer would say about the situation here: "We believe controlling shareholder Charlie Ergen has placed the interests of equity holders, including himself, above that of creditors."[13]  Plaintiffs agree—Charles Ergen, through his indirect control of DBS and DISH Network, raided the property of DBS (and of DISH Network) for his own benefit at the expense of creditors.

## X.     The Asset Transfers Rendered DISH Network and DBS Insolvent

74.     The Asset Transfers, taken together, rendered DISH Network and its subsidiary, DBS, insolvent.[14]

75.     Even prior to the Asset Transfers, contemporaneous market evidence indicated that DISH Network's and DBS's indebtedness would not likely be repaid in full.  For example, the DISH Network convertible notes were trading significantly under par, including as low as 52 cents on the dollar.  The same is true as it relates to the DBS notes.  Before the Asset Transfers were announced, the DBS Unsecured Notes and DBS Secured Notes were trading as low as 50 cents and 78 cents on the dollar, respectively.

---

[13]   Chris Mooney & Allyn Arden, *Dish Network and Dish DBS Downgraded To 'CC' On Announced Distressed Exchange, Outlook Negative; Debt Ratings Lowered*, S&P Global Ratings (Jan. 16, 2024), https://disclosure.spglobal.com/ratings/es/regulatory/article/-/view/type/HTML/id/3112495.

[14]   Indeed, today, DBS is insolvent on a book value basis.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

76.     These prices suggest the market's belief that such notes would not be repaid in full, and thus, both DISH Network and DBS were insolvent before the Asset Transfers.   Despite this apparent insolvency, DBS disclosed that it lent over $400 million dollars on an intercompany basis to DISH Network in the fourth quarter of 2023, even though DBS did not have the ability to repay its existing external creditors.

77.     DBS's and DISH Network's insolvency following the Asset Transfers is even more pronounced.   DBS and DISH Network simply cannot transfer away billions in valuable assets and create $4.7 billion of additional debt—for no consideration—and remain solvent.

78.     Before the Asset Transfers, EchoStar had little to no equity value.  After the Asset Transfers, EchoStar suddenly held billions of dollars of assets unencumbered by any obligations, except for this lawsuit.  The Asset Transfers are simply gifts to equity holders, including Ergen.

79.     The debt markets did not react favorably to the Asset Transfers, as reflected in the market trading prices of DISH Network's and DBS's debts.   For example, the DBS Unsecured Notes dropped in value, with certain tranches declining by over 30%, trading as low as 36 cents compared to par.

80.     Further, immediately after the Asset Transfers were announced, S&P downgraded DBS's secured and unsecured debt, lowering the latter to "CCC+" from "B-".  The downgrade was due to the lower recovery prospects after the transfers.   Indeed, S&P's dilution of DBS's "secured recovery prospects stem from its stripping away and shifting of certain collateral into a newly formed unrestricted subsidiary [which] holds 3 million Dish TV subscribers [and] represents about 45% of the company's existing satellite subscriber base."[15]  S&P recognized that those

---

[15]     Chris Mooney & Kenny Tang, *DISH DBS Corp. Debt Ratings Lowered on Asset Transfers*, S&P GLOBAL RATINGS (Jan. 12, 2024), https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/sourceId/12967372.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

"assets will no longer serve as collateral for [the DBS Secured Notes], nor will [DBS Issuer's] assets guarantee the company's existing notes.  Therefore, we estimate the remaining collateral would result in roughly 70% recovery for the secured lenders, which compares with 95% prior to the transfer."[16]

81.    Similarly, S&P changed the recovery rating of the DBS Unsecured Notes to a "4," indicating a recovery level at 30-50% of par values.  S&P reduced the recovery rating due to DBS's "stripping away and shifting of certain collateral into a newly formed unrestricted subsidiary."[17]

82.    One business day later, S&P lowered their ratings again following the announcement of the EchoStar Exchange Offer.  S&P lowered all affected issue-level debt ratings to "CC."[18]  A "CC" rating indicates that the debt or debtor is currently "**highly vulnerable to nonpayment** . . . when a default has not yet occurred, but **S&P Global Ratings expects default to be a virtual certainty**, regardless of the anticipated time to default."[19]

83.    Importantly, these downgrades occurred *before* the DBS Exchange Offer was announced; S&P indicated if an exchange like the DBS Exchange Offer were to occur, "recovery coverage for both secured and unsecured DBS noteholders could be significantly diluted."[20]  S&P further stated that it would "lower the [issuer credit rating] on Dish Network Corp and Dish DBS Corp to SD and the issue-level rating on the affected issues to 'D' if the exchange is completed as

---

[16]    *Id.*

[17]    *Id.*

[18]    Chris Mooney & Allyn Arden, *Dish Network and Dish DBS Downgraded To 'CC' On Announced Distressed Exchange, Outlook Negative; Debt Ratings Lowered*, S&P GLOBAL RATINGS (Jan. 16, 2024) https://disclosure.spglobal.com/ratings/es/regulatory/article/-/view/type/HTML/id/3112495.

[19]    S&P Global Ratings Definitions, S&P GLOBAL RATINGS (June 9, 2023) https://www.spglobal.com/ratings/en/research/articles/190705-s-p-global-ratings-definitions-504352#:~:text=An%20obligation%20rated%20'CC'%20is,the%20anticipated%20time%20to%20default (emphasis added).

[20]    *Id.*

25

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

proposed."[21]  A "D" rating indicates that an obligation is "**in default or in breach of an imputed promise**."[22]  Thus, had the Exchange Offers closed as contemplated, DBS would have been in default of its obligations according to S&P.

84.  After EchoStar terminated the exchanges, on March 13, 2024, S&P downgraded EchoStar's issuer creditor rating from "CCC+" to "CCC-" to "reflect the potential for a comprehensive debt restructuring."[23]  Consistent with the downgrade, S&P also lowered all issuer-level ratings two-notches across EchoStar's capital structure, including by lowering the rating of DBS's 5.875% senior unsecured notes due 2024 from "CCC+" to "CCC-."  S&P noted that EchoStar suffers from a "weak liquidity position" and that it "will need to raise at least $2 billion in external capital to repay its November 2024 maturity."[24]  It further observed that the Asset Transfer "significantly hurt recovery prospects for existing lenders," "the company's debt obligations are unsustainable," and "another subpar debt exchange offer is possible in the coming months."[25]  Ultimately, S&P concluded that "[t]he negative outlook on EchoStar's subsidiaries reflects that we view a restructuring as likely in the coming months."[26]

85.  Thus, upon information and belief, DBS is unable to pay its debts in full, has liabilities in excess of its assets, and has been rendered insolvent through the actions of its

---

[21]  Chris Mooney & Allyn Arden, *Dish Network and Dish DBS Downgraded To 'CC' On Announced Distressed Exchange, Outlook Negative; Debt Ratings Lowered*, S&P GLOBAL RATINGS (Jan. 16, 2024) https://disclosure.spglobal.com/ratings/es/regulatory/article/-/view/type/HTML/id/3112495.

[22]  S&P Global Ratings Definitions, S&P Global Ratings (June 9, 2023) https://www.spglobal.com/ratings/en/research/articles/190705-s-p-global-ratings-definitions-504352#:~:text=An%20obligation%20rated%20'CC'%20is,the%20anticipated%20time%20to%20default (emphasis added).

[23]  *See* Chris Mooney & Kenny Tang, *EchoStar Corp. Downgraded To 'CCC-' From 'CCC+'; Outlook Negative; Various Rating Actions Taken on Subsidiaries*, S&P GLOBAL RATINGS (Mar. 13, 2024) https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/3138093.

[24]  *Id.*

[25]  *Id.*

[26]  *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

controlling parent, EchoStar.  DBS, as a major creditor of DISH Network, is further prejudiced by the harm to DISH Network resulting from the Asset Transfers.

## XI.    The Asset Transfers Caused DBS to Breach the DBS Indentures

86.    The Trustees further assert that the Asset Transfers made by DBS also caused DBS to breach each of the DBS Indentures.

87.    First, the DBS Indentures include largely congruent provisions that prohibit DBS from transferring any assets to entities that are not bound to repay the DBS Secured and Unsecured Notes respectively, with certain contractual exceptions that apply only if "no Default or Event of Default . . . would occur as a consequence thereof."  One exception to this prohibition, colloquially referred to as the "builder basket" exception, allows transfers of limited amounts that grow over time as DBS generates value.  Those amounts are determined by a formula contained in the DBS Indentures.

88.    The DBS Indentures each require the use of the "builder basket" for certain restricted payments ("Restricted Payments") including the Asset Transfers made by DBS.  Under section 4.07(e)(ii), to use the builder baskets, among other requirements, the Indebtedness to Cash Flow Ratio of DBS could not exceed 8 to 1 after "giving effect" to such Restricted Payments.  The Indebtedness to Cash Flow Ratio of "the Company" is defined to exclude the transferred assets from the Asset Transfers:

"Indebtedness to Cash Flow Ratio" means, with respect to any Person, the ratio of: (a) the Indebtedness of such Person and its Subsidiaries (or if such Person is the Company, of the Company and its Restricted Subsidiaries) as of the end of the most recently ended fiscal quarter, plus the amount of any Indebtedness incurred subsequent to the end of such fiscal quarter; to (b) **such Person's Consolidated Cash Flow** for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur (the "Measurement Period"); provided, however, that **if such Person or any of its Subsidiaries** (or, if such Person is the Company, any of its Restricted Subsidiaries) **consummates an** acquisition, merger or other business combination or an Asset Sale or **other**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

disposition of assets subsequent to the commencement of the Measurement Period for which the calculation of the Indebtedness to Cash Flow Ratio is made, then the Indebtedness to Cash Flow Ratio shall be calculated giving pro forma effect to such transaction(s) as if the same had occurred at the beginning of the applicable period.

89.     Consolidated Cash Flow is defined to mean:

"with respect to any Person for any period, the **Consolidated Net Income** of such Person for such period, **plus**, to the extent deducted in computing Consolidated Net Income: (a) provision for **taxes based on income or profits**; (b) **Consolidated Interest Expense**; (c) **depreciation and amortization** (including amortization of goodwill and other intangibles) of such Person for such period; and (d) any extraordinary loss and any net loss realized in connection with any Asset Sale, in each case, on a consolidated basis determined in accordance with GAAP; provided that **Consolidated Cash Flow shall not include interest income derived from the net proceeds of the Offering**."

90.     The Consolidated Cash Flow of the Company is thus primarily based on its Consolidated Net Income, which is defined as follows: "[W]ith respect to any Person for any period, the aggregate of the Net Income of such Person and its Subsidiaries, **or, if such Person is the Company, of the Company and its Restricted Subsidiaries** for such period, on a consolidated basis, determined in accordance with GAAP . . . ."

91.     Thus, the calculation of DBS's Consolidated Net Income must exclude (i) any income associated with assets held by unrestricted subsidiaries or assets transferred away through the Asset Transfers or (ii) for each DBS Indenture, interest income from the net proceeds of the sale of the notes governed by that DBS Indenture.

92.     The DBS UnSub Transactions required the use of the "builder basket" for Restricted Payments under section 4.07 of the DBS Indentures.

93.     DBS has represented to the Trustees that it satisfied the 8 to 1 Indebtedness to Cash Flow Ratio under section 4.07 of the DBS Indentures.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

94.    On information and belief, after giving effect to the DBS UnSub Transactions, DBS did not satisfy the 8 to 1 Indebtedness to Cash Flow Ratio, and DBS therefore has breached section 4.07.[27]  On information and belief, DBS's representation was thus untrue.

95.    Section 6.01(d) of the DBS Indentures provides that a default under section 4.07 of the indentures that remains uncured for 30 days constitutes an Event of Default.

96.    Second, section 5.01 of the DBS Indentures contains the following prohibition (subject to certain exceptions): "[DBS] shall not consolidate or merge with or into (whether or not [DBS] is the surviving entity), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, another Person[.]"[28]

97.    This covenant looks only to DBS's assets (and not those of its subsidiaries) when evaluating particular transfers.  Upon information and belief, DBS's only assets are (a) its equity interests in several fully encumbered subsidiaries and (b) the InterCo Loan.

98.    Those equity interests are behind over $11.75 billion of debt guaranteed by those entities, which is trading at a significant discount.  As such, on information and belief, DBS's equity interests have little economic value, leaving the InterCo Loan as the only significant asset of DBS.  DBS, however, transferred away approximately $4.7 billion (or 63%) of its interests in the InterCo Loan via the InterCo Loan Transactions.  Furthermore, from the perspective of a holder of DBS Unsecured Notes, since the InterCo Loan was the asset that was set aside to back the DBS

---

[27]    The Trustees assert that section 4.07 of the DBS Indentures has been breached by DBS as directed by the holders of a majority of the outstanding principal amount of the Notes outstanding under each of the DBS Indentures. The Trustee's allegations of Events of Default, which are disputed by the DBS, remain subject to judicial determination by the Court herein, and the Trustees reserve the right to rely upon the ultimate determination of the Court with respect to the administration of its duties under the DBS Indentures.

[28]    DISH DBS Corp., Current Report (Form 8-K) Exhibit 4.1 – 5.125% Senior Notes Due 2029 Indenture at 68 (May 24, 2021).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Unsecured Notes (and keep their ratings from being further downgraded) at the time of the incurrence of the DBS Secured Notes in November 2021, the InterCo Loan was the "crown jewel" asset of DBS.

99.    Thus, DBS's transfer of its interest in the InterCo Loan constitutes a transfer of all or substantially all of DBS's assets to "other Persons," in violation of the DBS Indentures.

100.    Section 6.01(e) of the DBS Indentures provides that a failure by DBS "for 60 days after notice from the Trustee . . . to comply" with any of its agreements not separately specified in section 6.01 constitutes an Event of Default. "Default" is defined in the DBS Indentures as "any event that is, or with the passage of time or the giving of notes or both would be, an Event of Default."[29] Accordingly, a breach of section 5.01 of the DBS Indentures would, subject to a determination by the Court, constitute a Default.

## JURISDICTION AND VENUE

101.    This Court has jurisdiction over Defendants pursuant to NY CPLR § 301 because Defendants, through subsidiaries, continually transacted substantial business in the state of New York. EchoStar, through its subsidiaries, including Defendants, provides Internet and other satellite-based services throughout New York. Similarly, DBS and its subsidiaries offer their services throughout New York and maintain physical locations and have numerous employees in New York.

102.    This Court also has jurisdiction over Defendants pursuant to NY CPLR § 302(a)(1) because Defendants transacted business within the state of New York and Plaintiffs' claims are substantially related to Defendants' transaction of business in New York. All relevant notes were issued in New York and are governed by New York law.

---

[29]    *Id.* at 6.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

103.    The DBS Unsecured Notes were issued in the form of global notes that were deposited with the Depository Trust Company, a New York company that operates out of New York City.

104.    Venue is proper in this Court pursuant to CPLR § 503(a) and (c).  Furthermore, a substantial part of the events giving rise to Plaintiffs' claims, including the issuance of the relevant notes, occurred in New York, New York.

### FIRST CLAIM FOR RELIEF
### Declaratory Judgment Under NY CPLR § 3001
### (Against DBS)

105.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

106.    Plaintiffs and Defendant DBS are parties to the DBS Indentures.

107.    The DBS Indentures are valid and enforceable agreements governed by New York law.

108.    The Plaintiffs have performed all obligations under the DBS Indentures.

109.    DBS breached the plain language of the DBS Indentures, frustrating the intent of the parties at the time of contracting.

110.    Based on calculations provided to the Trustees by the holders who are directing the Trustees to bring this action, the DBS UnSub Transactions violated the Restricted Payments covenants contained in the DBS Indentures.

111.    Under the DBS Indentures, DBS is prohibited from transferring any assets to entities that are not bound to repay the DBS notes, subject to certain contractual exceptions, including the "builder basket" exception that permits transfers of limited amounts determined pursuant to an equation in the DBS Indentures.

31

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

112.    The DBS UnSub Transactions required the use of the "builder basket" for Restricted Payments under section 4.07 of the DBS Indentures.

113.    Section 4.07 of the DBS Indentures provides that, to use the "builder basket," among other things, the Indebtedness to Cash Flow Ratio of DBS could not exceed 8 to 1 after giving effect to such Restricted Payments.    Indebtedness to Cash Flow Ratio compares Indebtedness to Consolidated Cash Flow and is defined to exclude unrestricted subsidiaries and to give pro forma effect to any transfers that occurred in connection with the relevant Restricted Payment or after the end of the relevant measurement period.

114.    The Consolidated Cash Flow of DBS is based on its Consolidated Net Income, which is defined as "with respect to any Person for any period, the aggregate of the Net Income of such Person and its Subsidiaries, or, if such Person is the Company, of the Company and its Restricted Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP. . . ."

115.    Thus, the calculation of DBS's Consolidated Net Income must exclude income associated with assets held by unrestricted subsidiaries.

116.    The DBS UnSub Transactions caused each of DBS Issuer and the Sling TV Subsidiaries to become unrestricted subsidiaries.

117.    Based on calculations provided to the Trustees by the holders who are directing the Trustees to bring this action, the businesses held by DBS Issuer and the Sling TV Subsidiaries represented more than half of DBS's Consolidated Net Income and Consolidated Cash Flow.  After giving effect to the DBS UnSub Transactions, DBS's Indebtedness was more than eight times its Consolidated Cash Flow.

32

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

118.    Therefore, on information and belief, after giving effect to the DBS UnSub Transactions, the 8 to 1 Indebtedness to Cash Flow Ratio is not met and, therefore, such transactions constitute a breach of the DBS Indentures.

119.    Further, DBS may only use the "builder basket" if "no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof." Because the DBS UnSub Transactions violated other provisions of the indentures, including section 5.01 of each, DBS could not use the "builder basket." DBS breached section 4.07 of the DBS Indentures for this reason as well.

120.    Additionally, DBS breached section 5.01 of the DBS Indentures, which provides that, subject to certain non-applicable exceptions, "[DBS] shall not consolidate or merge with or into (whether or not [DBS] is the surviving entity), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, another Person[.]"

121.    The InterCo Loan Transaction and related transfers made by DBS constitutes a transfer of all or substantially all the assets of DBS, in one or more related transactions, to other Persons, in violation of section 5.01 of the DBS Indentures.

122.    DBS only has two types of meaningful assets: the equity interests in its subsidiaries and the $4.7 billion InterCo Loan owed to DBS by DISH Network. Because of the billions of dollars of distressed debts owed by those subsidiaries, the equity interests in such subsidiaries are worth a de minimis amount compared to the $4.7 billion InterCo Loan. By transferring over 63% of that receivable to "another Person"—EchoStar Receivable—DBS violated section 5.01 of the DBS Indentures.

33

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

123.    The foregoing breaches of the DBS Indentures have caused damages to Plaintiffs in an amount to be determined at trial.

124.    Based on the representations made to them by the holders who are directing the prosecution of this action, Plaintiffs are entitled to a declaratory judgment under NY CPLR § 3001 declaring that DBS breached the DBS Indentures.

<u>**SECOND CLAIM FOR RELIEF**</u>
**Actual Intent Fraudulent Transfer Under CUFTA § 105(1)(a)**
**(Against DBS, EchoStar Receivable, and DBS InterCo Sub)**

125.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

126.    The InterCo Loan Transaction constitutes an actual intent fraudulent transfer under CUFTA section 38-8-105(1)(a) and is voidable as to Plaintiffs.

127.    Prior to, at the time of, and following the InterCo Loan Transaction, Plaintiffs were creditors of Defendant DBS, with claims arising under the DBS Indentures.

128.    The InterCo Loan Transaction is a "transfer" under CUFTA section 38-8-102(13).

129.    Through the InterCo Loan Transaction, DBS transferred its right to payment on the $4.7 billion Assigned InterCo Loan to DBS InterCo Sub, which then assigned its rights thereunder to EchoStar Receivable, a newly formed, wholly owned subsidiary of EchoStar—DBS's ultimate parent company—for no consideration.

130.    DBS effectuated the InterCo Loan Transaction with actual intent to hinder, delay, or defraud creditors, as evidenced by multiple badges of fraud, including the following:

•    The transfers were made to an insider;

•    The transfers were made for no consideration and provide no value to DBS or its creditors;

•    DBS was insolvent at the time of and following the transfers;

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

- The transfers involved a transfer of substantially all of DBS's assets.

131. The InterCo Loan Transaction passed through DBS InterCo Sub and was ultimately transferred to EchoStar Receivable and for the benefit of EchoStar.

### THIRD CLAIM FOR RELIEF
**Constructive Fraudulent Transfer Under CUFTA §§ 105(1)(b) and 106(1)**
**(Against DBS, EchoStar Receivable, and DBS InterCo Sub)**

132. Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

133. The InterCo Loan Transaction constitutes a constructive fraudulent transfer under CUFTA section 38-8-105(1)(b) and section 38-8-106(1) and is voidable as to Plaintiffs.

134. Prior to, at the time of, and following the InterCo Loan Transaction, Plaintiffs were creditors of Defendant DBS, with claims arising under the DBS Indentures.

135. The InterCo Loan Transaction constitutes a "transfer" under CUFTA section 38-8-102(13).

136. DBS did not receive any value, let alone reasonably equivalent value, from the InterCo Loan Transaction.

137. On information and belief, (a) DBS was insolvent, (b) DBS was engaged or was about to engage in a business or a transaction for which DBS's remaining assets were unreasonably small in relation to the business or transaction, and (c) DBS intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

138. Further, DBS's assets are worth less than its liabilities following the Asset Transfers, as indicated by the trading prices of DBS's debts and rating agency guidance.

139. DBS was in a precarious financial condition prior to the InterCo Loan Transaction, as evidenced by the fact that its funded debt was trading well below par. DBS's financial condition

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

worsened because of the InterCo Loan Transaction.  Immediately after such transaction, S&P downgraded DBS's creditworthiness and reduced the recovery rating of the DBS Unsecured Notes, including the 2026 DBS Unsecured Notes.

140.    The InterCo Loan Transaction passed through DBS InterCo Sub and was ultimately transferred to EchoStar Receivable the benefit of EchoStar.

**FOURTH CLAIM FOR RELIEF**
**Actual Intent Fraudulent Transfer Under CUFTA § 105(1)(a)**
**(Against DBS, Network LLC, and DBS Issuer)**

141.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

142.    The DBS Subscriber Designation constitutes an actual intent fraudulent transfer under CUFTA section 38-8-105(1)(a) and is voidable as to Plaintiffs.

143.    Prior to, at the time of, and following the DBS Subscriber Designation, Plaintiffs were creditors of Defendants DBS and Network LLC, with claims arising under the DBS Indentures.

144.    Through the DBS Subscriber Designation, DBS and/or Network LLC transferred three million DISH TV subscribers—some of its most valuable assets—to DBS Issuer for no consideration.  DBS Issuer did not transfer any property in return.

145.    The DBS Subscriber Designation constitutes a "transfer" under CUFTA section 38-8-102(13).

146.    DBS and/or Network LLC effectuated the DBS Subscriber Designation with actual intent to hinder, delay, or defraud creditors, as evidenced by multiple badges of fraud, including the following:

- The transfers were made to an insider;

- The transfers were made for no value to DBS and/or Network LLC or its creditors;

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

- DBS and/or Network LLC was insolvent at the time of and following the transfers;

- The transfers were made in connection with a transfer of substantially all of DBS's and/or Network LLC's assets.

## FIFTH CLAIM FOR RELIEF
### Constructive Fraudulent Transfer Under CUFTA §§ 105(1)(b) and 106(1)
### (Against DBS, Network LLC, and DBS Issuer)

147. Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

148. The DBS Subscriber Designation constitutes a constructive fraudulent transfer under CUFTA section 38-8-105(1)(b) and section 38-8-106(1) and is voidable as to Plaintiffs.

149. Prior to, at the time of, and following the DBS Subscriber Designation, Plaintiffs were creditors of Defendants DBS and Network LLC, with claims arising under the DBS Indentures.

150. The DBS Subscriber Designation constitutes a "transfer" under CUFTA section 38-8-102(13).

151. DBS and/or Network LLC did not receive reasonably equivalent value from the DBS Subscriber Designation due to both the loss of revenue and the lost value to DBS of the disaggregation of its subscriber base.

152. On information and belief, (a) DBS and/or Network LLC was insolvent, (b) DBS and/or Network LLC was engaged or was about to engage in a business or a transaction for which DBS's and/or Network LLC's remaining assets were unreasonably small in relation to the business or transaction, and (c) DBS and/or Network LLC intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

37

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

153.    Further, DBS's and/or Network LLC's assets are worth less than its liabilities following the Asset Transfers, as indicated by the trading prices of DBS's debts and rating agency guidance.

154.    DBS and/or Network LLC was in a precarious financial condition prior to the DBS Subscriber Designation and other Asset Transfers, as evidenced by the fact that its funded debt was trading well below par.  DBS's and/or Network LLC's financial condition worsened because of the DBS Subscriber Designation and other Asset Transfers.  Immediately after such transactions, S&P downgraded DBS's creditworthiness and reduced the recovery rating of the DBS Unsecured Notes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court enter a judgment:

155.    Declaring that DBS has breached section 4.07 of the DBS Indentures and that, because more than 30 days have passed without that breach being cured, such breach constitutes an Event of Default under the DBS Indentures;

156.    Declaring that DBS's breach of section 5.01 of the DBS Indentures and that such breach constitutes a Default under those indentures for which the Trustee should provide notice to DBS;

157.    Avoiding and unwinding the InterCo Loan Transaction as an actual and/or constructive fraudulent transfer and recovering amounts transferred;

158.    Avoiding and unwinding the DBS Subscriber Designation as an actual and/or constructive fraudulent transfer and recovering amounts transferred;

159.    Enjoining any additional fraudulent transfers or contemplated fraudulent transfers by Defendants in connection with the above scheme;

38

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)          INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2          Case 1:24-cv-03646   Document 3-2   Filed 05/13/24   Page 40 of 41          RECEIVED NYSCEF: 04/26/2024

160.   Awarding Plaintiffs damages;

161.   Awarding a money judgment against Defendants who received the fraudulently

transferred property in the event that unwinding the transfers does not fully compensate Plaintiffs;

162.   Awarding Plaintiffs pre- and post-judgment interest;

163.   Awarding Plaintiffs attorney's fees; and

164.   Granting such other relief as this Court deems just and proper.

*[Remainder of page intentionally left blank]*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Dated: April 26, 2024
New York, New York

Respectfully submitted,

By:   /s/ Andrew M. Leblanc
Dennis F. Dunne
Lawrence G. Wee
Nelly Almeida
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone:  (212) 530-5770
Facsimile:  (212) 822-5770

- and -

Andrew M. Leblanc
S. Robert Marsters, Jr.
**MILBANK LLP**
1850 K Street NW,
Suite 1100
Washington, D.C. 20006
Telephone:  (202) 835-7574
Facsimile:   (202) 263-7574

- and –

Samir L. Vora (*pro hac vice forthcoming*)
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, CA 90067
Telephone:  (424) 386-4316
Facsimile:  (213) 629-5063

*Attorneys for Plaintiffs*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.