**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, solely in its capacities as Trustees, | ) ) ) ) |
| *Plaintiffs*, | ) No. 1:24-cv-3646 (JGLC) ) |
| v. | ) ) |
| DISH DBS CORPORATION, DISH NETWORK L.L.C., ECHOSTAR INTERCOMPANY RECEIVABLE COMPANY, L.L.C., DISH DBS ISSUER, LLC, and DBS INTERCOMPANY RECEIVABLE COMPANY L.L.C., | ) **ORAL ARGUMENT** ) **REQUESTED** ) ) ) |
| *Defendants*. | ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' MOTION TO DISMISS</u>**

WHITE & CASE LLP
Glenn M. Kurtz
Joshua D. Weedman
Dorian K. Panchyson
1221 Avenue of the Americas
New York, N.Y. 10020-1095
T: (212) 819-8200

*Attorneys for Defendants*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ................................................................................................4

    A.    The Parties ................................................................................4

    B.    The DBS Notes And Indentures ................................................5

        1.    Section 4.07—Restricted Payments And The "Builder Basket" ...........5

        2.    Section 5.01—Successor Obligor Provision And "All Or Substantially All" ................................................................6

    C.    DBS Seeks To Improve Its Capital Structure ................................7

    D.    The Proposed Exchange Offers ................................................8

    E.    DBS Completes Certain Intercompany Loans ................................9

    F.    DBS's April 2024 Officers' Certificate ......................................9

LEGAL STANDARD ........................................................................................10

ARGUMENT ................................................................................................11

I.    THE COMPLAINT FAILS TO STATE A CLAIM FOR BREACH ..........................11

    A.    Plaintiffs Fail To Plead Breach Of Section 4.07 ............................11

        1.    Plaintiffs Fail To Plead That The Transactions Breached Section 4.07 ...12

        2.    Plaintiffs Fail To Plead That The Advances Breached Section 4.07 ....14

    B.    Plaintiffs Fail To Plead Breach Of Section 5.01 ............................15

        1.    Successor Obligor Clauses Do Not Apply To Corporate Reorganizations ................................................................15

        2.    Plaintiffs Fail To Plead The Intercompany Loan Transaction Breached § 5.01 ................................................................17

            a.    Plaintiffs Fails To Plead Breach Under A Quantitative Analysis ...18

            b.    Plaintiffs Fails To Plead Breach Under A Qualitative Analysis ....18

II.    PLAINTIFFS FAIL TO PLEAD ANY FRAUDULENT TRANSFER ......................20

    A.    Plaintiffs Fail To Adequately Plead An Actual Fraudulent Transfer ..............20

        1.    Plaintiffs Fail To Plead Actual Intent With Particularity .....................20

        2.    Plaintiffs Fail To Plead The "Badges of Fraud" ................................22

            a.    Badge 1—Insolvency ................................................23

            b.    Badge 2—All Or Substantially All ................................25

            c.    Badge 3—Reasonably Equivalent Value ........................25

            d.    Badge 4—Transfers To "Insiders" ................................26

    B.    Plaintiffs Fail To Plead Constructive Fraudulent Transfer ..............................27

        1.    Plaintiffs Do No Plead Unreasonably Small Assets Or Inability To Pay Debts ................................................................27

            a.    "Unreasonably Small Assets" ......................................27

b.   "Debts Beyond The Ability To Pay".................................................28

2.    Plaintiffs Do Not Plead Lack Of Reasonably Equivalent Value ..........29

CONCLUSION.............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A&R Real Estate, Inc. v. Dorian N.Y. LLC*, 2023 U.S. Dist. Lexis 171688 (S.D.N.Y. Sept. 26, 2023) ....................................................................................................................13

*ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008)..........................................19

*Bank of N.Y. v. Tyco Int'l Group, S.A.*, 545 F. Supp. 2d 312 (S.D.N.Y. 2008)...........15, 16, 17, 21

*CB Richard Ellis, Inc. v. CLGP, LLC*, 251 P.3d 523 (Colo. App. 2010) ............................. passim

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ....................................................2, 4

*Chesapeake Bank & Tr. Co. v. Feaga*, No. 09-cv-114, 2012 D. Colo. Lexis 2556 (D. Colo. Aug. 28, 2012) ...................................................................................................................26

*Ciccarelli v. Guar. Bank*, 99 P.3d 85 (Colo. App. 2004)........................................................26, 27

*Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018) ....................................................11

*Gen. Trading v. Yale Materials Handling Corp.*, 119 F.3d 1485 (11th Cir. 1997) ......................23

*Gimbel v. Signal Co., Inc.*, 316 A.2d 599 (Del. Ch. 1974) ...........................................................16

*HFTP Invs. v. Grupo TMM, S.A.*, 2004 N.Y. Misc. Lexis 3248, at *10 (Sup. Ct. N.Y. Cnty. June 4, 2004) ....................................................................................................................18

*HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, 20-cv-00967, 2021 WL 918556 (S.D.N.Y. Mar. 10, 2021) ...................................................................................................................11

*In re Actrade Fin. Techs., Ltd.*, 337 B.R. 791 (Bankr. S.D.N.Y. 2005) .......................................22

*In re Adelphia Communs. Corp.*, No. 02-41729, 2015 U.S. Dist. Lexis 33229 (S.D.N.Y. Mar. 17, 2015) ...................................................................................................................19

*In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d 824 (Del. Ch. Feb. 27, 2012)....................17, 18

3

*In re Blair*, 594 B.R. 712 (Bankr. D. Colo. 2018) ........................................................20, 22, 27, 29

*In re Sender*, 423 F. Supp. 2d 1155 (D. Colo. 2006) ....................................................................21

*In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005) .............................................................20, 25

*In re Tronox Inc.*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013)..............................................................19

*Johnson v. Brettmann*, 2020-cv-33373, 2020 D. Colo. Lexis 4740 (D. Colo. Dec. 22, 2020)
............................................................................................................................................28, 30

*Kirch v. Liberty Media Corp.*, 449 F.3d 388 (2d Cir. 2006).........................................................10

*L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419 (2d Cir. 2011) ...........................................4, 10

*Lev. Leading Co. v. Smith*, 143 P.3d 1164 (Col. App. 2006)........................................................29

*Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357 (S.D.N.Y. Mar. 2003)..............................................26

*Mellon Bank v. Metro Comm'n, Inc.*, 945 F.2d 635 (3d Cir. 1991)...............................................26

*Multibank, Inc. v. Access Global Cap. LLC*, 17-civ-3467, 2017 U.S. Dist. Lexis 199947
(S.D.N.Y. Dec. 4, 2017).........................................................................................................26

*NRW, Inc. v. Bindra*, 12-cv-8555, 2014 WL 4449779 (S.D.N.Y. Sept. 10, 2014).......................11

*Pernick v. Computershare Tr. Co.*, 136 F. Supp. 3d 1247 (D. Colo. 2015) ............................23, 30

*Rein v. Esper*, No. 16-cv-7359, 2018 WL 10561521 (S.D.N.Y. Feb. 27, 2018) ............................4

*Resnick v. Karmax Camp Corp.*, 149 A.D.2d 709 (2d Dept. 1989) ..............................................16

*Roseton OL, LLC v. Dynegy Holdings, Inc.*, 2011 Del. Ch. Lexis 113, at *52 (Del. Ch. July 29,
2011) ...........................................................................................................................18, 22, 29

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)............................................................................7

*Sands v. New Age Fam. P'ship, Ltd.*, 897 P.2d 917 (Colo. App. 1995) ........................................22

*Schempp v. Lucre Mgmt. Grp., LLC*, 75 P.3d 1157 (Colo. App. 2003)....................................20, 22

*Sedoy v. JW Ventures, LLC*, 15-cv-02168, 2016 WL 8309768 (D. Colo. Dec. 23, 2016) ............23

*Seren Fashion Art and Interiors, LLC v. B.S.D. Capital, Inc.*, 23-cv-2349, 2023 WL 7529768
    (S.D.N.Y. Nov. 13, 2023) (Clarke, J.) .....................................................................................10

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982) ...................18

*Smith v. N.Y. Pres. Hosp.*, 06-cv-4056, 2007 WL 2142312 (S.D.N.Y. July 18, 2007) ................21

*Story v. Kennecott Copper Corp.*, 90 Misc.2d 333 (Sup. Ct. N.Y. Cnty. 1977)...........................18

*Waite v. Schoenbach*, 10-cv-3439, 2010 U.S. Dist. Lexis 115470 (S.D.N.Y. Oct. 29, 2010)
    .............................................................................................................................................23, 30

*Weinman v. Corwley*, 588 B.R. 605 (Bankr. D. Colo. 2018)........................................................24

*Weinman v. McCloskey*, 14-cv-00296, 2015 U.S. Dist. Lexis 43018 (D. Colo. Mar. 31, 2015)
    .......................................................................................................................................................21

*Whitebox Relative Value Partners, LP v. Transocean Ltd.*, 20-cv-07143, 2020 U.S. Dist. Lexis
    237497 (S.D.N.Y. Dec. 16, 2020)........................................................................17, 18, 19, 22

*WW Servs., Ltd. v. Bombardier Aerospace Corp.*, 14-cv-7343, 2015 WL 5671724 (S.D.N.Y.
    Sept. 22, 2015) .......................................................................................................................10

## STATUTES AND RULES

Colorado's Uniform Fraudulent Transfer Act ........................................................................3, 20

Uniform Fraudulent Transfer Act .........................................................................................20, 29

Defendants DISH DBS Corporation ("DBS"), DISH Network L.L.C. ("Network LLC"), EchoStar Intercompany Receivable Company, L.L.C. ("SATS Receivable"), DISH DBS Issuer, LLC ("DBS Issuer"), and DBS Intercompany Receivable Company L.L.C. ("DBS Receivable" and, collectively, "Defendants"), hereby submit this Memorandum of Law in support of their motion to dismiss the July 18, 2024 amended complaint (the "Complaint") filed by Plaintiffs U.S. Bank Trust Company (the "Trustees" or "Plaintiffs"), pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

## PRELIMINARY STATEMENT

EchoStar Corporation ("EchoStar"), through its subsidiaries, is a premier global provider of secure satellite communication solutions.  DISH Network Corporation ("DISH"), through its subsidiaries, is a leading provider of television and retail wireless services, operating under the "DISH," "Boost Mobile," and "Sling TV" brands, among others.  DBS, through its subsidiaries, owns and operates DISH's pay-tv business.  On December 31, 2023, EchoStar acquired DISH and its subsidiaries (the "Merger"), including Defendants here.

Shortly after the Merger, the newly-combined companies focused on the process of integrating the EchoStar and DISH businesses in a manner that facilitates synergies, cost savings, growth opportunities, and achieves other anticipated benefits.  In connection with such integration, they announced a series of transactions designed to unlock incremental strategic, financial, and operating flexibility for the combined business, including: (i) a transfer of certain wireless spectrum licenses from non-party DISH to a subsidiary of EchoStar (the "DISH Network Spectrum Transfer"); (ii) an assignment of approximately three million pay-tv subscribers from Defendant DBS to a wholly-owned DBS subsidiary, DBS Issuer (the "Subscriber Assignment"); (iii) an

---

[1] A true and correct copy of the Complaint is attached as **Exhibit A** to the Affirmation of Joshua D. Weedman, dated August 15, 2024, and attached hereto (the "Weedman Aff.").

assignment of a portion of an intercompany loan between DBS and DISH to a non-party subsidiary of EchoStar (the "Intercompany Loan Transaction"); and (iv) the designation of various DBS subsidiaries as unrestricted subsidiaries (the "Sling TV Designation") (together, the "Transactions"). (*See* Am. Compl. ¶¶ 27, 45) DBS also made cash-management transactions in the form of ordinary course intercompany loans of approximately $976 million to its parent-entity, non-party DISH (*id.* ¶¶ 66–67), which are consistent with many years of past practice, settled by its counterparties in the ordinary course of operation, and memorialized in an intercompany loan agreement (together, the "Advances").

The Trustees challenge the Transactions and the Advances, purportedly at the direction of a group of dissident bondholders (the "Bondholders") of DBS.[2] As set forth below, the Trustees' claims are without merit.

*First*, Plaintiffs seek a declaration that two of the Transactions—the Subscriber Assignment and the Sling TV Designation—breached Section 4.07 of the Indentures. That Section prohibits certain transactions unless DBS has sufficient "Restricted Payments" capacity under the Indentures to fund them, and DBS's indebtedness to cash-flow ratio is no more than 8-to-1 after giving effect to such transactions (the "Leverage Ratio"). Plaintiffs' claim is based on pure speculation that the Leverage Ratio exceeded 8-to-1 following the Transactions. Indeed, Plaintiffs initially acknowledged that an Officers' Certificate was delivered to the Trustees showing

---

[2] At most, these Bondholders represent 38% of holders of the outstanding debt of DBS, and likely far less. The Bondholders hold only two of six DBS senior notes with near-identical indentures: (i) $2 billion in 7.75% senior unsecured notes issued by DBS on June 13, 2016, with a maturity date of July 1, 2026 (the "2026 DBS Unsecured Notes"), (Am. Compl. ¶ 29), and (ii) $2.5 billion in 5.75% senior secured notes issued by DBS on November 26, 2021, with a maturity date of December 1, 2028 (the "2028 DBS Secured Notes" and, together with the 2026 DBS Unsecured Notes, the "DBS Bonds"). Both the 2026 DBS Unsecured Notes and the 2028 DBS Secured Notes were issued pursuant the terms of an indenture (the "7.75% Indenture" and "5.75% Indenture," respectively), which are identical in all material respects (together, the "Indentures"). (*Id.* ¶ 31) True and correct copies of the Indentures are attached to the Weedman Affirmation as **Exhibits B** and **C**, respectively. Plaintiffs refer to, and selectively quote from, the Indentures throughout the Complaint, and these documents are therefore incorporated by reference. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

unambiguously that the Leverage Ratio following the Transactions was only 6.56-to-1. Now, in an attempt to survive dismissal, Plaintiffs newly allege that there are purported "inaccuracies" in the Officers' Certificate. Plaintiffs still offer no calculation that the Leverage Ratio exceeds 8-to-1, as required. Plaintiffs' allegations, based upon information and belief, that DBS's calculations are incorrect by some undetermined amount are demonstrably wrong and impose non-existent requirements.

*Second*, Plaintiffs seek a declaration that the Advances also constitute a breach of Section 4.07, but intercompany loans to parent-entities like the Advances are expressly permitted under the terms of the Indentures. The Advances are ordinary-course transactions, common among companies within a corporate family, and remain a DBS asset.

*Third*, Plaintiffs seek a declaration that DBS breached Section 5.01 of the Indentures, a boilerplate successor obligor provision, because the Intercompany Loan Transaction allegedly involved a transfer by DBS of "all or substantially all" of its assets. Under established law, the Intercompany Loan Transaction did not involve anything close to "all or substantially all" of DBS's assets. In fact, the Intercompany Loan Transaction involved an assignment of a $4.7 billion portion (the "Tranche A Portion") of the $7.4 billion Intercompany Loan from DBS to its affiliate, at a time when DBS had assets of approximately $21 billion. Furthermore, the Tranche A Portion contributed no revenue to DBS's business, which generated over $11 billion annually in 2023. Thus, the assignment involved only 22% of DBS's asset base and 0% of its revenue base, which is nowhere close to "all or substantially all" of DBS's assets.

*Fourth*, Plaintiffs argue that the Transactions constitute fraudulent transfers under the Colorado Uniform Fraudulent Transfer Act ("CUFTA"). Plaintiffs have failed to plead their CUFTA claims with particularity, and instead try to insinuate that routine corporate transactions

are fraudulent simply because they are part of some undefined "scheme," which is insufficient under Rule 9(b). The Complaint contains little more than conclusory recitations of the statutory elements of fraudulent transfer claims and conclusory allegations made on "information and belief," neither of which is sufficient under Rule 9 or otherwise. Moreover, the Transactions are not "transfers" under CUFTA because there has been no disposition of any assets to a third party. Internal reorganizations are not fraudulent transfers. None of the assets at issue here, other than a portion of the Intercompany Loan, have been transferred away from the issuer, DBS.

## BACKGROUND[3]

### A.    The Parties

Non-party EchoStar is a Colorado-based satellite broadband platform. (*Id.* ¶ 18) Non-party DISH is a leading provider of television and retail wireless services, and a wholly-owned, direct subsidiary of EchoStar. (*Id.* ¶¶ 20, 42) Defendant DBS is an indirect subsidiary of both DISH and EchoStar and is a holding company of its subsidiaries, which offer cable and streaming television services under the "DISH" and "Sling TV" brands. (*Id.* ¶ 13) The remaining Defendants include: (i) Network LLC, a wholly-owned subsidiary of DBS; (ii) DBS Issuer, a wholly-owned subsidiary of Network LLC; (iii) DBS Receivable, a wholly-owned subsidiary of Network LLC; and (iv) SATS Receivable, a wholly-owned subsidiary of non-party EchoStar. (*Id.* ¶¶ 13–17)

Plaintiff U.S. Bank, as Trustee, is a national banking association and designated trustee under the terms of the Indentures. (*Id.* ¶ 12) The Complaint alleges that the Trustees are acting at the direction of a "majorit[y] of the holders" of the DBS Bonds to bring these claims pursuant to the Indentures. (*Id.*) The Complaint does not disclose the holders of the DBS Bonds or the total

---

[3] The facts below are drawn from the allegations in the Complaint, documents cited therein and integral to it, and those incorporated by reference. *Chambers*, 282 F.3d at 153; *see also L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (courts may consider documents integral to complaint). The facts herein also draw from publicly filed documents, of which the Court may take judicial notice. *Rein v. Esper*, No. 16-cv-7359, 2018 WL 10561521, at *2 (S.D.N.Y. Feb. 27, 2018).

aggregate amounts allegedly held by them.

### B.    The DBS Notes And Indentures

On June 13, 2016, DBS issued the 2026 DBS Unsecured Notes, maturing July 1, 2026.
(*Id.* ¶ 29)  On November 26, 2021, DBS issued the 2028 DBS Secured Notes, maturing December
1, 2028.  (*Id.* ¶ 31)  The Indentures, which are identical in all material respects, are both governed
by New York law.  (*Id.* ¶ 33).  Plaintiffs allege that the Transactions and the Advances caused DBS
to breach Section 4.07 of the Indentures, and that the Intercompany Loan Transaction caused a
breach of Section 5.01.  (*Id.* ¶¶ 103–04, 108–09)

#### 1.    Section 4.07—Restricted Payments And The "Builder Basket"

Section 4.07 limits DBS's ability to make enumerated "Restricted Payments," but includes
exceptions where: (i) DBS is not in default at the time of the transfer or the transfer would cause
an "Event of Default"; (ii) DBS's indebtedness to cash-flow does not exceed the 8-1 Leverage
Ratio; and (iii) the subject "Restricted Payment," together with any prior "Restricted Payments,"
is not more than a calculated capacity, colloquially referred to as a "builder basket."  (Ex. B at 46–
47; Ex. C at 47–49; *see also* Am. Compl. ¶ 105)[4]

The 8-1 Leverage Ratio is measured at the time of the transaction at issue and is calculated
by comparing DBS's "Consolidated Cash Flow" to its indebtedness over the trailing twelve-month
period, after giving effect to the subject transaction.  (*Id.* ¶¶ 95–96)  "Consolidated Cash Flow" is
measured by the subject entity's "Consolidated Net Income," adding back taxes, interest expenses,
depreciation and amortization, among other things, and "Consolidated Net Income" is defined as

---

[4] The "builder basket" capacity accumulates over time based on DBS's cash flows, and it is calculated under Section
4.07(e)(iii).  (Am. Compl. ¶ 94)  The calculation includes accumulations starting January 1, 2002, covering capacity
growth over more than twenty years of consolidated cash flows.  (Exs. B, C at § 4.07(e)(iii)(A)(y))  DBS had over
$28 billion of capacity under its "builder basket" to use for "Restricted Payments" at the time of the Transactions.
(Am. Compl. ¶ 100; *see also* Section I(A), *infra*)

"the aggregate Net Income of such [entity]" over the relevant period, including income generated as a result of day-to-day operations.  (*See* Exs. B, C at 5)

Here, the 2028 DBS Secured Notes were used to "make an intercompany loan to DISH Network in order to finance the potential purchase of wireless spectrum licenses and for general corporate purposes, including the buildout of wireless infrastructure."[5]  Therefore, the interest income that DBS receives on the Intercompany Loan is derived from the proceeds of the operations of DISH, and such interest income must be included in the calculation of Consolidated Cash Flow. (*See* Exs. B, C at 5)[6]

Additionally, Section 4.07 lists certain exempted transactions which DBS can undertake without implicating the Leverage Ratio or requiring the use of the "builder basket" of funds. Among others, this includes "[i]nvestments in the form of intercompany debt with any direct or indirect parent company," *i.e.*, DISH, "provided that such debt is incurred in the ordinary course of business and is used in a business described in Section 4.16."  (Ex. B, § 4.07(8); Ex. C, § 4.07(7)) Section 4.16 sets forth certain permitted business activities, which are broadly defined to include all manner of business lines common to a company in the satellite, pay-tv, and telecommunications sectors.  (*Id.* § 4.16)  The Advances, therefore, are exempt from the restrictions of Section 4.07.

### 2.  Section 5.01—Successor Obligor Provision And "All Or Substantially All"

Pursuant to Section 5.01 of the Indentures, DBS is permitted to effectuate certain transactions that do not result in the transfer, sale, assignment, or disposal of "all or substantially all" of DBS's assets:

---

[5] *See* Press Release, *DISH Network Places Offering of $5,250,000,000 in Senior Secured Notes*, DISH Network Corp. (Nov. 10, 2021) (the "Press Release")  A true and correct copy of the Press Release is attached to the Weedman Affirmation as **Exhibit D**.

[6] Plaintiffs' allegations that the calculation of "Consolidated Cash Flow" cannot include "interest income derived from the net proceeds of the [applicable offering of DBS Bonds]" is correct, but irrelevant.  There is no interest from the net proceeds of the 2028 DBS Secured Notes included in the calculation of "Consolidated Cash Flow."

> The Company shall not ... sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, another Person ....

(Ex. B at 69–70; Ex. C at 71–72; *see also* Am. Compl. ¶ 105)  At the time of the Transactions, DBS's consolidated asset base was approximately $21 billion, a figure publicly disclosed in DBS's SEC filings,[7] including: (i) seven million pay-tv subscribers; (ii) the Intercompany Loan; and (iii) certain spectrum licenses, real estate, satellites, and other assets.  (*See* Ex. E at 31–32, F4–F5)

### C.    DBS Seeks To Improve Its Capital Structure

On August 8, 2023, DBS's current parent companies, non-parties EchoStar and DISH, announced an agreement to merge.  (Am. Compl. ¶ 41)[8]  The Merger closed on December 31, 2023.  (*Id.* ¶ 42)  Shortly after the Merger, EchoStar announced the Transactions, a series of intercompany reorganizations whereby certain assets were assigned or transferred to other subsidiaries within the broader EchoStar structure.  (*Id.* ¶ 45)  The Transactions included:

- ▪ ***The DISH Network Spectrum Transfer***—non-party DISH transferred certain of its wireless spectrum licenses to a subsidiary of EchoStar, non-party SATS Wireless.  (*Id.*)  The DBS Bonds, held by the purported Bondholders here, are not secured by DISH's assets or the subject wireless spectrum licenses, and Plaintiffs bring no claims on account of the DISH Network Spectrum Transfer, despite referring to it throughout the Complaint as an alleged "harm" and "deeply prejudicial."  (*See, e.g.*, *id.* ¶¶ 10, 43, 75, 91)

- ▪ ***The Subscriber Assignment***—DBS assigned approximately 3 million pay-tv subscribers to its wholly-owned subsidiary DBS Issuer, and designated it as an unrestricted subsidiary.  (*Id.* ¶ 45)  The fair market value of the assigned subscribers at the time was approximately $5.4 billion and comprised approximately 46% of DBS's overall subscriber base, (*see id.* ¶¶ 27, 45, 86), or approximately 26% of DBS's total asset base.  The income derived from the 3 million pay-tv subscribers, approximately $4.5 billion

---

[7] *See, e.g.*, DISH DBS Corporation, Form 10-K (Apr. 1, 2024) (the "2023 DBS 10-K") at 31–32, F4–F5.  A true and correct copy of excerpts of the 2023 DBS 10-K is attached to the Weedman Affirmation as **Exhibit E**; *see also Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (court can take judicial notice of documents filed with the SEC).

[8] Initially, the plan entailed DISH acquiring EchoStar, but on October 2, 2023, the companies announced that the proposed structure of the deal would be amended, with EchoStar acquiring DISH and its various affiliates as part of an all-stock deal.  (Am. Compl. ¶ 42)  Plaintiffs insinuate there was something nefarious about the fact that the merger was changed so that EchoStar acquired DISH instead of the other way around, but SEC filings explained very clearly the rationale for the revised merger.  *See* EchoStar Corporation, Form S-4 (Oct. 3, 2023) at 54–55 (the "Form S-4").  A true and correct copy of an excerpt of the Form S-4 is attached to the Weedman Affirmation as **Exhibit F**; *see also Rothman*, 220 F.3d at 88.

annually, continues to flow up to DBS vis-à-vis Network LLC, a wholly-owned subsidiary of DBS.

- ▪ *The Intercompany Loan*—DBS transferred to SATS Receivable the Tranche A Portion of the approximately $7.4 billion Intercompany Loan from DBS to DISH, by way of an assignment from DBS Receivable. (*Id.* ¶ 45) The fair-market value of the Tranche A portion was approximately $4.7 billion, approximately 22% of DBS's total asset base.

- ▪ *The Sling TV Designation*—DBS designated various subsidiaries of its affiliate, Sling TV, L.L.C., as unrestricted. *Id.* As set forth in the Complaint, the Sling TV Designation is only relevant to the alleged breach of Section 4.07 of the Indentures. (*Id.* ¶ 124)

Giving effect to the Transactions, a simplified organizational structure of EchoStar is as follows[9]:



### D.    The Proposed Exchange Offers

On January 12, 2024, EchoStar announced a proposal to exchange certain classes of bonds issued by non-party DISH for new secured bonds issued by EchoStar (the "DISH Exchange Offer") (*id.* ¶ 47), which expired on February 12, 2024, after the minimum amount of tendering holders was not met (*id.* ¶ 56).

On January 16, 2024, EchoStar announced an additional exchange offer, in which DBS Issuer would issue secured bonds in exchange for four series of unsecured notes previously issued

---

[9] Entities in yellow are the Defendants; entities depicted by italicized, bolded font are non-parties to this suit.

by DBS (the "<u>DBS Exchange Offer</u>").  (*Id.* ¶ 58)  The DBS Exchange Offer provided all holders of the applicable DBS bonds the opportunity to participate.  On January 29, 2024, EchoStar elected to terminate the DBS Exchange Offer.  (*Id.* ¶ 62)

### E. DBS Completes Certain Intercompany Loans

Between late-2023 and early-2024, DBS made the Advances, routine intercompany loans of cash between DBS and its indirect parent company, non-party DISH, which together totaled approximately $976 million as of Q1 2024.  (*Id.* ¶¶ 66–67)  The Advances were made to support DISH in its pursuit of its ordinary-course, permitted business activities.  Intercompany loans to affiliates within the broader DISH/EchoStar corporate structure are expressly permitted under Sections 4.07(7) and 4.07(8) of the Indentures and, therefore, do not violate the "Restricted Payment" covenant or require use of the associated "builder basket."  (*See* Section B(1), *supra*)  These Advances were disclosed as a line item on DBS's audited and interim financials, including in various public filings with the SEC.  (Am. Compl. ¶ 67)  Additionally, the Advances were memorialized as intercompany debt between the two entities, as set forth in an intercompany loan agreement, and accrue variable monthly interest, and have a maturity date of August 2028.[10]

### F. DBS's April 2024 Officers' Certificate

Under Section 4.07 of the Indentures, DBS is required to produce an "officers' certificate" within ten days of a request from the trustee, setting forth all "Restricted Payments" made in the preceding six months:

> [T]he Company shall deliver to the Trustee an Officers' Certificate stating that each Restricted Payment made in the six months preceding the date of the request was permitted and setting forth the basis upon which the calculations required by this Section 4.07 were computed, which calculations shall be based upon the

---

[10] As of June 30, 2024, DBS advanced an additional $532 million to DISH as part of an additional cash transfer, which together with the $968 million made pursuant to the Advances, totals approximately $1.5 billion, including accrued interest.  Details of these amounts were disclosed in DBS's recent Form 10-Q filed with the SEC (the "<u>DBS 10-Q</u>").  A true and correct copy of an excerpt of the DBS 10-Q is attached to the Weedman Affirmation as **Exhibit G.**

Company's latest available financial statements.

(Exs. B, C at 51)  The calculations used in an officers' certificate are to be based on DBS's consolidated financial statements (*id.*), all which were prepared in accordance with GAAP.[11]

On March 26, 2024, the Trustees sent DBS three identical notices requesting an officers' certificate (the "Trustees' Notices").  On April 9, 2024, DBS sent the Trustees the certified statement with detailed calculations of DBS's compliance with the 8-to-1 Leverage Ratio requirement and "builder basket" capacity under Section 4.07 (the "Officers' Certificate").[12]  (Ex. G at 6 (showing a 6.56-to-1 Leverage Ratio and remaining "builder basket" capacity of $18.1 billion))  The Officers' Certificate was executed by DBS's CFO and Secretary.  (*Id.* at 3)

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must "allege[] facts sufficient 'to state a claim to relief that is plausible on its face.'"  *Seren Fashion Art and Interiors, LLC v. B.S.D. Capital, Inc.*, 23-cv-2349, 2023 WL 7529768, at *3 (S.D.N.Y. Nov. 13, 2023) (Clarke, J.).  "Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss."  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006).  A court will consider documents incorporated by reference or integral to the complaint.  *WW Servs., Ltd. v. Bombardier Aerospace Corp.*, 14-cv-7343, 2015 WL 5671724, at *8 (S.D.N.Y. Sept. 22, 2015); *L-7 Designs*, 647 F.3d at 422 ("A complaint is also deemed to include any...documents that, although not incorporated by reference, are 'integral' to the complaint.").  Although a court ordinarily "accept[s] as true all factual allegations in the complaint," "that tenet does not extend to 'factual assertions that are contradicted by the complaint itself, by documents upon which the

---

[11] *See, e.g.*, Ex. E at F-2 (DBS's Form 10-K, with an opinion from the Company's auditor, KPMG LLP, stating that the financial statements were audited in accordance with GAAP).

[12] True and correct copies of the Trustees' Notices and the Officers' Certificate are attached to the Weedman Affirmation as **Exhibits H** and **I**, respectively.

pleadings rely, or by facts of which the court may take judicial notice.'" *NRW, Inc. v. Bindra*, 12-cv-8555, 2014 WL 4449779, at *4 (S.D.N.Y. Sept. 10, 2014).

**ARGUMENT**

**I.    THE COMPLAINT FAILS TO STATE A CLAIM FOR BREACH**

Plaintiffs' claims for breaches of Sections 4.07 and 5.01 of the Indentures are patently deficient.

**A.    Plaintiffs Fail To Plead Breach Of Section 4.07**

As discussed above (*see* Section B(1), *supra*), Section 4.07 precludes DBS from making "Restricted Payments" unless DBS can demonstrate that it has maintained compliance with the 8-1 Leverage Ratio.  If DBS complies with that Leverage Ratio, DBS is free to access the "builder basket" to undertake payments or transactions that otherwise would constitute a prohibited "Restricted Payment" under the terms of the Indentures.  (Am. Compl. ¶¶ 94–95)  Additionally, certain transactions are exempted from the scope of "Restricted Payments" altogether, including "intercompany debt" to parents or affiliates, provided these loans are incurred in the ordinary course and are used by the recipient in one of the broadly defined businesses described in Section 4.16.  (Ex. B, § 4.07(8); Ex. C, § 4.07(7))

Here, Plaintiffs offer only a conclusory assertion that, "on information and belief," DBS did not comply with the 8-1 Leverage Ratio after effectuating the Transactions or the Advances, failing to even offer a violating calculation.  (*Id.* ¶¶ 103, 130, 150)  But these unsubstantiated, conclusory statements, premised on "information and belief," are insufficient to sustain a claim for breach.  *See, e.g.*, *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018) ("A litigant cannot merely plop upon 'information and belief' in front of a conclusory allegation and thereby render it non-conclusory."); *HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, 20-cv-00967, 2021 WL 918556, at *16 n.4 (S.D.N.Y. Mar. 10, 2021) ("Courts in this Circuit look unfavorably

upon conclusory pleadings made on information and belief.").

**1.  Plaintiffs Fail To Plead That The Transactions Breached Section 4.07**

In the original complaint, Plaintiffs referenced the Officers' Certificate, which showed that DBS's Leverage Ratio was 6.56-to-1 following the Transactions, well below the required 8-1 Leverage Ratio.  (*See* Ex. G at 6)  Defendants moved to dismiss on this basis, so Plaintiffs amended their complaint to allege that the Officers' Certificate should be ignored because it purportedly contains errors that, "when corrected," purportedly demonstrate that DBS exceeded the 8-1 Leverage Ratio in some uncalculated and unidentified way.  (Am. Compl. ¶¶ 101–02)  The Complaint does not fix Plaintiffs' fundamental pleading deficiencies, failing to plead facts to demonstrate that the 8-1 Leverage Ratio has been exceeded.  In fact, the Complaint essentially concedes that Plaintiffs have no basis to challenge the calculations set forth in the Officers' Certificate, admitting in a footnote that the Trustees' claim under Section 4.07 is made at the direction of the Bondholders, reserving the right to rely on the determination of this Court as to whether a breach has in fact occurred.  (*Id.* ¶ 103 n.27)  Plaintiffs' new allegations, made upon information and belief, that DBS's calculation of the Leverage Ratio must have been incorrect are insufficient:

- *First*, Plaintiffs claim that the formula for calculating "Consolidated Cash Flow" must exclude interest income from the Intercompany Loan, because such interest is "interest income derived from the proceeds of the Offering," and argue DBS erred in including such interest when calculating Consolidated Cash Flow.  (*Id.* ¶ 101)  But the 2028 DBS Secured Notes were used to finance DISH's potential purchase of wireless spectrum licenses and for general corporate purposes, including the buildout of wireless infrastructure.  Accordingly, any interest income that DBS receives from DISH on the Intercompany Loan is *not* derived from the "net proceeds of the offering," but rather, were derived from the operations of DISH, and therefore is properly included in the calculation of Consolidated Cash Flow.  (*See* Section B(1), *supra*)

- *Second*, Plaintiffs argue that the Officers' Certificate relied upon projections of the Consolidated Cash Flow that was being redirected to DBS's subsidiary as a result of the Subscriber Assignment, rather than actual results from the prior 12-month period.  (Am. Compl. ¶ 101)  To the contrary, DBS disclosed in the Offering Memorandum accompanying the DBS Exchange Offer, the calculations that DBS used *were* based on the historical

Consolidated Cash Flow for the prior 12-month period of a randomly-selected 3 million of 7 million subscribers that were being assigned to DBS's subsidiary as part of the Subscriber Assignment, and represented a true and accurate assessment of the maximum Consolidated Cash Flow that was potentially redirected to DBS's subsidiary as a result of the Subscriber Assignment.[13]  (*See* Section B(1), *supra*)

▪  *Third*, Plaintiffs assert that the Officers' Certificate failed to conform with GAAP.  (Am. Compl. ¶ 101)  Although the Indentures do not require the Officers' Certificate to comply with GAAP, it ***was*** created in accordance with GAAP.  *See A&R Real Estate, Inc. v. Dorian N.Y. LLC*, 2023 U.S. Dist. Lexis 171688, at *43 (S.D.N.Y. Sept. 26, 2023) (courts should "decline[] to re-write [] contracts to insert provisions that the parties failed to include themselves").  The calculations contained in the Officers' Certificate are based upon DBS's publicly-filed financial statements, which all complied with GAAP, and are reviewed by DBS's independent auditors.  Plaintiffs' allegations are conclusory.  They do not allege ***how*** GAAP was disregarded or ***how*** DBS's calculations were affected.[14]

▪  *Fourth*, Plaintiffs claim that the Officers' Certificate failed to: (i) account for the cumulative effect of changes to the relevant accounting rules; and (ii) that it did not state that the calculations were GAAP-compliant.  (Am. Compl. ¶ 101)  Both assertions are without merit.  *First*, the Officers' Certificate did account for changes to relevant accounting rules as required by clause (e) of the definition of "Consolidated Net Income") (namely, as it pertains revenue recognition), and included a specific line-item accounting for these amounts given that the indentures for each series of notes also provide, in the definition of "Consolidated Net Income," that the cumulative effect of a change in accounting principles shall be excluded. (*See* Ex. G at 6 (showing a line item "Cum. Effect for change in acctg (Rev Rec)" in the amount of $49 million))  *Second*, there is no requirement in the Indentures that an Officers' Certificate affirmatively state that it complies with GAAP, so Plaintiffs are once again trying to impose requirements that that do not exist.

▪  *Fifth*, Plaintiffs argue that, with regard to the Subscriber Assignment and Sling TV Designation, the Officers' Certificate failed to: (i) provide "support" for the allocation of shared costs; and (ii) account for "dis-synergy costs" associated with these two Transactions. (Am. Compl. ¶ 101)  Once again, there is no requirement in the Indentures that any Officers' Certificate include "support" for its calculations, and even if such "support" were required, all of the costs associated with the Subscriber Assignment and Sling TV Designation were transferred and appropriately allocated alongside those subscribers, which is accounted for in the Officers' Certificate and disclosed in the offering memorandum accompanying the DBS Exchange Offer.[15]  Further, accounting for "dis-synergy costs" is not a requirement of the

---

[13] DBS disclosed the process by which the Consolidated Cash Flows would be calculated in the offering memorandum accompanying the DBS Exchange Offer (the "Offering Memorandum"), as well as a subsequently issued supplement thereto (the "Supplement").  True and correct copies of the Offering Memorandum and Supplement are attached to the Weedman Affirmation as **Exhibits J** and **K**, respectively.

[14] EBITDA, which Plaintiffs claim was miscalculated in the Officers' Certificate, is itself a non-GAAP financial metric.

[15] *See* Offering Memorandum at 66–68; Supplement at 4–5 and n.1.

Officers' Certificate, nor do Plaintiffs define or even explain the concept.

- *Sixth*, Plaintiffs claim that the Officers' Certificate failed to provide "support" for the expenses associated with any "new intercompany arrangements" resulting from the Subscriber Assignment. (Am. Compl. ¶ 101)  Again, the Indentures do not require such "support," but the Officers' Certificate here accounted for allocable costs, and furthermore included appropriate disclosure on such allocations and methodology in connection with the DBS Exchange Offer.

In short, Plaintiffs' supposed "deficiencies" with the Officers' Certificate are entirely of Plaintiffs' own invention, and are based on requirements that do not exist in the Indentures.

### 2. Plaintiffs Fail To Plead That The Advances Breached Section 4.07

Plaintiffs argue that the Advances provide further support for their claim that DBS breached Section 4.07.  According to the Complaint, the Advances are "Restricted Payments" under the Indentures and, therefore, these intercompany loans could only be carried-out using the "builder basket."  (Am. Compl. ¶¶ 104, 144, 149–51)  Plaintiffs' claim is refuted by the plain language of the Indentures.  Under Section 4.07, DBS is allowed to make "[i]nvestments in the form of intercompany debt with any direct or indirect parent company" without implicating the Leverage Ratio or builder basket at all, provided these investments are "incurred in the ordinary course of business and [are] used [by the recipient] in a business described in Section 4.16."  (Ex. B, § 4.07(8); Ex. C, § 4.07(7))  Both requirements are met here.

*First*, the Advances, which are the loan of cash between parent-entities, subsidiaries, and other affiliates within the a corporate family, are plainly ordinary-course transactions.[16]  Indeed, DBS routinely undertakes such transactions.  (*See, e.g.*, *supra* n.10)

*Second*, the recipient of the Advances, DISH, uses the proceeds to fund its day-to-day operations, which are among the business activities set forth in Section 4.16.  Specifically, the

---

[16] *See, e.g.*, Financial Accounting Standards Board, *Accounting Standards Codification*, § 850-10-05-04 ("Transactions between related parties commonly occur in the normal course of business.").

"developing, owning, engaging in and dealing with ... media, entertainment, electronics, or communication, including but not limited to the purchase, ownership, operation, leading and selling of, ... communications satellites and transponders[,] ... communication uplink centers, the acquisition, transmissions, broadcast, production and other provision of programming relating thereto and the manufacturing, distribution and financing of equipment (including consumer electronic equipment) relating thereto."  (Exs. B, C at § 4.16; *see also* Am. Compl. ¶ 66)  The Complaint does not allege anything to the contrary.

### B.    Plaintiffs Fail To Plead Breach Of Section 5.01

Section 5.01 of the Indentures provides that "[DBS] shall not consolidate or merge with or into … or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets," subject to certain exceptions set forth in the provision.  (Exs. B, C, § 5.01; Am. Compl. ¶ 106)  Plaintiffs allege, again "on information and belief," that DBS's only asset was the approximately $7.4 billion Intercompany Loan with non-party DISH, and that a portion of the Intercompany Loan disposed of "all or substantially all" of DBS's assets.[17]  (*Id.* ¶¶ 108–09)  Plaintiffs' allegation is demonstrably incorrect.  DBS transferred only 22% of its assets, which is not nearly "all or substantially all."

#### 1.   Successor Obligor Clauses Do Not Apply To Corporate Reorganizations

Successor obligor provisions such as Section 5.01 do not apply to internal reorganizations. "Successor obligor provisions have two purposes: to leave the borrower free to merge, liquidate or to sell its assets in order to enter a wholly new business free of public debt and to assure the lender 'a degree of continuity of assets.'"  *Bank of N.Y. v. Tyco Int'l Group, S.A.*, 545 F. Supp. 2d 312, 322 (S.D.N.Y. 2008).  Because a creditor's interest is in a company's continued operations,

---

[17] The Complaint makes no allegations under Section 5.01 with regard to the Advances or any of the other three Transactions, *i.e.*, the Spectrum Transfer, the Subscriber Assignment, or the Sling TV Designation.

corporate restructurings of the type effectuated here are routinely found not to trigger a successor obligation. *Id.* at 321 ("[The subject company] was restructured, not liquidated ... [and] [t]here is no indication that successor obligor clauses were intended to require consent from the noteholders for such internal restructuring, even when coupled with a spin-off of some of the obligor's assets."); *Resnick v. Karmax Camp Corp.*, 149 A.D.2d 709, 709 (2d Dept. 1989) (transfer of assets to newly formed subsidiaries not disposition of all or substantially all assets); *Gimbel v. Signal Co., Inc.*, 316 A.2d 599, 605 (Del. Ch. 1974) ("[I]t is not our law that [] approval is required upon every 'major' restructuring of the corporation....  The statute requires [] approval upon the sale of 'all or substantially all' of the corporation's assets.  That is the sole test to be applied.").

*Tyco* is instructive.  In *Tyco*, a trustee claimed a corporate spin-off would violate an indenture covenant (near identical to Section 5.01 here) stating that the transferor-company "will not...sell or convey all or substantially all of its assets to any Person," subject to certain exceptions. 545 F. Supp. 2d at 314.  The court looked at the substance of the transaction and noted that:

> Before the Transaction, Tyco was a public corporation that maintained four lines of business through a single holding company, TIGSA....  After the Transaction, Tyco ... maintains two lines of business through a single holding company, TIFSA....  The noteholders remain lenders to Tyco, but Tyco divested itself of two lines of business.  In essence, Tyco spun off two of its businesses.

*Id.* at 320.  Mindful of the purpose of successor obligor clauses, the court concluded that the successor obligor clause was not implicated: "There is no indication that successor obligor clauses were intended to require consent from the noteholders for such internal restructuring, even when coupled with a spin-off of some of the obligor's assets." *Id.* at 320–21.

Here, there is continuity in the assets held by DBS.  Prior to the Intercompany Loan Transaction, DBS was an indirect subsidiary of DISH that held approximately seven million pay-tv subscribers, various other operating assets (including satellites, licenses and real estate, among

others), and the Intercompany Loan. (Am. Compl. ¶ 45) Today, DBS remains an indirect subsidiary of DISH that holds approximately four million pay-tv subscribers directly, which are valued at approximately $7.5 billion, in addition to approximately $1.9 billion in other assets, as well as the remaining portion of the Intercompany Loan, with a value of approximately $2.7 billion. Together, these remaining assets total approximately $12.1 billion. *See Tyco*, 545 F. Supp. 2d at 322 ("Assuming that [the transferred assets] did not represent substantially all of [the transferor's] assets, the lenders have maintained the requisite degree of continuity of assets. The successor obligor clauses require nothing more.").

### 2. Plaintiffs Fail To Plead The Intercompany Loan Transaction Breached § 5.01

Plaintiffs' claim that the Intercompany Loan Transaction constitutes "all or substantially all" of DBS's assets is without merit. Plaintiffs' argument that DBS's only asset with any meaningful value was the Intercompany Loan,[18] which had a face value of approximately $7.4 billion, is demonstrably false.[19] (*Id.* ¶¶ 106, 134)

"Determining whether a transaction constitutes a disposal of all or substantially all of an entity's assets 'requires an inquiry into both the quantitative and qualitative aspects' of the transaction in question." *Whitebox Relative Value Partners, LP v. Transocean Ltd*., 20-cv-07143, 2020 U.S. Dist. Lexis 237497, at *11 (S.D.N.Y. Dec. 16, 2020); *In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d 824, 838 (Del. Ch. Feb. 27, 2012) (applying New York law). Here, both qualitative and quantitative assessments demonstrate clearly that the Intercompany Loan Transaction did not involve all or substantially all of DBS's assets.

---

[18] Plaintiffs acknowledge that DBS's asset base includes the equity it holds in its various subsidiary entities. (Am. Compl. ¶ 107) However, the Complaint alleges that this equity should not be considered when calculating DBS's assets because it is encumbered by debt. (*Id.* ¶ 108) Plaintiffs do not cite to any law or economic principle, in this jurisdiction or elsewhere, that requires that such equity be disregarded in the manner that Plaintiffs propose.

[19] *See* Ex. E at F4–F5.

###### a.    Plaintiffs Fails To Plead Breach Under A Quantitative Analysis

Under the quantitative assessment, when considering the assets retained by the transferor, courts look to both book value and market value, as well as the income-producing nature of the assets at issue. *BankAtlantic*, 39 A.3d at 838. Here, the Tranche A portion of the Intercompany Loan represents $4.7 billion of the Intercompany Loan, which had a total face value of approximately $7.4 billion, so only 63% of that single asset. (Am. Compl. ¶ 45; *see also* Ex. E at F4) And, of course, as noted above, the Tranche A Portion only constitutes approximately 22% of DBS's overall asset base, which falls well short of "all or substantially all" of the Company's assets.[20] *See, e.g.*, *HFTP Invs. v. Grupo TMM, S.A.*, 2004 N.Y. Misc. Lexis 3248, at *10 (Sup. Ct. N.Y. Cnty. June 4, 2004) (75% of total assets not substantially all assets); *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1051 (2d Cir. 1982) (51% of book value not "even close" to satisfying "all or substantially all"); *Story v. Kennecott Copper Corp.*, 90 Misc.2d 333, 335–36 (Sup. Ct. N.Y. Cnty. 1977) (55% of company's assets not "all or substantially all").

###### b.    Plaintiffs Fails To Plead Breach Under A Qualitative Analysis

Under the qualitative analysis, courts consider "whether 'the sale substantially changed the nature or character of the entity's business,' ... whether 'the sale was one not in the normal and regular course of the entity's business,'" *Transocean*, 2020 U.S. Dist. Lexis 237497, at *11, and "involved primarily the entity's operating assets, rather than its liquid assets." *HFTP*, 2004 N.Y. Misc. Lexis 3248, at *11; *see also Roseton OL, LLC v. Dynegy Holdings, Inc.*, 2011 Del. Ch. Lexis 113, at *52 (Del. Ch. July 29, 2011).

Here, there has been no change to DBS's existence, purpose, or fundamental business.

---

[20] The Complaint misleadingly characterizes the Tranche A portion of the Intercompany Loan Transaction as being the entirety of the underlying loan itself (*see, e.g.*, Am. Compl. ¶¶ 4, 40, 45, 70, 72, 83, 158), only acknowledging in passing that it was in fact part of a larger loan amount that totaled approximately $7.4 billion. Thus, the Intercompany Loan Transaction itself only involved 63% of the asset's overall value. (*Id.* ¶ 107, 134)

Prior to the Transactions, DBS was an indirect holding-company subsidiary of DISH that held approximately seven million pay-tv subscribers, various other operating assets (including satellites, licenses and real estate, among others), and the Intercompany Loan. (Am. Compl. ¶ 45) Today, DBS remains an indirect holding-company subsidiary of DISH that holds approximately five million DISH-TV subscribers itself, valued at approximately $7.5 billion, in addition to approximately $1.9 billion in other assets, as well as the remaining portion of the Intercompany Loan, valued at approximately $2.7 billion. Together, these remaining assets total almost $12.1 billion. Thus, DBS's existence, purpose, and business are fundamentally the same. *See Transocean*, 2020 U.S. Dist. Lexis 23749, at *15 (internal reorganization not breach of successor obligor provision because it "posed no risk" to transferor's ability to satisfy outstanding debt because assets were not transferred away from transferor's ultimate ownership).

Plaintiffs try to avoid these inescapable conclusions by asserting that the Intercompany Loan was DBS's "crown jewel," (Am. Compl. ¶ 108), which defies credulity.[21] Indeed, it is hard to identify an asset less subject to the characterization of "crown jewel" than the Intercompany Loan, which is not an operating asset, and the suggestion that 22% of DBS's overall asset base, outside of its primary line of business (*i.e.*, pay-tv subscribers), constitutes a "crown jewel" is patently implausible. *See, e.g.*, *In re Adelphia Communs. Corp.*, No. 02-41729, 2015 U.S. Dist. Lexis 33229, at *30–31 (S.D.N.Y. Mar. 17, 2015) (selling small portion of debtor's subscriber base not "crown jewel" asset); *cf. In re Tronox Inc.*, 503 B.R. 239, 252 (Bankr. S.D.N.Y. 2013) (profitable business line spun-off to isolate from creditors was debtor's "crown jewel" in light of company's liabilities); *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008) (asset

---

[21] Despite referring to Tranche A of the Intercompany Loan as the "crown jewel" that was purportedly transferred out of the reach of DBS's creditors, Plaintiffs cannot escape the fact that the Intercompany Loan was expressly excluded from collateral package securing the 2028 DBS Secured Notes, as was publicly disclosed in the Press Release, issued at the time these notes were issued. *See generally* Ex. D.

that generated almost all of debtor's net income was "crown jewel").

## II. PLAINTIFFS FAIL TO PLEAD ANY FRAUDULENT TRANSFER

The Complaint alleges four counts of fraudulent transfer pursuant to Colorado's Uniform Fraudulent Transfer Act ("CUFTA").[22] (*See generally* Am. Compl. ¶¶ 154–83). These include an actual intentional and constructive fraudulent transfer claim for both the: (i) the Intercompany Loan Transaction; and (ii) the Subscriber Assignment.[23] All four claims fail.

### A. Plaintiffs Fail To Adequately Plead An Actual Fraudulent Transfer

To plead an actual fraudulent transfer claim, a complaint must allege facts sufficient to demonstrate that each of the subject transfers was made with the "actual intent to hinder, delay, or defraud [a] creditor." C.R.S.A § 38-8-105(1)(a); *see also In re Blair*, 594 B.R. 712, 741 (Bankr. D. Colo. 2018) ("[A] cause of action for 'actual intent to hinder, delay, or defraud' commonly is referred to as a claim for 'actual fraud.'"). Courts may also consider additional factors, referred to as the "badges of fraud," to determine if there are sufficient grounds to infer fraudulent intent. § 38-8-105(2); *see also Schempp v. Lucre Mgmt. Grp., LLC*, 75 P.3d 1157, 1165 (Colo. App. 2003) ("[T]he intent to hinder, delay, or defraud creditors must be established by the creditor, typically by showing a number of 'badges of fraud.'"). Plaintiffs fail on both fronts.

#### 1. Plaintiffs Fail To Plead Actual Intent With Particularity

Actual fraudulent transfer claims are subject to the heightened pleading standards of Rule 9(b). *See* FED. R. CIV. P. 9(b); *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) ("As 'actual intent to hinder, delay, or defraud' constitutes fraud, it must be pled with specificity, as required

---

[22] Decisions from other jurisdictions that have adopted a version of the Uniform Fraudulent Transfer Act can serve as guidance when evaluating CUFTA claims. *CB Richard Ellis, Inc. v. CLGP, LLC*, 251 P.3d 523, 529 (Colo. App. 2010).

[23] Plaintiffs complain about all four Transactions and the Advances throughout the Complaint, but only bring their fraudulent transfer claims on account of the Intercompany Loan Transaction and Subscriber Assignment. (Am. Compl. ¶¶ 155, 162, 171, 177)

by [Rule] 9(b).”); *see also Weinman v. McCloskey*, 14-cv-00296, 2015 U.S. Dist. Lexis 43018, at *30–31 (D. Colo. Mar. 31, 2015) (actual fraud claim under CUFTA subject to Rule 9(b)). Here, Plaintiffs complain about numerous routine corporate transactions, and then claim they add up to a broad “scheme” to defraud creditors. But simply arguing that routine corporate activities constitute a “scheme” to defraud, without explaining *how* they are fraudulent, does not satisfy Rule 9’s heightened pleading standard. *See, e.g.*, *Smith v. N.Y. Pres. Hosp.*, 06-cv-4056, 2007 WL 2142312, at *5 (S.D.N.Y. July 18, 2007) (“Although [plaintiff] manages to sketch out the nature of that claim by generally stating the ‘who, what, where, when and how’ of his theory of fraud, he fails to provide sufficient detail about that theory or about any specific fraudulent claim.”). Even without Rule 9, the Complaint would fail to sufficiently plead an actual fraudulent transfer claim.

*First*, transactions carried out in the ordinary course of business create a rebuttable presumption against actual fraudulent transfer claims. *In re Sender*, 423 F. Supp. 2d 1155, 1170 (D. Colo. 2006) (ordinary course transactions create a rebuttable presumption against an actual fraud claim under CUFTA). Here, the Intercompany Loan Transaction and Subscriber Assignment were announced shortly after the Merger and carried out as part of a broader effort to integrate the newly-merged entities in a manner that, *inter alia*, helped strengthen their balance sheets and improve their debt maturity profile, which are prudent and ordinary course transactions. *See Tyco*, 545 F. Supp. 2d at 321 (corporate restructuring involving transfer of assets between two holding companies was “made in the regular course of business”).

*Second*, the Subscriber Assignment—an intercompany assignment of three million pay-tv subscribers from one subsidiary to another within the EchoStar corporate structure—where the assignee subsidiary is itself a wholly-owned subsidiary of the assignor—is not a “transfer” under CUFTA, which is expressly defined as the “disposing of or parting with an asset or an interest in

an asset," neither of which have occurred here.  § 38-8-102(13); *Sands v. New Age Fam. P'ship, Ltd.*, 897 P.2d 917, 919–20 (Colo. App. 1995) ("[The term] 'transfer' [under CUFTA] refers to property, assets, or money ... conveyed from the debtor to a third party" by way of a "transaction by which the debtor sought to place assets beyond the reach of creditors.").  The three million subscribers are now held by a wholly-owned subsidiary of DBS—Defendant DBS Issuer—and a DBS subsidiary, Network LLC, continues to receive the revenue from these subscribers.  (*See* § I(B)(2)(b), *supra*)  Thus, no asset has been "disposed of" or "conveyed to a third party."

*Third*, there are no allegations that the Transactions have left DBS unable to pay its debts. Before the Transactions DBS had assets in excess of $21 billion, and after the Transaction it has assets of approximately $16.3 billion, and retains all the income and $4.3 billion of value from the three million subscribers it assigned to its wholly-owned subsidiary.  *See Dynegy*, 2011 Del. Ch. Lexis 113, at *65–66 (no transfer when transferor retained same value before and after subject transaction); *cf. Transocean*, 2020 U.S. Dist. Lexis 237497, at *12 (same).

## 2.  Plaintiffs Fail To Plead The "Badges of Fraud"

In the absence of sufficient allegations of actual fraudulent intent, Plaintiffs must demonstrate enumerated "badges of fraud."[24]  *Blair*, 594 B.R. at 756.  Plaintiffs must plead these "badges" with particularity.  *In re Actrade Fin. Techs., Ltd.*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005).  "[A] court should evaluate all the relevant circumstances in considering the factors ... '[taking] into account all indicia negativing as well as those suggesting fraud.'"  *Schempp*, 75 P.3d at 1162; *see also see also Blair*, 594 B.R. at 743 ("The exercise is holistic, and the Court should

---

[24] The "badges" include whether: (a) the transfer or obligation was to an insider; (b) the debtor retained possession or control of the property after the transfer; (c) the transfer or obligation was disclosed or concealed; (d) the debtor had been sued or threatened with suit before the transfer; (e) it was all or substantially all the debtor's assets; (f) the debtor absconded; (g) the debtor removed or concealed assets; (h) the consideration received was reasonably equivalent to the value of the asset transferred; (i) the debtor was insolvent or became insolvent shortly after the transfer; (j) it occurred shortly before or after a substantial debt; and (k) the debtor transferred the essential assets of the business to a lienor, who transferred the assets to an insider.  *See* § 38-8-105(2).

consider all the relevant circumstances."); *Gen. Trading v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1498–99 (11th Cir. 1997) (same).

Plaintiffs allege four "badges" of fraud: (i) DBS was insolvent; (ii) the Subscriber Assignment was made in connection with a transfer of all or substantially all of DBS's assets; (iii) the Transactions were made for no value or consideration; and (iv) the Transactions involved transferring assets to an "insider" under the statutory definition of the term. (Am. Compl. ¶¶ 159, 175) These conclusory allegations are insufficient to state a claim.

### a.    Badge 1—Insolvency

Plaintiffs first allege that DBS was insolvent at the time of the Intercompany Loan Transaction, Subscriber Assignment, and the Advances. (*Id.* ¶¶ 82–83, 86) But the Complaint pleads no facts to support this assertion. Instead, Plaintiffs allege, "on information and belief," that DBS has liabilities in excess of its assets. (*Id.* ¶¶ 86–90, 167, 182) Pleadings based on "information and belief" cannot satisfy the heightened pleading standard for the "badge" of insolvency. *Waite v. Schoenbach*, 10-cv-3439, 2010 U.S. Dist. Lexis 115470, at *17 (S.D.N.Y. Oct. 29, 2010) ("[A]llegations, made entirely on information and belief" that the "transfers were made without fair consideration" and "rendered Defendants insolvent...are conclusory allegations that are insufficient to withstand a motion to dismiss."); *Sedoy v. JW Ventures, LLC*, 15-cv-02168, 2016 WL 8309768, at *2 (D. Colo. Dec. 23, 2016) (same); *Pernick v. Computershare Tr. Co.*, 136 F. Supp. 3d 1247, 1274-75 (D. Colo. 2015) (dismissing CUFTA claim where allegations related to debtors' insolvency were "little more than a bare recitation of the elements").

Even under more lenient pleading standards, Plaintiffs' allegations regarding solvency fail. In order to demonstrate a transferor's insolvency under CUFTA, a plaintiff must sufficiently allege that, at the time of the transfer, the "[de]btor [was] generally not paying his debts as they become due," or that "the sum of the debtor's debts [was] greater than all of the debtor's assets at a fair

valuation." § 38-8-103; *Richard Ellis*, 251 P.3d at 527. Plaintiffs fail to plead either standard.

*First*, the Complaint contains no allegations that DBS was not paying its debts at the time of the Transactions. The commentary to CUFTA explains that:

> In determining whether a debtor is paying its debts generally as they become due, the court should look at more than the amount and due dates of the indebtedness[,] ... tak[ing] into account such factors as the number of debts, the proportion of those debts not being paid, the duration of the nonpayment, and the existence of bona fide disputes ....

§ 38-8-103(2), cmt. 2. Thus, the question is based "only on a simple factual inquiry: At the time of the alleged fraudulent transfers, was the [transferor] paying his debts as they became due, or not?" *Weinman v. Corwley*, 588 B.R. 605, 632 (Bankr. D. Colo. 2018). The Complaint actually pleads the opposite—Plaintiffs acknowledge that EchoStar and its affiliates used proceeds from an intercompany asset sale to satisfy almost $1 billion in outstanding debt as recently as March 2024. (*See, e.g.*, Am. Compl. ¶ 64)

Faced with these facts, Plaintiffs purport to rely on "market evidence" that DBS's debts will not be repaid. (*Id.* ¶¶ 81–82, 91) This market evidence, which is limited to analysts' reports issued by a single rating agency, S&P Global, does not support Plaintiffs' claims:

- Two of the four reports were based on certain future assumptions regarding the effect of the pending Exchange Offers, neither of which was effectuated. (*Id.* ¶ 86 & n.16);

- The third report was issued in March 2024, *after* the Exchange Offers were terminated, and says nothing about whether DBS has liabilities in excess of its assets at the time of the Transactions two months earlier. (*Id.* ¶ 90 & n.23–26); and

- The fourth report was issued in June 2023, more than six months before the relevant Transactions. (*Id.* ¶ 88–89 & nn.19–20) Thus, this report has no bearing on DBS's financial condition at the time of the Transactions, as required.[25] § 38-8-103; *see also Richard Ellis*, 251 P.3d at 533–34 (solvency measured at time of contested transfer).

*Second*, the Complaint contains no allegations that the sum of DBS's debts was greater

---

[25] The Complaint also claims that the June 2023 S&P Global report offered an opinion on the recovery coverage for holders of the DBS Bonds in the event another exchange offer were to occur. (Am. Compl. ¶ 89 & n.20) Not only is that temporally impossible, as this S&P report was written seven months before the Exchange Offers, the report itself

than all of its assets.  For this element, CUFTA requires a comparison of "the fair value of the debtor's assets [against] the extent of its liabilities at the time of each contested transfer." *Richard Ellis*, 251 P.3d at 533–34.  Here, Plaintiffs do not allege *anything* about DBS's specific debt obligations (focusing only on non-party DISH, which is not a borrower here), nor do they allege *anything* about DBS's total asset base.  Instead, the Complaint simply alleges, "on information and belief," that DBS had liabilities in excess of its assets, which Plaintiffs claim can be seen in the trading prices of DBS's debt and the reports issued by S&P at the time the Exchange Offers were announced.  (Am. Compl. ¶¶ 91, 167, 182)  These conclusory statements and cherry-picked analysts' reports do not satisfy the "balance sheet test" inquiry required under CUFTA.  *Richard Ellis*, 251 P.3d at 532 (balance sheet method used for determining solvency under CUFTA).

### b.    Badge 2—All Or Substantially All

Plaintiffs next allege that a badge of fraud exists because the Intercompany Loan Transaction involved "all or substantially all" of DBS's assets (Am. Compl. ¶¶ 133–34), which as discussed above, is demonstrably false.  (*See* § I(B)(2), *supra*) (noting that the Tranche A portion only involved 22% of DBS's assets).

### c.    Badge 3—Reasonably Equivalent Value

Plaintiffs next claim that a badge of fraud exists because the Intercompany Loan Transaction and Subscriber Assignment provided "no value" to DBS or its creditors.  (Am. Compl. ¶¶ 75, 159, 175)  Such conclusory recitations of the elements do not satisfy the particularity requirement under Rule 9(b).  *In re Sharp*, 403 F.3d at 56.  In any event, an assessment of whether DBS received reasonably equivalent value under CUFTA "requires an analysis of all the facts and circumstances surrounding the transaction ... look[ing] to the substance of a transaction rather than

---

makes no such claim.

its form." *Ciccarelli v. Guar. Bank*, 99 P.3d 85, 88 (Colo. App. 2004) ("Determination of reasonably equivalent value requires analysis of all the facts and circumstances surrounding the transaction."); *cf. Mellon Bank v. Metro Comm'n, Inc.*, 945 F.2d 635, 646-47 (3d Cir. 1991) (indirect benefits evaluated for reasonably equivalent value). Thus, alleging that a transfer was made for "no value," without considering the context of the Merger and the strategy underpinning the Transactions, is insufficient. *Ciccarelli*, 99 P.3d at 88; *see also Chesapeake Bank & Tr. Co. v. Feaga*, No. 09-cv-114, 2012 D. Colo. Lexis 2556, at *8 (D. Colo. Aug. 28, 2012) (adequacy of consideration not dispositive as to whether the transfer was actually fraudulent).

Critically, when a transfer is made within the same corporate structure following a merger, as was the case here, there is *no* loss of value, because any decrease in DBS's asset base resulted in an equal increase in the value of its wholly-owned subsidiary. Moreover, transfers between corporate affiliates are typically only deemed to have been made for insufficient value or consideration in instances where there is a pending or forthcoming claim against the transferor, such that the transfer could support a finding that it was made with an intent to defraud. *See, e.g.*, *Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357, 383 (S.D.N.Y. Mar. 2003) (intercompany transfers more likely to be considered fraudulent if purposefully done to leave company unable to pay its debts); *see also Multibank, Inc. v. Access Global Cap. LLC*, 17-civ-3467, 2017 U.S. Dist. Lexis 199947, at *19–20 (S.D.N.Y. Dec. 4, 2017) (company aware of pending suits against transferor weigh in favor of finding fraudulent transfer). No such pending claims were present here at the time of the Transactions, nor does the Complaint allege that there were.

### d.    Badge 4—Transfers To "Insiders"

Plaintiffs state in conclusory fashion that the counterparties to the Intercompany Loan Transaction and Subscriber Assignment were "insiders" under the statutory definition of the term. (Am. Compl. ¶¶ 77, 159, 175)  Standing alone, this allegation is meaningless, because *every*

corporate restructuring transaction definitionally involves transfers and assignments to insider corporate affiliates, so this badge alone does nothing to support Plaintiffs' claims. *Ciccarelli*, 99 P.3d at 88 (fraudulent transfer requires consideration of all facts and circumstances).

**B.    Plaintiffs Fail To Plead Constructive Fraudulent Transfer**

To plead a constructive fraudulent transfer under Sections 105(1)(b) and 106(1) of CUFTA, the Complaint must adequately plead that: (i) DBS's remaining assets after the Transactions "were unreasonably small in relation to [each T]ransaction" *or* that DBS "[i]ntended to incur, or believed or reasonably should have believed that [it] would incur, debts beyond [its] ability to pay as they became due," *see* § 38-8-105(1)(b); *and* (ii) DBS received a lack of "reasonably equivalent value" in exchange for the transferred assets, such that it rendered DBS insolvent as a result, to be measured as of the time of the transaction. § 38-8-106(1); *see also Richard Ellis*, 251 P.3d at 534. Plaintiffs fail to satisfy any of these elements.[26]

**1.    Plaintiffs Do No Plead Unreasonably Small Assets Or Inability To Pay Debts**

Section 105(1)(b) requires Plaintiffs to sufficiently allege either that DBS's remaining assets after the Transactions were "unreasonably small," or that the Transactions rendered DBS unable to pay its debts as they came due. Plaintiffs plead nothing more than a verbatim recitation of the statutory language, (Am. Compl. ¶¶ 166, 181), which is insufficient.

**a.    "Unreasonably Small Assets"**

Section 105(1)(b)(I) focuses on the transferor's line of business and considers whether, after the subject transaction, the transferor's remaining assets were "unreasonably small" in relation to the transferred assets. *Blair*, 594 B.R. at 758. "The unreasonably small assets

---

[26] Similar to the actual constructive fraud claims, Plaintiffs' constructive fraud claims are not brought on account of the Spectrum Transfer or the Sling TV Designation, despite weaving in allegations about the purported "harm" these Transactions caused to other bondholders who did not elect to join this lawsuit. (*See, e.g.*, Am. Compl. ¶¶ 70–74)

test…considers whether the transfer in question left the debtor with an 'inability to generate sufficient profits to sustain operations.'" *Richard Ellis*, 251 P.3d at 531. "[C]ourts consider whether the transfer put the debtor on 'the road to ruin'…or whether it left 'the transferor technically solvent but doomed to fail.'" *Id.*[27]

Plaintiffs do not allege that DBS is unable to generate sufficient profits or was steered onto a "road to ruin" by the Transactions, nor could they because DBS retained consolidated assets in excess of $16 billion following the Transactions, or more than 57% of the pre-Transaction asset base. The Complaint, therefore, fails to satisfy Section 105(1)(b)(I).

**b.    "Debts Beyond The Ability To Pay"**

Section 105(1)(b)(II) "measures whether the debtor, as a going concern, would reasonably have been seen as able to pay its debts after making the [subject] transfer." *Richard Ellis*, 251 P.3d at 532. "This does not mean that a debtor accumulated debts beyond the total of [its] assets, or that [it] could not immediately pay his or her debts in full. Rather, this test focuses on whether the debtor could reasonably pay debts as they came due" at the time of the transaction. *Id.* at 533.

Plaintiffs do not allege that DBS was rendered incapable of paying its debts as they came due. Instead, Plaintiffs rely on their own unsubstantiated speculation that DBS may have insufficient funds to pay future debts as they come due, based on the S&P Global reports. But the S&P Global reports' opinions as to DBS's ability to pay its future debts were premised on the effect of the Exchange Offers, neither of which occurred. Thus, these reports cannot support Plaintiffs' claims. *Richard Ellis*, 251 P.3d at 535–36 (claim as to company's solvency based on "uncertain" future events improper inquiry); *Johnson v. Brettmann*, 2020-cv-33373, 2020 D. Colo.

---

[27] Although the Complaint's allegations regarding DBS's solvency fail to satisfy Section 106(1) or the "badges of fraud" under Section 105(2)(ii) (*see* § II(A)(2)(a), *supra*), "[t]he unreasonably small assets test is not the same as the test for insolvency" under these provisions. *Richard Ellis*, 251 P.3d at 531. Plaintiffs fail under either provision.

Lexis 4740, at *16-17 (D. Colo. Dec. 22, 2020) (dismissing CUFTA claim in part because of failure to allege that debtor would be unable to pay plaintiff's debt after subject transfers); *see also Dynegy*, 2011 Del. Ch. Lexis 113, at *68 (transactions that would not render company insolvent insufficient).

### 2.  Plaintiffs Do Not Plead Lack Of Reasonably Equivalent Value

A complaint must also allege sufficient facts to show such a lack of "reasonably equivalent value" that the transferor was rendered insolvent.  *See* § 38-8-106(1).  Solvency under this inquiry is identical to what is required for actual fraud, considering whether "the sum of the [transferor's] debts is greater than all of the [transferor's] assets at a fair valuation."  *Richard Ellis*, 251 P.3d at 532; *see also Blair*, 594 B.R. at 753 (insolvency under CUFTA requires demonstration that transferor was "generally not paying his debts as they become due").  However, "[r]easonably equivalent value ... is not wholly synonymous with market value and it depends upon an analysis of all the facts and circumstances... includ[ing] both direct and indirect benefits to the transferor."  *Lev. Leading Co. v. Smith*, 143 P.3d 1164, 1166 (Col. App. 2006).

Here, the Complaint focuses on each Transaction in a vacuum, maintaining that the statutory requirements have been met simply because DBS received "no value at all" in return.  (*See, e.g.*, Am. Compl. ¶¶ 72, 75, 159, 175)  But an inquiry into whether DBS received dollar-for-dollar "value" as part of the Transactions ignores the context in which the Transactions were made (as part of a corporate reorganization following a corporate merger) and for what purpose (to effectuate the integration of the EchoStar and DISH business).  It also ignores the "benefits" to DBS, as transfers made within the same corporate structure do not result in any "loss" in value from a transferred asset because they create a corresponding value "gain" elsewhere within the same structure.  *See, e.g., Dynegy*, 2011 Del. Ch. Lexis 113, at *65–66 (no transfer of assets under UFTA when transferor retained same value and the transactions improved transferor's ability to

meet its financial obligations); *see also Johnson*, 2020 D. Colo. Lexis 4740, at *16-17 (dismissing CUFTA claim that did "not even attempt to aver why the[] transfers were made").  This is particularly the case in the Subscriber Assignment, where DBS has retained 100% of the value of the three million subscribers that are now with DBS Issuer.  Plaintiffs' remaining allegations that DBS had liabilities in excess of its assets are again premised only on "information and belief" (Am. Compl. ¶¶ 86–90, 167, 182), which is insufficient.  *Waite*, 2010 U.S. Dist. Lexis 115470, at *17 (dismissing CUFTA claim that did "not even attempt to aver why the[] transfers were made ...[forcing] speculat[ion]" about lack of reasonably equivalent value); *Pernick*, 136 F. Supp. 3d at 1274 (dismissing CUFTA claim where bare allegations "d[id] not support a plausible inference that [the transferor] did not receive reasonable equivalent value").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint with prejudice, and grant such further relief as the Court deems proper.

Dated:  August 15, 2024
New York, N.Y.

Respectfully submitted,

 /s/ *Glenn M. Kurtz*
Glenn M. Kurtz
Joshua D. Weedman
Dorian K. Panchyson

WHITE & CASE LLP
1221 Avenue of the Americas
New York, N.Y. 10020-1095
(212) 819-8200
gkurtz@whitecase.com
jweedman@whitecase.com
dorian.panchyson@whitecase.com