**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

U.S. BANK TRUST COMPANY, NATIONAL
ASSOCIATION, in its capacities as Trustees,

                    Plaintiffs,

v.

DISH DBS CORPORATION, DISH NETWORK
CORPORATION, DISH NETWORK L.L.C.,
ECHOSTAR INTERCOMPANY RECEIVABLE
COMPANY L.L.C., DISH DBS ISSUER LLC, and
DBS INTERCOMPANY RECEIVABLE L.L.C.,

                    Defendants.

No. 1:24-cv-3646 (JGLC)

**SECOND AMENDED
COMPLAINT**

U.S. Bank Trust Company, National Association, solely in its capacities as Trustee under

each of (i) that certain Secured Indenture dated November 26, 2021 by and among DISH DBS

Corporation as issuer, U.S. Bank Trust Company, National Association, as successor trustee and

successor collateral agent, relating to DBS's 5.75% Senior Secured Notes due 2028, and (ii) that

certain Indenture dated June 13, 2016 by and among DBS, as issuer, and U.S. Bank Trust

Company, National Association, as successor trustee, relating to DBS's 7.75% Senior Notes due

2026 (in such capacities, the "Plaintiffs" or "Trustees"), bring this action at the direction of the

holders of the majority of the outstanding principal amount of notes issued and outstanding under

these indentures against DISH DBS Corporation ("DBS"), DISH Network Corporation ("DISH

Network"), EchoStar Intercompany Receivable Company L.L.C. ("EchoStar Receivable"), DISH

Network L.L.C. ("Network LLC"), DISH DBS Issuer LLC ("DBS Issuer"), and DBS

Intercompany Receivable L.L.C. ("DBS InterCo Sub").  In support hereof, Plaintiffs allege as

follows:

## NATURE OF THE ACTION

1.      This is an action for declaratory judgment under NY CPLR § 3001 that Defendant DBS breached the DBS Indentures (as defined below) and actual and constructive fraudulent transfers under Colorado Uniform Fraudulent Transfer Act ("CUFTA") §§ 38-8-105(1)(a)-(b) and 38-8-106(1).  Ultimately, this is a complaint regarding the unlawful actions of a billionaire equity owner—Charles Ergen—who has spent the last year scheming to defraud his creditors by siphoning valuable assets away from their borrower as leverage to negotiate concessions from these same parties.  Ergen first fraudulently transferred key assets to entities under his control and subsequently offered to transfer those same assets back within the reach of creditors in exchange for billions in coerced debt forgiveness.  When that first attempt failed, Ergen did not relent.  Instead, he proposed a coercive merger transaction that would allow him to walk away with billions in value, all conditioned on creditors agreeing to forgive billions of dollars of debts.  This unlawful transaction was also rejected by the noteholders Plaintiffs represent, but the damage to those noteholders remains.  These maneuvers, and others detailed in this complaint, each have their own form and flavor, but one common theme animates them all: Charles Ergen is engaged in a systematic attempt to siphon DBS's cash and most valuable assets away from creditors.  Those transactions are patently unlawful and will not withstand judicial scrutiny.

2.      In January 2024, through a brazen series of related transactions, EchoStar Corporation ("EchoStar") and its controlling shareholder, Charles Ergen, transferred billions of dollars of assets from DBS to entities he controls, out of the reach of existing creditors, in exchange for *nothing*.  Ergen (i) caused DISH Network to transfer spectrum licenses—a portion of which EchoStar valued at $9 billion—to a direct, wholly owned subsidiary of EchoStar, (ii) caused DBS to transfer a $4.7 billion intercompany loan owed to DBS by DISH Network to a direct, wholly owned subsidiary of EchoStar, and (iii) siphoned *three million* DISH TV (as defined below)

subscriber contracts from DBS and handed them over to a newly-created subsidiary, DBS Issuer, intending to place the assets outside of the reach of DBS's existing creditors. In exchange for the transferred assets, EchoStar and the other transferees paid DBS and DISH Network nothing—not one dollar. Immediately following the initial set of transfers, Defendants offered the stolen property back to creditors of DBS, but only on the condition that they accept steep discounts on their DBS notes. Defendants' coercive offer was rejected, and this litigation was commenced to address those wrongs.

3.      Undeterred by this lawsuit, Ergen and EchoStar continued to siphon assets away from DBS. In their second act of corporate malfeasance, Ergen caused DBS to "advance" nearly $1 billion of cash from DBS to DISH Network between December 2023 and March 2024 in violation of fraudulent transfer laws and the DBS Indentures. Plaintiffs thus amended this lawsuit to add allegations that those advances were also unlawful.

4.      Plaintiffs hoped that shining the light on Ergen's fraudulent transfers and breaches of DBS indentures would stem the misconduct. But it has not. Between April and September 2024, *after* Plaintiffs filed the original complaint, Ergen caused DBS to advance *another* billion of cash to DISH Network, bringing the total amount of cash advances from DBS to DISH Network to a whopping ***$2 billion***. Any company transferring $2 billion to its parent company over approximately ten months would be extraordinary; DBS doing so ***while publicly disclosing that DBS cannot pay its liabilities and in the face of litigation*** is unlawful.

5.      In their third act, Defendants announced another series of transactions that were again designed to enrich Defendants' ultimate controlling shareholder, Charles Ergen, at the expense of his creditors. This time, they first announced on September 30, 2024, that DBS was to be sold to its main competitor, DirecTV, for ***one dollar***. That transaction, however, is conditioned

on DBS's creditors, including the DBS noteholders represented by Plaintiffs, receiving significantly less than what DBS owes them—DBS must capture $1.5 billion in debt reduction from its noteholders to close the deal. By admitting that DBS's assets and its liabilities combined are worth less than $1, DBS again implicitly admits its own insolvency. Worse yet, before DirecTV purchases DBS, DBS intends to transfer *an additional* $1.5 billion in cash or cash equivalents to DISH Network, further hampering DBS's financial condition. And if the sale is consummated, DBS will *forfeit over $9 billion in intercompany receivables from DISH Network*, including the previously fraudulently transferred InterCo Loan (defined *infra*). Those receivables could be used to repay DBS noteholders in full; instead, by forgiving those amounts, Ergen will have effectively made a dividend to himself and diverted those amounts away from DBS creditors.

6. Next, to achieve the intended $1.5 billion debt reduction, Ergen and DBS launched new exchange offers, designed to coerce DBS noteholders into acceding to the transaction. Though holders have again soundly rejected these coercive exchanges, they highlight DBS's attempts to subordinate creditors who do not bend to Ergen's will.

7. Finally, Ergen raised an additional $2.5 billion in financing at DBS Issuer, the entity that received some of the fraudulently transferred assets from DBS in January 2024. The DBS Issuer financing comes in the form of a $1.8 billion term loan, $200 million preferred equity offering, and a $500 million "bridge" loan. These financings are purportedly secured by the subscribers fraudulently transferred to DBS Issuer in the DBS Subscriber Designation (defined *infra*), and each piece of the financing is designed to cement earlier transactions in Ergen's scheme. The $1.8 billion term loan to DBS Issuer will be used to encumber the previously transferred assets. Simply put, after transferring subscriber contracts to a new subsidiary in January (which precipitated this lawsuit in the first place), Ergen, through his control of the Defendants, pledged

the taken assets as collateral to new lenders to hinder, delay, and defraud existing creditors' ability to be timely and fully repaid. The $200 million preferred equity was raised to give these new creditors complete control over DBS Issuer by giving those equity holders majority control of DBS Issuer's board of managers, preventing it from filing for bankruptcy or making other decisions that could alienate their questionable collateral. And finally, the "bridge" term loan appears to be designed to fund additional cash transfers from DBS Issuer to DBS and eventually to DISH Network before DirecTV purchases DBS, further defrauding creditors.

8.  If these recently announced term loans are repaid earlier than maturity, DBS Issuer may owe additional make-whole amounts or prepayment premium to the new lenders, which would amount to hundreds of millions of additional liabilities. Those prepayment premiums may be enormous: DBS Issuer may owe 111.25% of the aggregate principal amount of the term loans *plus* the full principal and accrued interest. These additional amounts potentially subordinate DBS creditors to the same amount.

9.  Further, through an imprecisely disclosed "side letter," DBS Issuer has agreed to incur an additional term loan of $500 million in financing. That side letter allows certain preferred new lenders to exchange DBS notes for additional DBS Issuer term loans at a 15-20% premium. Not only do the incremental term loans further subordinate existing DBS creditors, ***but*** DBS Issuer may ***also*** "loan" the exchanged notes back to DBS, increasing the intercompany obligations owed to DBS Issuer by DBS. Moreover, if DBS holders do not agree to Ergen's latest coercive debt exchange, the side letter increases the amount of the additional term loan to ***$1.5 billion***, further subordinating DBS creditors.

10. Simply put, the January 2024 asset transfers, the intercompany advances, and the latest DirecTV transactions are exactly what they appear to be: bad faith maneuvers designed to

hinder, delay, and defraud creditors of DBS, lower the trading price of those creditors' notes, and divert value from creditors to shareholders.

11.    The Trustees have been directed by DBS noteholders in accordance with their respective DBS Indentures (as defined below) to seek declaratory judgments that the transfers breached each of the DBS Indentures and that the transfers are intentional and constructive fraudulent transfers.  The transfers have already caused the holders of DBS's debt substantial harm: the bond prices for debt issued by DBS have plummeted following the January asset transfers, and rating agencies have downgraded DBS's creditworthiness out of concern that its creditors, including Plaintiffs, may no longer have recourse to the fraudulently transferred assets.

12.    Accordingly, Plaintiffs seek a judgment (a) declaring that DBS breached the DBS Indentures, (b) avoiding and unwinding certain transactions made by or on behalf of DBS as actual and/or constructive fraudulent transfers, and (c) awarding damages and other and further relief as may be appropriate.

## THE PARTIES AND RELATED ENTITIES

13.    U.S. Bank Trust Company, National Association is a national banking association formed under the laws of the United States with its principal place of business in Portland, Oregon. It appears in this action solely in its capacities as Trustee under each of the DBS Indentures and as Collateral Agent under the indenture for the DBS 5.75% Secured Notes (as defined below), pursuant to the terms of which it has been directed to bring this lawsuit and make the allegations contained herein by respective majorities of the holders of the DBS 5.75% Secured Notes and the 2026 DBS Unsecured Notes (each as defined below).[1]  The Trustees state these allegations on

---

[1]    All the allegations in this Complaint are made solely in the Trustees' capacities under the DBS Indentures (defined below) as holder-directed trustees and are not made individually or as trustee under any other indenture.  The Trustees expressly reserves all rights, protections, immunities, and exculpations under the DBS Indentures.  U.S.

behalf of and at the direction of such holders.  The Trustees bring this action in a representative capacity for the benefit of all the holders of those notes.  Allegations of injury or damage to Plaintiffs include injury or damage to all such holders.

14.  Defendant DBS is a Colorado corporation with principal offices in Colorado.  It is an indirect, wholly owned subsidiary of DISH Network.  DBS, through its subsidiaries, operates the pay-tv segment of DISH Network's business under two separate brands: DISH TV and SLING TV.  The DISH branded pay-tv service ("<u>DISH TV</u>") consists of, among other things, Federal Communications Commission licenses authorizing DBS to use direct broadcast satellite and Fixed Satellite Service spectrum, its owned and leased satellites, receiver systems, broadcast operations, a leased fiber optic network, in-home service and call center operations, and certain other assets utilized in its operations.  The SLING branded pay-tv services ("<u>SLING TV</u>") consists of, among other things, multichannel, live-linear and on-demand streaming over-the-top Internet-based domestic, international, and Latino video programming services.  Combined, DISH TV and SLING TV's almost nine million pay-tv subscribers in the United States accounted for roughly 99% of annual revenue for DISH DBS and roughly 76% of revenue for DISH Network in 2023.  An aggregate consumer base of that size drives significant value.

15.  Defendant EchoStar Receivable is a Colorado entity that was formed in January 2024 and has its principal offices in Colorado.  It is a wholly owned subsidiary of EchoStar.

16.  Defendant DISH Network Corporation is a Nevada corporation with principal offices in Colorado.  It is a wholly owned subsidiary of EchoStar.  DISH Network operates two primary business segments—pay-tv services and wireless internet services—which provide the

---

Bank Trust Company, National Association is not a holder of the Notes issued under the DBS Indentures.  For the avoidance of doubt, nothing in this Second Amended Complaint is intended as constituting a notice by the Trustees to DBS within the meaning of the Indentures.

vast majority of its current revenue.  The wireless business segment provides nationwide prepaid and postpaid retail wireless services.  DISH Network is in the process of leveraging the spectrum assets it controls to build its own 5G Network.  Until then, it relies on external mobile network operators—T-Mobile and AT&T—to provide network services for its retail wireless business.

17.     Defendant Network LLC is a Colorado entity with principal offices in Colorado.  It is a wholly owned subsidiary of DBS.

18.     Defendant DBS Issuer is a Delaware entity that was formed in January 2024.  It is a wholly owned, direct subsidiary of Network LLC and a wholly owned, indirect subsidiary of DBS.

19.     Defendant DBS Interco Sub is a Colorado entity that was formed in January 2024 and has its principal offices in Colorado.  It is a wholly owned subsidiary of DBS.

20.     Non-party EchoStar is a Nevada corporation with principal offices in Colorado.  It operates two business segments: the Hughes segment—which provides broadband satellite technologies and broadband internet products and services—and the EchoStar Satellite Services segment—which provides satellite services on a full-time and/or occasional-use basis to U.S. government service providers, internet service providers, broadcast news organizations, content providers, and private enterprise customers.

21.     Non-party EchoStar Wireless Holding L.L.C. is a Colorado entity with principal offices in Colorado.  It is a wholly owned subsidiary of EchoStar.

22.     Non-party Sling TV Holding L.L.C. ("Sling Holding") is a Colorado entity with principal offices in Colorado.  It is a wholly owned subsidiary of DBS.

23.     Non-party Sling TV Purchasing L.L.C. ("Sling Purchasing") is a Colorado entity with principal offices in Colorado.  It is a wholly owned subsidiary of DBS.

24.     Non-party Sling TV L.L.C. is a Colorado entity with principal offices in Colorado. It is a wholly owned subsidiary of DBS.

25.     Non-party Sling TV Gift Card Corporation (together with Sling Holding, Sling Purchasing, and Sling TV L.L.C., the "Sling TV Subsidiaries") is a Virginia corporation with principal offices in Colorado.  It is a wholly owned subsidiary of DBS.

## FACTUAL ALLEGATIONS

### I.    EchoStar Launched DISH Network

26.     The DISH Network brand began in 1996, when EchoStar Communications Corporation ("ECC"), a telecommunications company founded by Charles Ergen, launched the DISH brand to market satellite-delivered digital television.  In 2007, ECC announced it would spin off (the "Spin-Off") its technology and infrastructure assets into EchoStar, a separate company, and that the remainder of the company would continue under the name DISH Network Corporation.  The Spin-Off completed on January 1, 2008, and DISH Network operated as an independent, publicly traded company until the end of 2023.  After the Spin-Off, however, EchoStar and DISH Network remained under the common control of Charles Ergen, who was the Chief Executive Officer and Chairman of the board of directors of DISH Network at the time.

27.     DBS was formed in 1996 as a wholly owned subsidiary of ECC.  In connection with the Spin-Off, DISH Network contributed certain satellites, uplink and satellite transmission assets, real estate, and other assets and related liabilities, including $1.0 billion of cash, to EchoStar.  After the Spin-Off and ECC's renaming, DBS continued as a subsidiary of DISH Network.

28.     DBS operates the pay-tv segment of DISH Network's business, which currently accounts for the vast majority of DISH Network's yearly revenue.  In 2023, the pay-tv segment accounted for roughly 76% of the company's total revenue *and 100% of its operating income*.  The

pay-tv segment, however, has struggled in recent years.  In 2023, the pay-tv segment generated $11.6 billion in revenues, a 7.5% decrease from 2022.  As of December 31, 2023, DBS had 8.53 million pay-tv subscribers in the United States, including 6.471 million DISH TV subscribers and 2.06 million SLING TV subscribers.  DBS's business continues to decline because, among other reasons, the continued proliferation of high-speed internet accessibility.  Indeed, DBS's subscriber count declined 8.9% in 2022 and 12.6% in 2023.

29.    The following chart illustrates a simplified corporate structure of DISH Network as of June 2023:



## II.    DBS Issues Notes

30.    From 2014 through 2021, DBS issued a series of unsecured notes, including: (a) $2.0 billion aggregate principal amount of 5.875% senior unsecured notes due November 15, 2024, governed by that certain indenture dated as of November 20, 2014; (b) $2.0 billion aggregate

principal amount of 7.75% senior unsecured notes due July 1, 2026, governed by that certain indenture dated as of June 13, 2016 (the "2026 DBS Unsecured Notes"); (c) $1.0 billion aggregate principal amount of 7.375% senior unsecured notes due July 1, 2028, governed by that certain indenture dated as of July 1, 2020 (the "2028 DBS Unsecured Notes"); and (d) $1.5 billion aggregate principal amount of 5.125% senior unsecured notes due June 1, 2029, governed by that certain indenture dated as of May 24, 2021 (the foregoing notes, collectively, the "DBS Unsecured Notes").

31.     In total, DBS incurred $6.5 billion in debt by issuing the DBS Unsecured Notes, $6.48 billion of which remained outstanding as of December 31, 2023.

32.     Then, on November 26, 2021, after issuing the DBS Unsecured Notes, DBS issued two series of secured notes, including: (a) $2.75 billion aggregate principal amount of 5.25% Senior Secured Notes due December 1, 2026 (the "DBS 5.25% Secured Notes"); and (b) $2.5 billion aggregate principal amount of 5.75% Senior Secured Notes due December 1, 2028 (the "DBS 5.75% Secured Notes" and together with the DBS 5.25% Secured Notes, the "DBS Secured Notes").  As of December 31, 2023, all $5.25 billion aggregate principal amount of the DBS Secured Notes remained outstanding.

33.     The DBS Secured Notes are guaranteed by various subsidiaries of DBS, including Network LLC, DISH Operating L.L.C., Echosphere L.L.C., DISH Network Service L.L.C., DISH Broadcasting Corporation, DISH Technologies L.L.C., and Sling TV, and are secured by substantially all existing and future tangible and intangible assets of DBS and the guarantor subsidiaries on a first priority basis, subject to certain exceptions.

34.     The indentures for the DBS 5.75% Secured Notes and the 2026 DBS Unsecured Notes (together, the "DBS Indentures") are governed by New York law.

35.     DBS used the proceeds from the DBS Secured Notes to make an intercompany loan to DISH Network pursuant to a Loan and Security Agreement dated November 26, 2021 (the "InterCo Loan").  The InterCo Loan generated interest income for DBS and was secured by the cash proceeds thereof and an interest in any wireless spectrum licenses acquired by DISH Network using such proceeds.

36.     The InterCo Loan was a significant development for investors and for rating agencies in their evaluation of the credit quality of DBS and the value of the DBS Unsecured Notes.  On November 8, 2021, Moody's said in a release with respect to the ratings of DISH Network and DBS (and their various debt instruments):

> The affirmation of DBS's CFR is due to the neutralizing effect of the intercompany loan on the impact from the new debt issuance . . . We anticipate that the intercompany loan terms will be structured to effectively mirror or exceed the cost of the new secured notes and link DBS more closely to DISH [Network] but will fall far short of a full bilateral guarantee and consolidation of the two credits. The downgrade of the existing senior unsecured notes at DBS is caused by the issuance of the new secured notes, which will result in contractual subordination of the unsecured notes and potential disproportionate loss absorption relative to the new secured notes if a bankruptcy were to occur. However, we note that the unsecured notes will be contractually senior to the new secured notes with respect to certain realizations under the intercompany loan and any collateral pledged as security for the intercompany loan.[2]

37.     Moody's press release reflected the concern that DBS investors (particularly holders of DBS Unsecured Notes) had with respect to DBS's incurrence of additional secured debt. To partially allay those concerns, DBS lent the proceeds from the DBS Secured Notes to DISH Network via the InterCo Loan.  DBS excluded the InterCo Loan from the definition of "Collateral" in the security agreement for the DBS Secured Notes.  In turn, the holders of the DBS Secured

---

[2]     Moody's Ratings, *Moody's downgraded DISH Network's CFR and unsecured notes to B2; affirmed DISH DBS's B2 CFR, downgraded its unsecured notes to B3, and assigned a Ba3 rating to its new secured notes*, MOODY'S (Nov. 8, 2021), https://www.moodys.com/research/Moodys-downgraded-DISH-Networks-CFR-and-unsecured-notes-to-B2-Rating-Action--PR_457797.

Notes agreed to subordinate their right to repayment to the holders of the DBS Unsecured Notes with respect to the proceeds of the InterCo Loan.

### III.    The Capital Structure and Financial Condition of DBS and DISH Network

38.    Due to the issuance of the DISH Network convertible notes, the DISH Network secured notes, the DBS Unsecured Notes, and the DBS Secured Notes, DISH Network and its indirect subsidiary DBS had incurred over ***$20 billion*** in debt.

39.    Consistent with the above, the following table lists DISH Network's various liabilities as of March 31, 2023:

## CAPITAL STRUCTURE

| Tranche | Amount |
|---|---|
| 5.250% Senior Secured Notes | $2,750 |
| 5.750% Senior Secured Notes | 2,500 |
| **Total DISH DBS Secured Debt** | **$5,250** |
| 5.875% Senior Notes | 2,000 |
| 7.750% Senior Notes | 2,000 |
| 7.375% Senior Notes | 1,000 |
| 5.125% Senior Notes | 1,500 |
| **Total DISH DBS Debt** | **$11,750** |
| 11.750% Senior Secured Notes | 3,500 |
| **Total DISH "TopCo" Secured Debt** | **$3,500** |
| 2.375% Convertible Notes | 1,000 |
| 0% Convertible Notes | 2,000 |
| 3.375% Convertible Notes | 3,000 |
| **Total DISH "TopCo" Debt** | **$9,500** |
| Other Notes Payable | 126 |
| Finance Lease Obligations | 166 |
| **Total Consolidated Debt** | **$21,542** |

40.    Prior to January 10, 2024, approximately $5 billion of certain DISH Network convertible notes were trading between 52 and 61 cents on the dollar (yielding between approximately 27% and 32%), indicating that the market believed such notes would not be repaid in full.

41.     Like DISH Network's notes, DBS's funded debt was also trading well below par prior to January 10, 2024.  Indeed, even before EchoStar rerouted $4.7 billion of the InterCo Loan away from DBS (as described in more detail below), the DBS Secured Notes were trading as low as 78 cents (yielding approximately 12%) and the DBS Unsecured Notes were trading as low as 50 cents (yielding approximately 25%).  Notably, only a few months ago, DISH Network recognized the difficult financial market and its place in it, noting that there was a "narrow path" to achieve financial stability.[3]

## IV.    EchoStar Merged with DISH Network

42.     Roughly 15 years after the Spin-Off, on August 8, 2023, DISH Network and EchoStar entered into an agreement to re-merge the two companies and their subsidiaries.  The original plan for the merger was for DISH Network to acquire EchoStar, with EchoStar surviving as a wholly owned subsidiary of DISH Network.  Under that plan, all outstanding EchoStar stock would be converted into the right to receive DISH Network stock of equivalent value.

43.     On October 2, 2023, however, the parties entered into an Amended and Restated Agreement and Plan of Merger (the "Amended Merger Agreement"), which reversed the original merger's structure.  Under the Amended Merger Agreement, EchoStar would acquire DISH Network, with DISH Network surviving as a wholly owned subsidiary of EchoStar.  Accordingly, the Amended Merger Agreement provided for the conversion of outstanding DISH Network stock into EchoStar stock.  On December 31, 2023, DISH Network and EchoStar merged as contemplated in the Amended Merger Agreement: EchoStar acquired DISH Network, and DISH Network survived as EchoStar's subsidiary.

---

[3]     DISH Network Corp., *Corrected Transcript: DISH Network Corp.(DISH-US), Q3 2023 Earnings Call*, Octus (Nov. 6, 2023, 12:00 PM ET), https://app.reorg.com/v3#/items/transcript-factset/14956?item_id=65493581684c5b49c10d0e84.

44.    The purported justification for the Amended Merger Agreement was to "unlock incremental strategic, financial and operating flexibility," and was first considered by DISH Network's board in August 2023.[4]   In fact, the reversal was the first step in a scheme to avoid repaying creditors of DBS and DISH Network.  By having DISH Network become a subsidiary of EchoStar, it ensured that none of EchoStar's value would be available to pay creditors of DISH Network and its subsidiaries (including DBS).  This intent is evidenced by the Asset Transfers (as defined below) themselves and the language used to describe them: "EchoStar . . .  announced today the completion of a series of strategic transactions to further **unlock incremental strategic, financial and operating flexibility** for its business."[5]   The merger facilitated the Asset Transfers that harmed the DBS Noteholders represented by Plaintiffs and can be viewed—together with the Exchange Offers (as defined below)—as one step in a single, integrated transaction and scheme to defraud creditors.

## V.    EchoStar Announced Asset Transfers that Transfer and Unencumber Assets in Violation of the Indentures and Applicable Law

45.    Mere days after the merger was consummated, it became clear that EchoStar, DBS, and DISH Network's goal was to defraud creditors.  On January 10, 2024, EchoStar issued a press release (the "January 10 Press Release") setting forth a series of transactions (the "Asset Transfers") completed by EchoStar and its subsidiaries, including DISH Network and DBS.

46.    According to the January 10 Press Release, the Asset Transfers included the following transactions:

- DISH Network transferred certain of its unencumbered wireless spectrum licenses, including AWS-4, H-Block, CBRS, C-Band - Cheyenne, 12GHz, LMDS, 24 GHz, 28 GHz, 37GHz, 30GHz and 47GHz, under the umbrella of a newly formed

---

[4]    DISH Network Corp., Current Report (Form 8-K), Exhibit 99.1 at 1 (Jan. 10, 2024).

[5]    *Id.*

subsidiary, EchoStar Wireless Holding L.L.C., a direct wholly owned subsidiary of EchoStar (the "DISH Network Spectrum Transfer");

- DBS designated DBS InterCo Sub as an unrestricted subsidiary[6] for purposes of the relevant indentures governing such entities and transferred a portion of the receivable in respect of the InterCo Loan owed by DISH Network (valued at approximately $4.7 billion) (the "Assigned InterCo Loan") to DBS Interco Sub, which then assigned its rights as lender thereunder to EchoStar Receivable, a direct wholly owned subsidiary of EchoStar, such that amounts owed in respect of the Assigned InterCo Loan would now be paid by DISH Network to EchoStar Receivable (the "InterCo Loan Transaction").  In other words, the InterCo Loan Transaction resulted in DBS transferring an approximately $4.7 billion asset to a newly created wholly owned subsidiary of EchoStar for EchoStar's benefit;

- DBS transferred approximately three million DISH TV subscribers to a newly formed subsidiary, DBS Issuer, and designated it as an unrestricted subsidiary for purposes of the relevant indentures governing such entities (both the transfer and designation, the "DBS Subscriber Designation"); and

- DBS designated the Sling TV Subsidiaries—which appear to hold the Sling TV business—as unrestricted subsidiaries for purposes of the relevant indentures governing such entities (the "Sling TV Designation" and together with the Interco Loan Transaction and the DBS Subscriber Designation, the "DBS UnSub Transactions").

47.    A simplified diagram is included below:

---

[6]    Restriction is a mechanism used in indentures to determine which subsidiaries of the issuer will be required to comply with the indenture's covenants, guarantee the debt securities, and otherwise be subject to the terms of the indenture.  Subsidiaries that are not restricted (called unrestricted subsidiaries) are not subject to the terms of the indenture.  Usually, unrestricted subsidiaries' income and results of operations are also not counted in the calculation of the indenture financial covenants.  Since unrestricted subsidiaries are 'outside' of the indenture, the indenture covenants will limit the amount of assets and money that can be distributed to them by the issuer and its restricted subsidiaries.



### a. EchoStar Announced January 2024 Exchange Offers and Consent Solicitations Related to DISH Network's Funded Debt

48.    The nature of the fraudulent transfers became even more evident just a few days later when EchoStar announced its plan to engage in coercive exchange offers at the expense of the creditors.  On January 12, 2024, EchoStar announced that it had commenced offers to exchange (the "EchoStar Exchange Offer") any and all of the DISH Network convertible notes, each for 10.00% Senior Secured Notes due 2030 to be issued by EchoStar (the "EchoStar Notes"), pursuant to the terms described in a preliminary prospectus and consent solicitation statement, dated January 12, 2024.

49.     The EchoStar Exchange Offer was conditioned upon, among other things, at least a majority of the outstanding principal amount of the applicable notes being validly tendered and not properly withdrawn prior to the expiration date.  The expiration date for the EchoStar Exchange Offer was February 9, 2024.

50.     EchoStar stated that the purpose of the EchoStar Exchange Offer was to "further advance[] EchoStar's objective of realizing on the synergistic opportunities of the combined business to utilize its valuable portfolio of spectrum and other assets to optimize its capital structure to position the business to execute on its strategic goal of becoming the premier provider of terrestrial mobile, satellite connectivity, and content services."[7]    In reality, however, the EchoStar Exchange Offer was nothing more than an attempt to avoid repaying its existing creditors by taking assets away and holding them hostage.

51.      By February 9, 2024—the expiration date of the EchoStar Exchange Offer—the majority of noteholders had refused to participate in the exchange.  Having no choice, EchoStar terminated the EchoStar Exchange Offer.

### b. EchoStar Announced Exchange Offers and Consent Solicitations Related to DBS's Funded Debt

52.     On January 16, 2024, EchoStar and DBS Issuer announced an exchange offer, this time by DBS Issuer (the "DBS Exchange Offer" and, collectively with the EchoStar Exchange Offer, the "Exchange Offers") to issue new senior secured notes of DBS Issuer ("DBS Issuer Notes") in exchange for the DBS Unsecured Notes.  EchoStar expected the DBS Exchange Offer to close on February 12, 2024.

53.     Under the terms of the DBS Exchange Offer, DBS Issuer offered to exchange up to (a) $1 billion aggregate principal amount of the 5.875% senior unsecured notes due 2024 for Series

---

[7]     EchoStar Corp., Current Report (Form 8-K), Exhibit 99.1 at 1 (Jan. 16, 2024).

2024-1 Class A-1 10.00% Senior Secured Notes due 2030 and (b) $3 billion aggregate principal amount of the 7.75% senior unsecured notes due 2026, 7.375% senior unsecured notes due 2028, and 5.125% senior unsecured notes due 2029, each for 2024-1 Class A-2 10.00% senior secured notes due 2034. The DBS Exchange Offer contemplated that the later-dated DBS unsecured notes would be exchanged at a significant discount to par as reflected in the table below. As is the case with DISH Network, the massive discounts requested from holders of these notes reflected that DBS was insolvent and unable to pay those debts as they come due. The table also shows that the offer prices for the later-dated DBS unsecured notes were lower than the trading prices of those notes the day before the Asset Transfers were announced. This demonstrates that the DBS Exchange Offer was priced *specifically* to take advantage of the drops in price precipitated by their fraudulent transfers.

| Maturity | Pre-Transfer Price (1/9/24) | Post-Transfer Price (1/16/24) | *Change* | Tender Price . . . | . . . *compared to 1/9/24* |
|---|---|---|---|---|---|
| 2026 | **$69.75** | $56.25 | ($13.50) | $66.00 | **($3.75)** |
| 2028 | **$58.00** | $40.38 | ($17.63) | $50.00 | **($8.00)** |
| 2029 | **$50.00** | $36.50 | ($13.50) | $43.00 | **($7.00)** |

54.    The DBS Issuer Notes would have been secured by the assets of DBS Issuer, including the approximately three million DISH TV subscribers that DBS had transferred to DBS Issuer, as described in the January 10 Press Release.

55.    Concurrently with the DBS Exchange Offer, EchoStar, through DBS Issuer, solicited consents from the holders of each series of the DBS Unsecured Notes to amend the terms of the applicable series of such notes and corresponding indentures to, among other things, "eliminate certain events of default (including any defaults related to any payment default or acceleration of certain indebtedness and defaults related to the bankruptcy of DBS and substantially all of the covenants" in each such indenture and the DBS Unsecured Notes of the

applicable series.[8]    Specifically, the proposed amendments sought to eliminate the following provisions:

- Section 4.03 – Reports;

- Section 4.04 – Compliance Certificates;

- Section 4.07 – Limitation on Restricted Payments;

- Section 4.08 – Limitations on Dividend and Other Payment Restrictions Affecting Subsidiaries;

- Section 4.09 – Limitation on Incurrence of Indebtedness;

- Section 4.10 – Asset Sales;

- Section 4.11 – Limitation on Transactions with Affiliates;

- Section 4.12 – Limitation on Liens;

- Section 4.13 – Additional Subsidiary Guarantees;

- Section 4.15 – Offer to Purchase Upon Change of Control Event;

- Section 4.16 – Limitation on Activities of the Company;

- Section 4.18 – Accounts Receivable Summary;

- Section 4.19 – Dispositions of ETC and Non-Core Assets (for purposes of the 5.875% Senior Notes Indenture and the 7.75% Senior Notes Indenture)

- Section 4.19 – Dispositions of DTLLC and Non-Core Assets (for purposes of the DBS Indentures governing the 5.125% DBS Unsecured Notes and the 7.375% DBS Unsecured Notes);

- Section 4.20 – Payments for Consent; and

- Section 5.01 – Merger, Consolidation or Sale of Assets (with respect to requirements specified in clauses (c) and (d) thereof).

56.    Holders of the DBS Unsecured Notes could not (a) consent to the proposed amendments without tendering the applicable DBS Unsecured Notes in the relevant exchange offer

---

[8]    EchoStar Corp., Current Report (Form 8-K), Exhibit 99.2 at 2 (Jan. 16, 2024).

or (b) tender DBS Unsecured Notes of any series for exchange without consenting to the proposed amendments therefor.

57.    On January 29, 2024, after the market reacted negatively to the exchange offer, EchoStar terminated the DBS Exchange Offer.

### c. After the January 2024 Exchange Offers Failed, EchoStar Disclosed Going Concern Qualification

58.    Undeterred by the market's overwhelmingly negative reaction to the Exchange Offers, on information and belief, EchoStar sought to raise new capital using the raided property as collateral.  In EchoStar's 10-K filing for the 2023 fiscal year—its first financial filing since its merger with DISH Network—EchoStar disclosed that, together with its subsidiaries, including Hughes, DBS, and Dish Network, it had about $2.4 billion in cash and cash equivalents ("Cash on Hand") as of December 31, 2023.  But the company also disclosed that it had $951 million and $1.98 billion of debt maturing in March and November 2024, respectively, and is "forecasting negative cash flows" in 2024.[9]

59.    EchoStar's 10-K filing for the 2023 fiscal year also disclosed that "[b]ecause [EchoStar] do[es] not currently have committed financing to fund [its] operations for at least twelve months from the issuance of these consolidated financial statements, substantial doubt exists about [EchoStar's] ability to continue as a going concern."[10]  In particular, the company did not possess sufficient liquidity to pay both the $2 billion unsecured notes issued by DISH DBS due in November 2024 and subsequent interest on its other outstanding debt.  Like EchoStar's auditors, DISH Network's and DBS's auditors also made the same disclosures expressing substantial doubt as to whether these entities could continue as a going concern.  In other words,

---

[9]    EchoStar Corp. Annual Report (Form 10-K), Index to Consolidated Financial Statements at F-10 (Feb. 29, 2024).
[10]    *Id.*

as of January 10, 2024, the auditors lacked confidence that DBS had access to the liquidity to pay its debts as they come due.

## VI.    After Making the January 2024 Asset Transfers, DBS Further Dissipated Its Assets to Affiliates

60.    Having completed the Asset Transfers on or about January 10, 2024—and following the unsuccessful Exchange Offers—in the first quarter of 2024, DBS made advances (the "1Q2024 Advances") of approximately $555 million to certain "affiliates."  DISH Network, DBS's corporate parent, was the recipient of the 1Q2024 Advances.  The 1Q2024 Advances followed an initial set of advances, totaling approximately $421 million (the "4Q2023 Advances," and together with the 1Q2024 Advances, the "Advances"), made by DBS to Dish Network in the fourth quarter of 2023.  Thus, DBS transferred approximately *$976 million* to DISH Network in the last quarter of 2023 and the first quarter of 2024, all while being insolvent and carrying a going-concern qualification in its audit.

61.    DBS at first disclosed little information to the public about the Advances.  The Advances are recorded as "Advances to affiliates" in the Condensed Consolidated Balance Sheet as of March 31, 2024 contained in DBS's quarterly report on Form 10-Q for the quarter ended March 31, 2024 (the "1Q2024 10-Q"), and the 1Q2024 Advances are recorded as "Advances to/from affiliates" in the Condensed Consolidated Statement of Cash Flows for the quarter ended March 31, 2024 in the 1Q2024 10-Q. [11]   Nevertheless, DBS did not disclose any further information as to the purpose of the 1Q2024 Advances, nor the rationale for making the 1Q2024 Advances in the first quarter of 2024 (shortly after the transfer away of DBS's most valuable assets via the Asset Transfers).  Furthermore, the 1Q2024 10-Q failed to include all disclosures regarding the 1Q2024 Advances that would be required under applicable accounting guidance in the

---

[11]    DISH DBS Corp. Quarterly Report (Form 10-Q), Financial Statements at 1, 4 (Mar. 31, 2024).

footnotes to the financial statements contained therein, including, among other things, the nature of the relationships involved, a description of the transactions, the terms and manner of settlement and other information necessary to an understanding of the effects of the 1Q2024 Advances on the financial statements.  The same is true for the 4Q2023 Advances, about which DBS has been equally nebulous.  The omission to state these material facts is consistent with the overall scheme to hinder, delay and defraud the DBS noteholders represented by Plaintiffs and the other creditors of DBS, since the omitted disclosures would help alert investors to the nature of the scheme.

62.     The Advances are not ordinary course or common transactions for DBS.  The Advances appear in a new line in DBS's disclosures, first appearing in DBS's 2023 annual report filed earlier this year.  This irregularity—coupled with the fact that DBS was insolvent at the time it made the Advances and was under the specter of a going-concern qualification—makes apparent the true purpose of the Advances: they were made at the direction of DBS's ultimate parent, EchoStar, and its controlling shareholder, Charles Ergen, to siphon away as much value as possible from DBS—all for their own gain and DBS's creditors' detriment.

### a.  Despite This Lawsuit, Ergen Continues to Siphon Assets from DBS

63.     To address Defendants' unlawful conduct, Plaintiffs filed their original complaint on April 26, 2024.  In the face of that complaint, however, Defendants continued to violate Plaintiffs' legal rights and those of the DBS noteholders Plaintiffs represent, including by removing hundreds of millions of dollars in cash from DBS.  As described *supra*, the 4Q2023 Advances and the 1Q2024 Advances resulted in DBS transferring almost *$1 billion* to its parent company.  Compounding these actions, DBS made these advances without providing the related-party footnote disclosures mandated by the SEC and the Financial Accounting Standards Board. Plaintiffs amended their original complaint in part to allege that those transfers were unlawful.

64.    For more than eight months (during which DBS's notes due November 2024 were current liabilities, meaning coming due within one year), DBS failed to provide any disclosure to creditors regarding the nature of these Advances or how, if ever, they might be repaid.  After Plaintiffs sued DBS (and perhaps because Plaintiffs sued DBS and pointed out the inadequacy of DBS's disclosures), DBS provided additional disclosures in its second quarter 2024 quarterly report and recharacterized the Advances as long term obligations, memorialized by an intercompany loan agreement.  Only because of those additional disclosures do creditors now know that the intercompany agreement causes the now-long-term Advances to bear a below-market, non-cash interest rate and an August 2028 maturity, which does not reflect fair value for DBS's cash and instead reflects an off-market deal for DISH Network and Ergen.[12]

65.    DBS also announced that in the second quarter of 2024, DBS advanced an additional $526 million to DISH Network (the "2Q2024 Advances").  Most recently, DBS disclosed that it advanced an additional $483 million to DISH Network (the "3Q2024 Advances", and, together with the 4Q2023 and 1Q2024 Advances, the "Advances").  To date, the total amount transferred from DBS to DISH Network via the Advances totals approximately *$2 billion*.  So even after Plaintiffs filed the Complaint on behalf of DBS noteholders to prevent and remedy the harms caused by the Asset Transfers, and even after the filing of the Amended Complaint to address the ongoing looting of DBS as evidenced by the 4Q2023 Advances and the 1Q2024 Advances, Ergen caused DBS to transfer *a billion dollars* to DISH Network between April and

---

[12]    Among other things, the intercompany loan agreement established an interest rate and a maturity date on the intercompany loans subject to such agreement.  The intercompany loan is due in August 2028.  Interest accrues monthly on a variable rate, currently at 6.8% effective April 1, 2024, subject to adjustments based on, among other things, the weighted average cost of borrowing or the borrowing rate for new debt incurred by the company.  Interest payments with respect to the new intercompany loan shall be payable "in kind" and shall be added to the principal amount of the loan on each interest payment date.  During each of the three and six months ended June 30, 2024, DBS recorded $21 million of "Interest income" related to the above on its Condensed Consolidated Statements of Operations and Comprehensive Income.

September of this year.  There is a clear and unmistakable pattern to these transfers: Ergen is systematically, unlawfully, and fraudulently siphoning all available cash from DBS to fund other businesses that do not benefit creditors of DBS.

## VII.  The Asset Transfers and the Advances Were Made for Inadequate Consideration and Are Designed to Hinder, Delay, and Defraud DBS's Creditors

66.    These Asset Transfers, together with the amended merger structure, were all part of a broader bad faith scheme that included the transfers by DBS and were designed to enrich shareholders to detriment of the creditors, including the holders under the DBS Indentures.

67.    Through the DISH Network Spectrum Transfer and the InterCo Loan Transaction, DISH Network and DBS transferred a substantial portion of their assets—including wireless spectrum licenses and $4.7 billion of receivables—to newly-created unrestricted subsidiaries of EchoStar for *no consideration*.

68.    The DISH Network Spectrum Transfer resulted in DISH Network transferring the relevant spectrum—a portion of which EchoStar valued at $9 billion in the January 12 press release—for *nothing* in return.  It did not pay down indebtedness of DISH Network.  It did not enhance the equity value of its subsidiary.  Nor did it even receive an intercompany claim in return. Under *any* measure, the DISH Network Spectrum Transfer was a gratuitous transfer.  That transfer significantly harms DBS creditors because DISH Network owes DBS billions of dollars.

69.    The InterCo Loan Transaction resulted in DBS transferring approximately $4.7 billion of receivables to EchoStar (via a newly created, wholly owned subsidiary EchoStar Receivable) for *nothing* in return.  It was not used to pay down indebtedness of DBS.  It did not enhance the value of its subsidiary.  Nor did it even receive an intercompany claim in return.  Under *any* measure, the InterCo Loan Transaction was a gratuitous transfer.  That transfer massively reduces the assets available to satisfy the DBS notes.

70.     Further, the DBS Subscriber Designation and the Sling TV Designation significantly harmed DBS and the holders under the DBS Indentures as well.  The DBS Subscriber Designation resulted in DBS transferring a substantial portion of its subscriber base—over three million customers—to an unrestricted subsidiary, thereby placing those assets beyond the reach of its creditors.  The sole purpose of this transfer was to limit or eliminate creditor recovery of these valuable assets.  Indeed, as discussed *infra*, these fraudulently transferred assets were used to secure new financing from strategic lenders in violation of the rights of the DBS noteholders Plaintiffs represent.  Thus, the DBS Subscriber Designation is another intentional fraudulent transfer by DBS in furtherance of EchoStar's scheme.

71.     Ultimately, DBS's total aggregate subscriber base drives its value.  It is widely acknowledged in the pay-tv industry that an increase in subscribers results in a non-linear increase in value—and vice versa—due to additional bargaining power and a reduction in operating leverage.  This is especially relevant to negotiating programming costs, which is the largest variable cost for DBS.  Accordingly, once that subscriber base is disaggregated—as the DBS Subscriber Designation did here—the value of that subscriber base decreases, particularly considering the risks and uncertainty associated with the ultimate disposition of the transferred subscribers from the perspective of existing creditors or any potential new investor in DBS.  The transfer of more than a third of those subscribers to an unrestricted subsidiary destroys value due to both the revenue loss and the disaggregation of the subscriber base and constitutes a fraudulent transfer.  The harm from this fraudulent transfer is compounded by the Sling TV Designation, which designated the Sling TV Subsidiaries as unrestricted subsidiaries, further reducing the amount of assets from which Plaintiffs can recover.

72.     The Asset Transfers are deeply prejudicial to Defendants' creditors.  The Asset Transfers were made without the transferor entities receiving reasonably equivalent value—for certain transfers, DBS received no value at all.  And the Asset Transfers rendered the transferor entities insolvent.  Thus, the Asset Transfers constitute constructive fraudulent transfers as against the holders of notes issued and outstanding under the DBS Indentures.

73.     The Asset Transfers are also transfers made with the intent to hinder, delay, and defraud DBS's creditors, including the holders of the DBS 5.25% Secured Notes and the 2026 DBS Unsecured Notes.  DBS, being controlled by its dominating parent company, EchoStar, and EchoStar's dominating shareholder, Charles Ergen, concocted this scheme to avoid paying creditors in full and instead divert value to EchoStar and Ergen.

74.     The Asset Transfers bear a number of other badges of fraud that demonstrate the Asset Transfers were effectuated to benefit equity at the expense of creditors.  They were made to insiders for no consideration, rendered DBS insolvent, and resulted in new entities obtaining title to property despite the transferring entities retaining control of the property for the transferors' use.  Further, upon information and belief, they were designed to drive down the prices of the notes issued under the DBS Indentures to avoid having to repay them in full and to capture discount by EchoStar.

75.     S&P's downgrade of DBS's credit rating confirms as much.  On January 16, 2024, S&P said what any reasonable observer would say about the situation here: "We believe controlling shareholder Charlie Ergen has placed the interests of equity holders, including himself,

above that of creditors."[13]  Plaintiffs agree—Charles Ergen, through his indirect control of DBS and DISH Network, raided the property of DBS for his own benefit at the expense of creditors.

76.    The same is true for the Advances, which likely deepened DBS's existing insolvency resulting from the Asset Transfers.

## VIII. The Asset Transfers Rendered DBS Insolvent

77.    The Asset Transfers, taken together, rendered DBS insolvent.[14]  And the Advances only deepened DBS's existing insolvency.

78.    Even prior to the Asset Transfers, contemporaneous market evidence indicated that DBS's indebtedness would not likely be repaid in full.  For example, before the Asset Transfers were announced, the DBS Unsecured Notes and DBS Secured Notes were trading as low as 50 cents and 78 cents on the dollar, respectively.  These prices suggest the market's belief that such notes would not be repaid in full, and thus that DBS was insolvent before the Asset Transfers. Despite this apparent insolvency, DBS disclosed that it lent over $400 million dollars on an intercompany basis to DISH Network in the fourth quarter of 2023, even though DBS did not have the ability to repay its existing external creditors.

79.    DBS's insolvency following the Asset Transfers is even more pronounced.  DBS simply cannot transfer away billions in valuable assets—for no consideration—and remain solvent.

80.    Before the Asset Transfers, EchoStar had no direct interest in the transferred assets. After the Asset Transfers, EchoStar suddenly held billions of dollars of assets unencumbered by

---

[13]  Chris Mooney & Allyn Arden, *Dish Network and Dish DBS Downgraded To 'CC' On Announced Distressed Exchange, Outlook Negative; Debt Ratings Lowered*, S&P Global Ratings (Jan. 16, 2024), https://disclosure.spglobal.com/ratings/es/regulatory/article/-/view/type/HTML/id/3112495.

[14]  Indeed, today, DBS is insolvent on a book value basis.

any obligations, except for this lawsuit.  The Asset Transfers are simply gifts to equity holders, including Ergen.

81.     The debt markets did not react favorably to the Asset Transfers, as reflected in the market trading prices of DBS's debts.  For example, the DBS Unsecured Notes dropped in value, with certain tranches declining by over 30%, trading as low as 36 cents compared to par.

82.     Further, immediately after the Asset Transfers were announced, S&P downgraded DBS's secured and unsecured debt, lowering the latter to "CCC+" from "B-".  The downgrade was due to the lower recovery prospects after the transfers.  Indeed, S&P's dilution of DBS's "secured recovery prospects stem from its stripping away and shifting of certain collateral into a newly formed unrestricted subsidiary [which] holds 3 million Dish TV subscribers [and] represents about 45% of the company's existing satellite subscriber base."[15]  S&P recognized that those "assets will no longer serve as collateral for [the DBS Secured Notes], nor will [DBS Issuer's] assets guarantee the company's existing notes.  Therefore, we estimate the remaining collateral would result in roughly 70% recovery for the secured lenders, which compares with 95% prior to the transfer."[16]

83.     Similarly, S&P changed the recovery rating of the DBS Unsecured Notes to a "4," indicating a recovery level at 30-50% of par values.  S&P reduced the recovery rating due to DBS's "stripping away and shifting of certain collateral into a newly formed unrestricted subsidiary."[17]

84.     One business day later, S&P lowered their ratings again following the announcement of the EchoStar Exchange Offer.  S&P lowered all affected issue-level debt ratings

---

[15]    Chris Mooney & Kenny Tang, *DISH DBS Corp. Debt Ratings Lowered on Asset Transfers*, S&P GLOBAL RATINGS     (Jan.     12,     2024),     https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/sourceId/12967372.

[16]    *Id.*

[17]    *Id.*

to "CC."[18]  A "CC" rating indicates that the debt or debtor is currently "**highly vulnerable to nonpayment** . . . when a default has not yet occurred, but **S&P Global Ratings expects default to be a virtual certainty**, regardless of the anticipated time to default."[19]

85.    Importantly, these downgrades occurred *before* the DBS Exchange Offer was announced; S&P indicated if an exchange like the DBS Exchange Offer were to occur, "recovery coverage for both secured and unsecured DBS noteholders could be significantly diluted."[20]  S&P further stated that it would "lower the [issuer credit rating] on Dish Network Corp and Dish DBS Corp to SD and the issue-level rating on the affected issues to 'D' if the exchange is completed as proposed."[21]  A "D" rating indicates that an obligation is "**in default or in breach of an imputed promise**."[22]  Thus, had the Exchange Offers closed as contemplated, DBS would have been in default of its obligations according to S&P.

86.    After EchoStar terminated the exchanges, on March 13, 2024, S&P downgraded EchoStar's issuer creditor rating from "CCC+" to "CCC-" to "reflect the potential for a comprehensive debt restructuring."[23]  Consistent with the downgrade, S&P also lowered all issuer-

---

[18]    Chris Mooney & Allyn Arden, *Dish Network and Dish DBS Downgraded To 'CC' On Announced Distressed Exchange, Outlook Negative; Debt Ratings Lowered*, S&P GLOBAL RATINGS (Jan. 16, 2024) https://disclosure.spglobal.com/ratings/es/regulatory/article/-/view/type/HTML/id/3112495.

[19]    S&P Global Ratings Definitions, S&P GLOBAL RATINGS (June 9, 2023) https://www.spglobal.com/ratings/en/research/articles/190705-s-p-global-ratings-definitions-504352#:~:text=An%20obligation%20rated%20'CC'%20is,the%20anticipated%20time%20to%20default (emphasis added).

[20]    *Id.*

[21]    Chris Mooney & Allyn Arden, *Dish Network and Dish DBS Downgraded To 'CC' On Announced Distressed Exchange, Outlook Negative; Debt Ratings Lowered*, S&P GLOBAL RATINGS (Jan. 16, 2024) https://disclosure.spglobal.com/ratings/es/regulatory/article/-/view/type/HTML/id/3112495.

[22]    S&P Global Ratings Definitions, S&P Global Ratings (June 9, 2023) https://www.spglobal.com/ratings/en/research/articles/190705-s-p-global-ratings-definitions-504352#:~:text=An%20obligation%20rated%20'CC'%20is,the%20anticipated%20time%20to%20default (emphasis added).

[23]    *See* Chris Mooney & Kenny Tang, *EchoStar Corp. Downgraded To 'CCC-' From 'CCC+'; Outlook Negative; Various Rating Actions Taken on Subsidiaries*, S&P GLOBAL RATINGS (Mar. 13, 2024) https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/3138093.

level ratings two-notches across EchoStar's capital structure, including by lowering the rating of DBS's 5.875% senior unsecured notes due 2024 from "CCC+" to "CCC-."  S&P noted that EchoStar suffers from a "weak liquidity position" and that it "will need to raise at least $2 billion in external capital to repay its November 2024 maturity."[24]  It further observed that the Asset Transfer "significantly hurt recovery prospects for existing lenders," "the company's debt obligations are unsustainable," and "another subpar debt exchange offer is possible in the coming months."[25]  Ultimately, S&P concluded that "[t]he negative outlook on EchoStar's subsidiaries reflects that we view a restructuring as likely in the coming months."[26]

87.    Thus, upon information and belief, DBS is unable to pay its debts in full, has liabilities in excess of its assets, and has been rendered insolvent through the actions of its controlling parent, EchoStar.  DBS, as a major creditor of DISH Network, is further prejudiced by the harm to DISH Network resulting from the Asset Transfers.

88.    Having been rendered insolvent and unable to pay its debts in full by the Asset Transfers, DBS's subsequent payment of the Advances to its affiliates further deepened its insolvency.

## IX.    The Asset Transfers and Advances Caused DBS to Breach the DBS Indentures

89.    As holder-directed Trustees, Plaintiffs further assert that the Asset Transfers and Advances made by DBS also caused DBS to breach each of the DBS Indentures.

90.    First, the DBS Indentures include largely congruent provisions that prohibit DBS from transferring any assets to entities that are not bound to repay the DBS Secured and Unsecured Notes respectively, with certain contractual exceptions that apply only if "no Default or Event of

---

[24]    *Id.*

[25]    *Id.*

[26]    *Id.*

Default . . . would occur as a consequence thereof." One exception to this prohibition, colloquially referred to as the "builder basket" exception, allows transfers of limited amounts that grow over time as DBS generates value. Those amounts are determined by a formula contained in the DBS Indentures.

91.     The DBS Indentures each require the use of the "builder basket" for certain restricted payments ("Restricted Payments") including the Asset Transfers made by DBS. Under section 4.07(e)(ii), to use the builder basket, among other requirements, the Indebtedness to Cash Flow Ratio of DBS could not exceed 8 to 1 after "giving effect" to such Restricted Payments. The Indebtedness to Cash Flow Ratio of "the Company" is defined to exclude amounts related to the assets transferred in the Asset Transfers:

> "Indebtedness to Cash Flow Ratio" means, with respect to any Person, the ratio of: (a) the Indebtedness of such Person and its Subsidiaries (or if such Person is the Company, of the Company and its Restricted Subsidiaries) as of the end of the most recently ended fiscal quarter, plus the amount of any Indebtedness incurred subsequent to the end of such fiscal quarter; to (b) **such Person's Consolidated Cash Flow** for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur (the "Measurement Period"); provided, however, that **if such Person or any of its Subsidiaries** (or, if such Person is the Company, any of its Restricted Subsidiaries) **consummates an** acquisition, merger or other business combination or an Asset Sale or **other disposition of assets subsequent to the commencement of the Measurement Period for which the calculation of the Indebtedness to Cash Flow Ratio is made, then the Indebtedness to Cash Flow Ratio shall be calculated giving pro forma effect to such transaction(s) as if the same had occurred at the beginning of the applicable period**" (emphasis added).

92.     Consolidated Cash Flow is defined to mean:

> "with respect to any Person for any period, the **Consolidated Net Income** of such Person for such period, **plus**, to the extent deducted in computing Consolidated Net Income: (a) provision for **taxes based on income or profits**; (b) **Consolidated Interest Expense**; (c) **depreciation and amortization** (including amortization of goodwill and other intangibles) of such Person for such period; and (d) any extraordinary loss and any net loss realized in connection with any Asset Sale, in each case, on a consolidated basis determined in accordance with GAAP; provided

that **Consolidated Cash Flow shall not include interest income derived from the net proceeds of the Offering**" (emphasis added).

93.    The Consolidated Cash Flow of the Company is thus primarily based on its Consolidated Net Income, which is defined as follows: "[W]ith respect to any Person for any period, the aggregate of the Net Income of such Person and its Subsidiaries, **or, if such Person is the Company, of the Company and its Restricted Subsidiaries** for such period, on a consolidated basis, determined in accordance with GAAP . . . ."

94.    Thus, the calculation of DBS's Consolidated Net Income must exclude (i) any income associated with assets held by unrestricted subsidiaries or assets transferred away through the Asset Transfers and (ii) for each DBS Indenture, interest income derived from the net proceeds of the sale of the notes governed by that DBS Indenture.

95.    The DBS UnSub Transactions required the use of the "builder basket" for Restricted Payments under section 4.07 of the DBS Indentures.

96.    DBS has represented to the Trustees that it satisfied the 8 to 1 Indebtedness to Cash Flow Ratio under section 4.07 of the DBS Indentures with respect to the Asset Transfers.

97.    DBS's officers' certificate dated April 9, 2024 (the "Officers' Certificate"), purports to certify that DBS complied with the 8 to 1 Indebtedness to Cash Flow Ratio, stating, among other things, that the Asset Transfers complied with section 4.07 of the DBS Indentures. The Officers' Certificate suffers from several flaws that, when corrected, reveal DBS has failed to comply with the 8 to 1 Indebtedness to Cash Flow Ratio. Further, the Officers' Certificate did not disclose the myriad flawed assumptions that underpin its conclusions and which greatly impact the calculation of the 8 to 1 Indebtedness to Cash Flow Ratio. These flaws and flawed assumptions include but are not limited to the following:

- The Officers' Certificate's calculation of Consolidated Cash Flow purported to include interest income derived from the InterCo Loan and should not have included such

interest income. The Indenture governing the DBS 5.75% Secured Notes (the "<u>DBS Secured Notes Indenture</u>") *excludes* such interest income from the calculation of Consolidated Cash Flow since the InterCo Loan was made using the proceeds of the DBS Secured Notes, and the interest income from the InterCo Loan is "interest income derived from the proceeds of the Offering" of the DBS Secured Notes.

- In calculating the estimated Consolidated Cash Flow that was lost in the DBS UnSub Transaction, the Officers' Certificate relied on a projection of such amounts rather than historical last-twelve-months amounts. The pro forma calculations in the Officers' Certificate were required to give effect to the various Asset Transfers as if they had occurred at the beginning of the last-twelve-month period measured in the definition of "Indebtedness to Consolidated Cash Flow Ratio" in the DBS Indentures. This error resulted in a meaningful understatement of the Consolidated Cash Flow contribution of the assets transferred as part of the DBS UnSub Transaction.

- The Officers' Certificate calculation failed to conform to the Generally Accepted Accounting Principles ("<u>GAAP</u>"), as is required in the DBS Indentures, resulting in an overstatement of its pro forma EBITDA that directly affected the calculation of DBS's Consolidated Cash Flow (and, thus, its Consolidated Net Income).

- The Officer's Certificate failed to account for the cumulative effect of accounting rules changes and contains no confirmation that its calculations align with the GAAP as they existed at the time of the issuance of each relevant series of notes, as is required in the DBS Indentures.

- The Officers' Certificate failed to provide support for the allocation of existing shared costs related the transfer of pay tv subscribers and Sling TV subscribers and failed to account for the dis-synergy costs from separating the subscriber base through such transfers.

- The Officers' Certificate failed to provide support for the incremental selling, general, and administrative costs associated with transferring over half of pay-tv subscribers into new entities, which would require new intercompany arrangements and resulting administrative expense.

98.    Cumulatively, these errors and flaws undermine the credibility of the Officers' Certificate. They artificially inflate its calculation of DBS's Consolidated Net Income and pro forma Consolidated Cash Flow, which in turn renders illegitimate the Officers' Certificate's representations concerning compliance with the 8 to 1 Indebtedness to Cash Flow Ratio. After accounting for these errors and flaws and properly calculating the 8 to 1 Indebtedness to Cash Flow Ratio, DBS's Indebtedness to Cash Flow Ratio exceeded 8 to 1.

99.     Therefore, after giving effect to the DBS UnSub Transactions, DBS did not satisfy the 8 to 1 Indebtedness to Cash Flow Ratio, and DBS therefore has breached section 4.07.[27]  On information and belief, DBS's representation was thus untrue.

100.    Similarly, DBS has breached section 4.07 of the DBS Indentures by making the 1Q2024 Advances.  Like the Asset Transfers, the 1Q2024 Advances required the use of the "builder basket" for Restricted Payments under section 4.07 of the DBS Indentures.  DBS's cash flow necessarily has reduced since the date of the Asset Transfers and was continuing to diminish when DBS made the 1Q2024 Advances.  That is because DBS is losing subscribers over time and at an increasing rate, and accordingly losing cash flow.  After giving effect to the DBS UnSub Transactions and the Advances, DBS did not satisfy the 8 to 1 Indebtedness to Cash Flow Ratio.  Therefore, DBS also has breached section 4.07 by making the 1Q2024 Advances.  The same is true for the other Advances.

101.    Section 6.01(d) of the DBS Indentures provides that a default under section 4.07 of the indentures that remains uncured for 30 days constitutes an Event of Default.  Because the Advances and the Asset Transfers were made more than 30 days prior to the date of this filing, an Event of Default exists today.

102.    Second, section 5.01 of the DBS Indentures contains the following prohibition (subject to certain exceptions): "[DBS] shall not consolidate or merge with or into (whether or not [DBS] is the surviving entity), or sell, assign, transfer, lease, convey or otherwise dispose of all or

---

[27]    The Trustees assert that section 4.07 of the DBS Indentures has been breached by DBS as directed by the holders of a majority of the outstanding principal amount of the Notes outstanding under each of the DBS Indentures. The Trustee's allegations of Events of Default, which are disputed by the DBS, remain subject to judicial determination by the Court herein, and the Trustees reserve the right to rely upon the ultimate determination of the Court with respect to the administration of its duties under the DBS Indentures.

substantially all of its properties or assets in one or more related transactions to, another Person[.]"[28]

103.    This covenant looks only to DBS's assets (and not those of its subsidiaries) when evaluating particular transfers.  DBS's only assets were (a) its equity interests in several fully encumbered subsidiaries and (b) the InterCo Loan.

104.    At the time of the Asset Transfers, those equity interests were behind over $11.75 billion of debt guaranteed by those entities.  That debt was (and is today) trading at a significant discount.  As such, DBS's equity interests had little economic value, leaving the InterCo Loan as the only significant asset of DBS. DBS, however, transferred away approximately $4.7 billion (or 63%) of its interests in the InterCo Loan via the InterCo Loan Transactions.  Furthermore, from the perspective of a holder of DBS Unsecured Notes, since the InterCo Loan was the asset that was set aside to back the DBS Unsecured Notes (and keep their ratings from being further downgraded) at the time of the incurrence of the DBS Secured Notes in November 2021, the InterCo Loan was the "crown jewel" asset of DBS.

105.    Thus, DBS's transfer of its interest in the InterCo Loan constitutes a transfer of all or substantially all of DBS's assets to "other Persons," in violation of the DBS Indentures.

106.    Section 6.01(e) of the DBS Indentures provides that a failure by DBS "for 60 days after notice from the Trustee . . . to comply" with any of its agreements not separately specified in section 6.01 constitutes an Event of Default.  "Default" is defined in the DBS Indentures as "any event that is, or with the passage of time or the giving of notice or both would be, an Event of

---

[28]    DISH DBS Corp., Current Report (Form 8-K) Exhibit 4.1 – 5.125% Senior Notes Due 2029 Indenture at 68 (May 24, 2021).

Default."[29]  Accordingly, a breach of section 5.01 of the DBS Indentures would, subject to a determination by the Court, constitute a Default.

**X.    Undeterred by Plaintiffs' Lawsuit, DBS Announces DirecTV's Acquisition of DBS and Contemporaneous Transactions that Further Impact DBS's Creditors**

107.    On September 30, 2024, EchoStar and Ergen announced the latest step in their scheme to extract as much value as possible from DBS to the detriment of its creditors.  EchoStar filed a public disclosure, announcing certain completed transactions and other contemplated transactions and exchange offers involving DBS, DISH Network, and other EchoStar subsidiaries. These transactions include the following:

- DBS Issuer incurred $2.3 billion in new secured debt and $200 million in new preferred equity (the "DBS Issuer Financing");

- offers to exchange all outstanding DBS Secured Notes and DBS Unsecured Notes (other than the DBS Unsecured Notes due 2024) into new DBS notes of the applicable series (the "New DBS Notes" and such exchanges offers, the "DBS Acquisition Exchanges") and contemporaneous consent solicitations to facilitate the DBS Acquisition; and

- DIRECTV Holdings, LLC ("DTV") will acquire DBS, including its assets and liabilities, for one dollar (the "DBS Acquisition");

- certain holders of outstanding DISH Network convertible notes due 2025 and 2026 agreeing to exchange their notes for new EchoStar secured notes maturing in 2030, alongside EchoStar issuing $5.1 billion of committed senior secured notes due 2029 (respectively, the "DISH Converts Exchange" and "EchoStar Financing").

At their core, these transactions result in massive transfers of value to Ergen and his captive entities, defrauding the DBS noteholders represented by Plaintiffs and attempting to coerce them into accepting less than what they are owed.  These transactions are described in relevant part below.

---

[29]    *Id.* at 6.

### a. Ergen Encumbers the Fraudulently Transferred Assets That Were Transferred in the DBS Subscriber Designation

108. Through the DBS Issuer Financing, Ergen transferred away control of DBS Issuer and encumbered the assets transferred in the DBS Subscriber Designation through new financing.  Importantly, a large portion of the DBS Issuer Financing was lent by DTV's shareholders, giving them ulterior and strategic interests in providing capital to DBS Issuer, including to ensure the DBS Acquisition closes.

109. First, on September 29, 2024, DBS Issuer entered into an amended and restated limited liability company agreement pursuant to which, among other things, DBS Issuer issued to certain investors (the "Preferred Members") redeemable preferred equity interests (the "Preferred Membership Interests") with an aggregate liquidation preference of $200 million (the "Equity Investment").[30]  Following the Equity Investment, the Preferred Members have the right to appoint three out of the five managers of the board of managers of DBS Issuer.  The Preferred Members (or the managers appointed by the Preferred Members, as applicable) will also have certain negative consent rights with respect to DBS Issuer.  The Preferred Membership Interests are redeemable at DBS Issuers' option prior to the maturity date at a premium as described in the DBS Issuer amended and restated limited liability company agreement.  At maturity, DBS Issuer is required to redeem all of the Preferred Membership Interests issued and outstanding at such time, and upon payment in full of the aggregate liquidation preference, all rights of the Preferred Members will terminate.

---

[30]  The Preferred Membership Interests have a preferential cumulative return that accumulates monthly in arrears at a rate of (a) from (and including) September 29, 2024 and until (but excluding) the date that is twelve (12) months thereafter, at 13.25% per annum and (b) from (and including) the date that is twelve (12) months after September 29, 2024 and until June 30, 2029 (or the first business day thereafter), at 13.75% per annum, payable in cash monthly and a liquidation preference equal to the issue price plus all accrued and unpaid dividends.

110. Second, DBS Issuer, the several lenders and Alter Domus (US) LLC, as the administrative agent, entered into a loan and security agreement (the "DBS Issuer Loan and Security Agreement") that provides for a secured term loan facility (the "DBS Issuer Loan Facility" and, together with the borrowings thereunder and the Equity Investment, the "DBS Issuer Financing").  The DBS Issuer Loan Facility consists of (i) $1.80 billion of initial term loans drawable on September 29, 2024 (the "Initial Term Loans"), (ii) $500 million of Bridge Term Loans also drawable on September 29, 2024 (the "Bridge Term Loans") and (iii) an additional amount of incremental term loans (the "Roll-up Incremental Term Loans" and, together with the Initial Term Loans and the Bridge Term Loans, the "DBS Issuer Loans") which may be incurred from time to time subject to the terms of an undisclosed "Incremental Side Letter." DBS Issuer incurred the Initial Term Loans and Bridge Term Loans in full, in an aggregate principal amount of $2.30 billion.  Unless otherwise terminated pursuant to the terms of the Loan and Security Agreement, the Initial Term Loans and Roll-up Incremental Term Loans mature on June 30, 2029 and the Bridge Term Loans mature on September 30, 2025.[31]

111. The DBS Issuer Loans are purportedly secured by a lien on all of DBS Issuer's assets, including the assets that DBS transferred to it in the DBS Subscriber Designation and that are the subject of this litigation.  Those loans are also purportedly secured against equity interests in an "IP SPV LLC," which purportedly holds and licenses back an exclusive license to certain intellectual property rights owned by DBS Issuer relating to the subscription agreements

---

[31] Amounts outstanding under: (1) the Initial Term Loans bear interest initially at 10.75% per annum and increasing to 11.25% per annum after 12 months, (2) the Roll-up Incremental Term Loans bear interest at 11.00% initially and increase to 11.50% per annum after 12 months, and (3) the Closing Date Incremental Term Loans bear interest at 11.00% per annum.  The DBS Issuer Loans may be repaid within one year (x) with respect to the Initial Term Loans, subject to a customary make-whole premium and (y) with respect to the Closing Date Incremental Term Loans, a make-whole premium equal to 50% of the sum of all interest that would have accrued on such Closing Date Incremental Term Loans through the maturity date with respect thereto.  After one year, the DBS Issuer Loans may be redeemed above face value, ranging from 111.250% from (and including) to par depending on the loan and when the loan is redeemed.

transferred to DBS Issuer in the DBS Subscriber Designation. Those intellectual property rights were transferred to DBS Issuer sometime between the DBS Subscriber Designation and September 30, 2024.

112. After incurring the DBS Issuer Loans, DBS Issuer will distribute a portion of the proceeds from the DBS Issuer Loan Facility to DISH DBS pursuant to an undisclosed loan, guaranty, and security agreement (the "AG Intercompany Loan Facility"), which also provides for further loans from time to time in connection with the incurrence of Roll-up Incremental Term Loans. The remaining portion of the proceeds were set aside in an account and used to discharge DISH DBS's 5.875% senior notes due 2024 by maturity or to earlier discharge the indenture governing such notes in connection with the consummation of the Exchange Offers. Loans under the AG Intercompany Loan Facility apparently bear interest at rates that correspond to the then outstanding loans incurred under the Loan Facility plus 0.25%, and are purportedly secured to the maximum extent permitted by the Outstanding Notes Indentures by a first-priority lien on certain collateral, including, the portion of the Interco Loan that was not already fraudulently transferred by DBS.

113. The remaining proceeds derived from the DBS Issuer Loans will be used by DBS for certain purposes, including by funding certain additional intercompany transfers to DISH Network, whether in the form of a dividend, intercompany obligation, or otherwise. As described *infra*, any intercompany obligation incurred by DISH Network in exchange for these proceeds will be forgiven through the DTV Acquisition. As a result, DBS will receive inadequate consideration for passing along the proceeds of the DBS Issuer Financing to DISH Network.

### b. Ergen Launches New Exchange Offers for the DBS Notes

114.    Next, DBS launched offers to exchange its existing DBS Secured Notes and DBS Unsecured Notes (other than the DBS Unsecured Notes due 2024) for new DBS notes that would eventually be mandatorily exchanged for secured notes issued by DIRECTV Financing, LLC and DIRECTV Financing Co-Obligor, Inc. (the "DTV Notes"), with extended maturity dates and at meaningful discounts to par (with principal amounts equal to approximately 60–90% of exiting DBS notes).[32]  These massive discounts reflect that DBS is insolvent and unable to pay those debts as they come due.  The non-participating noteholders will retain their DBS notes, which will be assumed by DTV and subordinated to the DTV Notes.[33]

115.    To participate in the new exchange, participating holders would have been required to amend the existing notes to eliminate substantially all of the covenants and certain events of defaults, release all guarantees and all collateral securing the 2026 DBS Secured Notes and 2028 DBS Secured Notes, and permit any required reorganization or restructuring, corporate or other conversion, merger or consolidation of any subsidiaries, transfers of equity interests, and any other action necessary, in each case in connection with DTV's and DBS's reorganization and restructuring plans.[34]

---

[32]    EchoStar Press Release, *EchoStar Corporation Announces Exchange Offers and Consent Solicitations to exchange 5.25% Senior Secured Notes due 2026, 5.75% Senior Secured Notes due 2028, 7.75% Senior Notes due 2026, 7.375% Senior Notes due 2028, and 5.125% Senior Notes due 2029 Issued by DISH DBS Corporation for New DBS Notes (as defined herein) issued by DISH DBS Corporation* (Sept. 30, 2024), https://ir.echostar.com/news-releases/news-release-details/echostar-corporation-announces-exchange-offers-and-consent-1.

[33]    EchoStar Corp., Current Report (Form 8-K), Ex. 99.4, Slide 16 (Sept. 30, 2024).

[34]    EchoStar Press Release, *EchoStar Corporation Announces Exchange Offers and Consent Solicitations to exchange 5.25% Senior Secured Notes due 2026, 5.75% Senior Secured Notes due 2028, 7.75% Senior Notes due 2026, 7.375% Senior Notes due 2028, and 5.125% Senior Notes due 2029 Issued by DISH DBS Corporation for New DBS Notes (as defined herein) issued by DISH DBS Corporation* (Sept. 30, 2024), https://ir.echostar.com/news-releases/news-release-details/echostar-corporation-announces-exchange-offers-and-consent-1.

116.    The exchange would only be effective if, among other conditions, (i) 67% of holders agree to participate in the exchange, and (ii) DBS captures at least $1.568 billion in aggregate principal discount.[35] The expiration date for the DBS Notes Exchange was November 12, 2024, and the DBS Notes Exchange was not completed.[36]

### c.  DTV Proposes to Acquire DBS For One Dollar

117.    Also on September 29, 2024, DirecTV Holdings LLC (DTV) agreed to purchase all of DBS (its assets and its liabilities) for $1.00, subject to certain terms and conditions. Not $1 billion. Not $1 million. One dollar.

118.    DTV has the right to terminate their obligation to purchase DBS if the DBS Acquisition Exchanges do not result in reducing DBS's liabilities by over $1.5 billion (the amount of debt reduction DBS sought to achieve through the DBS Notes Exchange). Taken together, the DTV Acquisition values DBS at less than ***negative $1.5 billion***, admitting again that DBS is insolvent.[37]

119.    Unsurprisingly, after the transactions were announced, S&P again downgraded DBS's and DISH Network's credit ratings. This time, S&P dropped the relevant ratings to 'CC' from 'CCC-' and downgraded DBS's recovery ratings to '6' from '4' (for DBS Unsecured Notes)

---

[35]    *Id.*

[36]    *Id*

[37]    Unsurprisingly, Ergen and EchoStar took advantage of this value extraction and raised additional debt and equity at the EchoStar and DISH Network level on the news. On September 30, 2024, EchoStar and DISH Network also entered into a transaction support agreement with a group of DISH Network convertible noteholders holding more than 85% of aggregate DISH Network convertible notes due 2025 and 2026. Pursuant to that agreement, the noteholders agreed to (i) purchase and/or backstop an aggregate $5 billion of new 10.75% Spectrum Senior Secured Notes due 2029 to be issued by EchoStar at closing and (ii) exchange all their existing convertible notes for 6.375% Spectrum Senior Secured Notes due 2030 and 3.875% Spectrum Secured Convertible Notes due 2030. A related party of Charles Ergen also committed to purchase and/or backstop $100 million of the new EchoStar notes, increasing the total amount of new EchoStar notes to $5.1 billion. The new EchoStar notes will be secured by first-priority liens on EchoStar's licenses in respect of AWS-3 and AWS-4 spectrums and the equity interests in EchoStar's subsidiaries that hold such licenses. Additionally, EchoStar entered into subscription agreements with certain investors, including a corporation controlled by Charles Ergen, for the purchase of $400 million of EchoStar Class A common stock at a purchase price of $28.04 per share. These transactions were completed on November 12.

and to '3' from '2' (for DBS secured notes).[38]  Importantly, these ratings "do not reflect the distressed exchange offers related to the DirecTV acquisition," and just reflect the negative effects of the DBS Issuer Loans and DBS's contemplated forgiveness of the InterCo Loan.[39]  As S&P explains, it lowered DBS's recovery ratings because "its direct source of recovery—the tranche B Intercompany Loan will be assumed unavailable and secondly its indirect source of recovery—the unrestricted pay-tv subscriber base now secures the" DBS Issuer Loans.[40]

120.    Instead, S&P intends to further lower its ratings guidance upon completion of the new exchange offers.  S&P explained that it viewed the DBS Acquisition Exchanges "as tantamount to a default" because "the exchange rate as part of the mandatory exchange consideration into new DirecTV issuer notes is at a significant discount to par for most issues and the maturity dates will be extended.  S&P viewed the DISH Exchanges as "distressed" because holders of existing DISH convertible notes "are being offered less value than the original promise because the principal amount of new debt provided in the restructuring is less than the original par amount, the new debt's maturity extends beyond the original, and timing of payments is slowed on the 3.375% tranche."[41]  Upon completion of the proposed transactions, S&P said it would "lower [its] ratings on Dish DBS and Dish Network to 'SD' and the affected unsecured notes to 'D.'"[42]

121.    On November 14, 2024, S&P issued additional ratings.  S&P reiterated that the DBS Acquisition Exchanges were credit negative.  Noting that the DBS Acquisition Exchanges were rejected by holders, S&P viewed these developments as "credit negative because EchoStar

---

[38]  S&P Global Ratings, Dish *DBS And Dish Network Downgraded To 'CC' From 'CCC-' On Announced Distressed Exchange; Other Actions Taken*, S&P GLOBAL (Oct. 1, 2024), https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/3260113.
[39]  *Id.*
[40]  *Id.*
[41]  *Id.*
[42]  *Id.*

will be unable to eliminate about $11 billion of Dish DBS debt, with a need to refinance $4.7 billion of DISH DBS' debt in 2026 if the merger fails."[43]  The only reason DBS's credit rating was not further reduced from CC was because DBS and its creditors may agree to a different offer "in the coming weeks." [44]

        **d.**        **DTV Acquisition Would Allow Further Asset Stripping of DBS**

122.     Further, the DTV Acquisition takes significant assets away from DBS that could be used to repay at least part of DBS's multibillion-dollar liabilities.  For example, as part of the DTV Acquisition, DBS is required to forgive all intercompany balances between it and DISH Network and/or EchoStar.  This includes forgiving both Tranche A and Tranche B of the InterCo Loan, *resulting in DBS permanently losing over $7.6 billion in accrued intercompany receivables*.  It must further *forgive the $2 billion Advances* to Dish Network.  All told, DBS will lose approximately *$9.7 billion* in intercompany receivables alone through the DTV Acquisition.  If those intercompany balances are allowed to accrue interest through the anticipated closing date of the DTV Acquisition, that total balloons to over *$10.3 billion* in lost receivables.  Further, prior to closing the DTV Acquisition, DTV will permit Ergen and DISH Network *to transfer over an additional $1.7 billion in cash to DISH Network* before DTV takes ownership of DBS.

## JURISDICTION AND VENUE

123.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because all Plaintiffs and all Defendants are entirely diverse.  Additionally, this Court has jurisdiction because Defendants removed this action pursuant to 28 U.S.C. § 1441.

---

[43]   Chris Mooney & Kenny Tang, *Echostar Corp. Upgraded To 'CCC+' On Exchange At Subsidiary Dish Network Corp, Outlook Negative; Other Actions Taken*, S&P Global Ratings (Nov. 14, 2024), available at https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/3283703.

[44]   *Id.*

124.    This Court has jurisdiction over Defendants pursuant to NY CPLR § 301 because Defendants, through subsidiaries, continually transacted substantial business in the state of New York.   EchoStar, through its subsidiaries, including Defendants, provides Internet and other satellite-based services throughout New York.   Similarly, DBS and its subsidiaries offer their services throughout New York and maintain physical locations and have numerous employees in New York.

125.    This Court also has jurisdiction over Defendants pursuant to NY CPLR § 302(a)(1) because Defendants transacted business within the state of New York and Plaintiffs' claims are substantially related to Defendants' transaction of business in New York.  All relevant notes were issued in New York and are governed by New York law.

126.    The DBS Unsecured Notes were issued in the form of global notes that were deposited with the Depository Trust Company, a New York company that operates out of New York City.

127.    Venue is proper in this District because Defendants properly removed this action pursuant to 28 U.S.C. § 1441, meaning venue lies in this District.

128.    Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims, including the issuance of the relevant notes, occurred in Manhattan, New York, New York.

## FIRST CLAIM FOR RELIEF
### Declaratory Judgment Under NY CPLR § 3001
### (Against DBS)

129.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

130.    Plaintiffs and Defendant DBS are parties to the DBS Indentures.

131.    The DBS Indentures are valid and enforceable agreements governed by New York law.

132.    The Plaintiffs have performed all obligations under the DBS Indentures.

133.    DBS breached the plain language of the DBS Indentures, frustrating the intent of the parties at the time of contracting.

134.    Based on calculations provided to the Trustees by the holders who are directing the Trustees to bring this action, the DBS UnSub Transactions violated the Restricted Payments covenants contained in the DBS Indentures.

135.    Under the DBS Indentures, DBS is prohibited from transferring any assets to entities that are not bound to repay the DBS notes, subject to certain contractual exceptions, including the "builder basket" exception that permits transfers of limited amounts determined pursuant to an equation in the DBS Indentures.

136.    The DBS UnSub Transactions required the use of the "builder basket" for Restricted Payments under section 4.07 of the DBS Indentures.

137.    Section 4.07 of the DBS Indentures provides that, to use the "builder basket," among other things, the Indebtedness to Cash Flow Ratio of DBS could not exceed 8 to 1 after giving effect to such Restricted Payments.    Indebtedness to Cash Flow Ratio compares Indebtedness to Consolidated Cash Flow and is defined to exclude unrestricted subsidiaries and to give pro forma effect to any transfers that occurred in connection with the relevant Restricted Payment or after the end of the relevant measurement period.

138.    The Consolidated Cash Flow of DBS is based on its Consolidated Net Income, which is defined as "with respect to any Person for any period, the aggregate of the Net Income of such Person and its Subsidiaries, or, if such Person is the Company, of the Company and its

Restricted Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP. . . ."

139.    Thus, the calculation of DBS's Consolidated Net Income must exclude income associated with assets held by unrestricted subsidiaries.

140.    The DBS UnSub Transactions caused each of DBS Issuer and the Sling TV Subsidiaries to become unrestricted subsidiaries.

141.    Based on calculations provided to the Trustees by the holders who are directing the Trustees to bring this action, the businesses held by DBS Issuer and the Sling TV Subsidiaries represented more than half of DBS's Consolidated Net Income and Consolidated Cash Flow.  After giving effect to the DBS UnSub Transactions, DBS's Indebtedness was more than eight times its Consolidated Cash Flow.

142.    Therefore, on information and belief, after giving effect to the DBS UnSub Transactions, the 8 to 1 Indebtedness to Cash Flow Ratio is not met and, therefore, such transactions constitute a breach of the DBS Indentures.

143.    Further, DBS may only use the "builder basket" if "no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof."  Because the DBS UnSub Transactions violated other provisions of the indentures, including section 5.01 of each, DBS could not use the "builder basket."  DBS breached section 4.07 of the DBS Indentures for this reason as well.

144.    Additionally, DBS breached section 5.01 of the DBS Indentures, which provides that, subject to certain non-applicable exceptions, "[DBS] shall not consolidate or merge with or into (whether or not [DBS] is the surviving entity), or sell, assign, transfer, lease, convey or

otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, another Person[.]"

145. The InterCo Loan Transaction and related transfers made by DBS constitutes a transfer of all or substantially all the assets of DBS, in one or more related transactions, to other Persons, in violation of section 5.01 of the DBS Indentures.

146. DBS only has two types of meaningful assets: the equity interests in its subsidiaries and the $4.7 billion InterCo Loan owed to DBS by DISH Network. Because of the billions of dollars of distressed debts owed by those subsidiaries, the equity interests in such subsidiaries are worth a de minimis amount compared to the $4.7 billion InterCo Loan. By transferring over 63% of that receivable to "another Person"—EchoStar Receivable—DBS violated section 5.01 of the DBS Indentures.

147. The foregoing breaches of the DBS Indentures have caused damages to the noteholders represented by Plaintiffs in an amount to be determined at trial.

148. Based on the representations made to them by the holders who are directing the prosecution of this action, Plaintiffs are entitled to a declaratory judgment under NY CPLR § 3001 declaring that DBS breached the DBS Indentures.

## SECOND CLAIM FOR RELIEF
### Declaratory Judgment Under NY CPLR § 3001
### (Against DBS)

149. Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

150. Plaintiffs and Defendant DBS are parties to the DBS Indentures.

151. The DBS Indentures are valid and enforceable agreements governed by New York law.

152. The Plaintiffs have performed all obligations under the DBS Indentures.

153.    DBS breached the plain language of the DBS Indentures, frustrating the intent of the parties at the time of contracting.

154.    Based on calculations provided to the Trustees by the holders who are directing the Trustees to bring this action, each of the Advances violated the Restricted Payments covenants contained in the DBS Indentures.

155.    Under the DBS Indentures, DBS is prohibited from transferring any assets to entities that are not bound to repay the DBS Notes, subject to certain contractual exceptions, including the "builder basket" exception that permits transfers of limited amounts determined pursuant to an equation in the DBS Indentures.

156.    The Advances required the use of the "builder basket" for Restricted Payments under section 4.07 of the DBS Indentures.

157.    Section 4.07 of the DBS Indentures provides that, to use the "builder basket," among other things, the Indebtedness to Cash Flow Ratio of DBS could not exceed 8 to 1 after giving effect to such Restricted Payments.   Indebtedness to Cash Flow Ratio compares Indebtedness to Consolidated Cash Flow and is defined to exclude Unrestricted Subsidiaries and to give pro forma effect to any transfers that occurred in connection with the relevant Restricted Payment or after the end of the relevant measurement period.

158.    The Consolidated Cash Flow of DBS is based on its Consolidated Net Income, which is defined as "with respect to any Person for any period, the aggregate of the Net Income of such Person and its Subsidiaries, or, if such Person is the Company, of the Company and its Restricted Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP. . . ."

159.    Thus, the calculation of DBS's Consolidated Net Income must exclude income associated with assets held by Unrestricted Subsidiaries.

160.    The DBS UnSub Transactions caused each of DBS Issuer and the Sling TV Subsidiaries to become Unrestricted Subsidiaries.

161.    Based on calculations provided to the Trustees by the holders who are directing the Trustees to bring this action, the businesses held by DBS Issuer and the Sling TV Subsidiaries represented more than half of DBS's Consolidated Net Income and Consolidated Cash Flow.  After giving effect to the DBS UnSub Transactions, DBS's Indebtedness was more than eight times its Consolidated Cash Flow.

162.    Therefore, on information and belief, after giving effect to the DBS UnSub Transactions and the Advances, the 8 to 1 Indebtedness to Cash Flow Ratio was not met at the time DBS made the 1Q2024 Advances or any of the other Advances.

163.    Further, DBS may only use the "builder basket" if "no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof."  Because the DBS UnSub Transactions violated other provisions of the indentures, including section 5.01 of each, DBS could not use the "builder basket."  DBS breached section 4.07 of the DBS Indentures by making the Advances for this reason as well.

164.    The foregoing breaches of the DBS Indentures have caused damages to the noteholders represented by Plaintiffs in an amount to be determined at trial.

165.    Based on the representations made to them by the holders who are directing the prosecution of this action, Plaintiffs are entitled to a declaratory judgment under NY CPLR § 3001 declaring that DBS breached the DBS Indentures.

### THIRD CLAIM FOR RELIEF
**Actual Intent Fraudulent Transfer Under CUFTA § 105(1)(a)**
**(Against DBS, EchoStar Receivable, and DBS InterCo Sub)**

166.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

167.    The InterCo Loan Transaction constitutes an actual intent fraudulent transfer under CUFTA section 38-8-105(1)(a) and is voidable as to Plaintiffs.

168.    Prior to, at the time of, and following the InterCo Loan Transaction, Plaintiffs, on behalf of the noteholders they represent, were creditors of Defendant DBS, with claims arising under the DBS Indentures.

169.    The InterCo Loan Transaction is a "transfer" under CUFTA section 38-8-102(13).

170.    Through the InterCo Loan Transaction, DBS transferred its right to payment on the $4.7 billion Assigned InterCo Loan to DBS InterCo Sub, which then assigned its rights thereunder to EchoStar Receivable, a newly formed, wholly owned subsidiary of EchoStar—DBS's ultimate parent company—for no consideration.

171.    DBS effectuated the InterCo Loan Transaction with actual intent to hinder, delay, or defraud creditors, as evidenced by multiple badges of fraud, including the following:

- The transfers were made to an insider;

- The transfers were made for no consideration and provide no value to DBS or its creditors;

- DBS was insolvent at the time of and following the transfers;

- The transfers involved a transfer of substantially all of DBS's assets.

172.    The InterCo Loan Transaction passed through DBS InterCo Sub and was ultimately transferred to EchoStar Receivable and for the benefit of EchoStar.

**FOURTH CLAIM FOR RELIEF**
**Constructive Fraudulent Transfer Under CUFTA §§ 105(1)(b) and 106(1)**
**(Against DBS, EchoStar Receivable, and DBS InterCo Sub)**

173.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

174.    The InterCo Loan Transaction constitutes a constructive fraudulent transfer under CUFTA section 38-8-105(1)(b) and section 38-8-106(1) and is voidable as to Plaintiffs.

175.    Prior to, at the time of, and following the InterCo Loan Transaction, Plaintiffs, on behalf of the noteholders they represent, were creditors of Defendant DBS, with claims arising under the DBS Indentures.

176.    The InterCo Loan Transaction constitutes a "transfer" under CUFTA section 38-8-102(13).

177.    DBS did not receive any value, let alone reasonably equivalent value, from the InterCo Loan Transaction.

178.    On information and belief, (a) DBS was insolvent, (b) DBS was engaged or was about to engage in a business or a transaction for which DBS's remaining assets were unreasonably small in relation to the business or transaction, and (c) DBS intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

179.    Further, DBS's assets are worth less than its liabilities following the Asset Transfers, as indicated by the trading prices of DBS's debts and rating agency guidance.

180.    DBS was in a precarious financial condition prior to the InterCo Loan Transaction, as evidenced by the fact that its funded debt was trading well below par. DBS's financial condition worsened because of the InterCo Loan Transaction. Immediately after such transaction, S&P

downgraded DBS's creditworthiness and reduced the recovery rating of the DBS Unsecured Notes, including the 2026 DBS Unsecured Notes.

181.    The InterCo Loan Transaction passed through DBS InterCo Sub and was ultimately transferred to EchoStar Receivable the benefit of EchoStar.

<u>**FIFTH CLAIM FOR RELIEF**</u>
**Actual Intent Fraudulent Transfer Under CUFTA § 105(1)(a)**
**(Against DBS, Network LLC, and DBS Issuer)**

182.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

183.    The DBS Subscriber Designation constitutes an actual intent fraudulent transfer under CUFTA section 38-8-105(1)(a) and is voidable as to Plaintiffs.

184.    Prior to, at the time of, and following the DBS Subscriber Designation, Plaintiffs, on behalf of the noteholders they represent, were creditors of Defendants DBS and Network LLC, with claims arising under the DBS Indentures.

185.    Through the DBS Subscriber Designation, DBS and/or Network LLC transferred three million DISH TV subscribers—some of its most valuable assets—to DBS Issuer for no consideration.  DBS Issuer did not transfer any property in return.

186.    The DBS Subscriber Designation constitutes a "transfer" under CUFTA section 38-8-102(13).  Through the DBS Issuer Financing, DBS Issuer subsequently encumbered the assets fraudulently transferred to it through the DBS Subscriber Designation.

187.    DBS and/or Network LLC effectuated the DBS Subscriber Designation with actual intent to hinder, delay, or defraud creditors, as evidenced by multiple badges of fraud, including the following:

- The transfers were made to an insider;

- The transfers were made for no value to DBS and/or Network LLC or its creditors;

- DBS and/or Network LLC was insolvent at the time of and following the transfers;

- The transfers were made in connection with a transfer of substantially all of DBS's and/or Network LLC's assets.

### SIXTH CLAIM FOR RELIEF
**Constructive Fraudulent Transfer Under CUFTA §§ 105(1)(b) and 106(1)**
**(Against DBS, Network LLC, and DBS Issuer)**

188.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

189.    The DBS Subscriber Designation constitutes a constructive fraudulent transfer under CUFTA section 38-8-105(1)(b) and section 38-8-106(1) and is voidable as to Plaintiffs.

190.    Prior to, at the time of, and following the DBS Subscriber Designation, Plaintiffs, on behalf of the noteholders they represent, were creditors of Defendants DBS and Network LLC, with claims arising under the DBS Indentures.

191.    The DBS Subscriber Designation constitutes a "transfer" under CUFTA section 38-8-102(13).  Through the DBS Issuer Financing, DBS Issuer subsequently encumbered the assets fraudulently transferred to it through the DBS Subscriber Designation.

192.    DBS and/or Network LLC did not receive reasonably equivalent value from the DBS Subscriber Designation due to both the loss of revenue and the lost value to DBS of the disaggregation of its subscriber base.

193.    On information and belief, (a) DBS and/or Network LLC was insolvent, (b) DBS and/or Network LLC was engaged or was about to engage in a business or a transaction for which DBS's and/or Network LLC's remaining assets were unreasonably small in relation to the business or transaction, and (c) DBS and/or Network LLC intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

194.    Further, DBS's and/or Network LLC's assets are worth less than its liabilities following the Asset Transfers, as indicated by the trading prices of DBS's debts and rating agency guidance.

195.    DBS and/or Network LLC was in a precarious financial condition prior to the DBS Subscriber Designation and other Asset Transfers, as evidenced by the fact that its funded debt was trading well below par.  DBS's and/or Network LLC's financial condition worsened because of the DBS Subscriber Designation and other Asset Transfers.  Immediately after such transactions, S&P downgraded DBS's creditworthiness and reduced the recovery rating of the DBS Unsecured Notes.

## SEVENTH CLAIM FOR RELIEF
### Actual Intent Fraudulent Transfer Under CUFTA § 105(1)(a)
### (Against DBS and DISH Network)

196.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

197.    The Advances constitute actual intent fraudulent transfers under CUFTA section 38-8-105(1)(a) and are voidable as to Plaintiffs.

198.    Prior to, at the time of, and following the Advances, Plaintiffs, on behalf of the noteholders they represent, were creditors of Defendant DBS, with claims arising under the DBS Indentures.

199.    The Advances are "transfers" under CUFTA section 38-8-102(13).

200.    Through the Advances, DBS has transferred approximately $2 billion (or more) in cash to DISH Network—DBS's parent company—for inadequate consideration (*i.e.*, a deeply subordinated "IOU" from DISH Network that is due after DBS's debts mature, bears interest at a below-market rate, and is unlikely to ever be repaid in full).

201.    DBS effectuated the Advances with actual intent to hinder, delay, or defraud creditors, as evidenced by multiple badges of fraud, including the following:

- the transfers were made to an insider;

- the transfers were concealed from creditors via material omissions in DBS's SEC disclosures;

- the transfers were made outside of the ordinary course of business;

- the transfers were not negotiated at arms' length;

- DBS received less than reasonably equivalent value in connection with the transfers; and

- at the time of and following the transfers, DBS was insolvent and unable to pay its debts as they mature.

## EIGHTH CLAIM FOR RELIEF
### Constructive Fraudulent Transfer Under CUFTA §§ 105(1)(b) and 106(1)
### (Against DBS and DISH Network)

202.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

203.    The Advances constitute constructive fraudulent transfers under CUFTA section 38-8-105(1)(b) and section 38-8-106(1) and are voidable as to Plaintiffs.

204.    Prior to, at the time of, and following the Advances, Plaintiffs, on behalf of the noteholders they represent, were creditors of Defendant DBS, with claims arising under the DBS Indentures.

205.    The Advances constitutes "transfers" under CUFTA section 38-8-102(13).

206.    DBS did not receive reasonably equivalent value from the Advances.

207.    DBS was insolvent, was engaged or was about to engage in a business or a transaction for which DBS's remaining assets were unreasonably small in relation to the business

or transaction, and intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

208.    Further, DBS was in a precarious financial condition prior to the Advances, and DBS's financial condition worsened because of the Advances.

### NINTH CLAIM FOR RELIEF
**Actual Intent Fraudulent Transfer Under CUFTA § 105(1)(a)**
**(Against DBS, Network LLC, DBS Issuer, and DISH Network)**

209.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

210.    DBS incurred substantial obligations in connection with the DBS Issuer Financing and the AG Intercompany Loan Facility.  The proceeds of those obligations were or will be immediately transferred to DISH Network for inadequate consideration.

211.    Prior to, at the time of, and after entering into the DBS Issuer Financing and AG Intercompany Loan Facility, Plaintiffs, on behalf of the noteholders they represent, were creditors of Defendant DBS, with claims arising under the DBS Indentures.

212.    Through the DBS Issuer Financing and the AG Intercompany Loan Facility, DBS incurred approximately $2.3 billion (or more) in new obligations.  Such obligations encumber assets DBS previously fraudulently transferred to other entities in violation of Plaintiffs' rights.

213.    DBS effectuated the DBS Issuer Financing and AG Intercompany Loan Facility as part of a series of transactions designed with actual intent to hinder, delay, or defraud creditors, as evidenced by multiple badges of fraud, including the insider nature of the transaction, the failure to disclose the terms of the AG Intercompany Loan Facility, and that the proceeds of the obligations are intended to be gratuitously transferred to DISH Network while DBS is insolvent.

**TENTH CLAIM FOR RELIEF**
**Constructive Fraudulent Transfer Under CUFTA §§ 105(1)(b) and 106(1)**
**(Against DBS, Network LLC, DBS Issuer, and DISH Network)**

214.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

215.    DBS incurred substantial obligations in connection with the DBS Issuer Financing and the AG Intercompany Loan Facility.  The proceeds of those obligations were or will be immediately transferred to DISH Network for no consideration.

216.    Prior to, at the time of, and after entering into the DBS Issuer Financing and AG Intercompany Loan Facility, Plaintiffs, on behalf of the noteholders they represent, were creditors of Defendant DBS, with claims arising under the DBS Indentures.

217.    Through the DBS Issuer Financing and the AG Intercompany Loan Facility, DBS incurred approximately $2.3 billion (or more) in new obligations.  Such obligations directly and indirectly encumber assets DBS previously fraudulently transferred to other entities in violation of Plaintiffs' rights.

218.    DBS did not receive reasonably equivalent value from the DBS Issuer Financing and the AG Intercompany Loan Facility.

219.    At the time of the DBS Issuer Financing and the AG Intercompany Loan Facility, DBS was insolvent, was engaged or was about to engage in a business or a transaction for which DBS's remaining assets were unreasonably small in relation to the business or transaction, and intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court enter a judgment:

220.    Declaring that DBS has breached section 4.07 of the DBS Indentures and that, because more than 30 days have passed without that breach being cured, such breach constitutes an Event of Default under the DBS Indentures;

221.    Declaring that DBS's breach of section 5.01 of the DBS Indentures and that such breach constitutes a Default under those indentures for which the Trustee should provide notice to DBS;

222.    Avoiding and unwinding the InterCo Loan Transaction as an actual and/or constructive fraudulent transfer and recovering amounts transferred;

223.    Avoiding and unwinding the DBS Subscriber Designation as an actual and/or constructive fraudulent transfer and recovering amounts transferred;

224.    Enjoining and/or unwinding any additional fraudulent transfers or contemplated fraudulent transfers by Defendants, including the transfers contemplated in connection with the DBS Issuer Financing, DTV Acquisition, and related transactions, in connection with the above-described scheme;

225.    Awarding Plaintiffs damages to be distributed in accordance with the DBS Indentures;

226.    Awarding a money judgment against Defendants who received the fraudulently transferred property in the event that unwinding the transfers does not fully compensate Plaintiffs as representatives of noteholders under the DBS Indentures;

227.    Awarding Plaintiffs additional damages in the amount of one and one-half the value of the assets fraudulently transferred by Defendants or one and one-half the amount found to be owing under the DBS Indentures as contemplated by CUFTA section 38-8-108(c);

228.    Awarding Plaintiffs pre- and post-judgment interest;

229.    Awarding Plaintiffs attorney's fees; and

230.    Granting such other relief as this Court deems just and proper.

[*Remainder of page intentionally left blank*]

Dated: January 22, 2025
New York, New York

Respectfully submitted,

*/s/  Andrew M. Leblanc*
Dennis F. Dunne
Nelly Almeida
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone:  (212) 530-5770
Facsimile:   (212) 822-5770

- and -

Andrew M. Leblanc
S. Robert Marsters, Jr. (admitted *pro hac vice*)
**MILBANK LLP**
1850 K Street NW,
Suite 1100
Washington, D.C. 20006
Telephone:  (202) 835-7574
Facsimile:   (202) 263-7574

- and –

Samir L. Vora (admitted *pro hac vice*)
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, CA 90067
Telephone:  (424) 386-4316
Facsimile:   (213) 629-5063

*Attorneys for Plaintiffs*