UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, solely in its capacities as Trustees,<br><br>                Plaintiff,<br><br>    -against-<br><br>DISH DBS CORPORATION; DISH NETWORK CORPORATION; DISH NETWORK L.L.C.; ECHOSTAR INTERCOMPANY RECEIVABLE COMPANY, L.L.C.; DISH DBS ISSUER, L.L.C.; and DBS INTERCOMPANY RECIEVABLE L.L.C.,<br><br>                Defendants. | 24-CV-3646 (JGLC)<br><br>**OPINION AND ORDER** |

JESSICA G. L. CLARKE, United States District Judge:

DISH DBS Corporation, or DBS, is a part of a network of telecommunications companies owned by Charles Ergen that has undergone significant restructuring in the past few years. Creditors of DBS bring this lawsuit alleging that the recent restructuring efforts are a part of a scheme to siphon DBS's assets away from the hands of creditors. According to these creditors, Ergen first transferred key assets away from DBS to other entities under his control, then offered to transfer those assets back within the reach of creditors in exchange for billions in coerced debt forgiveness. And, according to DBS creditors, when this first coercion failed, Ergen proposed another coercive merger transaction that would allow him to walk away with billions in value, while pressuring creditors to forgive billions of dollars of debts.

Creditors seek declaratory judgment that DBS has breached the terms of its indentures and also seek damages for fraud. Defendants move to dismiss the complaint in its entirety. Because Defendants' arguments turn largely on factual disputes, and for further reasons stated

herein, the Court DENIES the motion to dismiss with regards to the breach of contract claims and certain fraud claims. However, because creditors fail to state actual injury arising from the September 2024 Transactions, Defendants' motion is GRANTED with respect to fraud claims predicated on those transactions.

## BACKGROUND

### I. Facts

The following facts are, unless otherwise noted, taken from the Second Amended Complaint (ECF No. 50, "SAC") and presumed to be true for the purposes of this motion. *See Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 175 (S.D.N.Y. 2021).

#### A. DBS, the DISH Network, and Their Creditors

In 1996, Charles Ergen, through his company EchoStar Communications Corporation, launched the DISH Network brand. SAC ¶ 26. At that time, DISH DBS Corporation ("DBS") was a wholly owned subsidiary of EchoStar Communications Corporation. *Id.* ¶ 27. Over time, the brand restructured to operate as the separate companies EchoStar and DISH Network Corporation ("DISH Network"), each with their own set of subsidiaries. *Id.* DBS continued as a subsidiary of DISH Network. *Id.* ¶ 26.

DBS operates the pay-tv segment of DISH Network's business, which accounts for the vast majority of DISH Network's yearly revenue. *Id.* ¶ 28. In 2023, the pay-tv segment accounted for roughly 76% of the company's total revenue and 100% of its operating income. *Id.* But the pay-tv segment has struggled in recent years, due to, among other things, the proliferation of high-speed internet accessibility. *Id.* In 2022, DBS's subscriber count declined 8.9%. In 2023, the count declined 12.6%. *Id.*

From 2014 through 2021, DBS issued a series of unsecured notes, through which DBS incurred $6.5 billion in debt. *Id.* ¶¶ 30–31. Then in November 2021, DBS issued two series of secured notes, through which DBS incurred $5.25 billion in debt. *Id.* ¶ 32. The secured notes are guaranteed by various subsidiaries of DBS, and are secured by substantially all existing and future tangible and intangible assets of DBS and the guarantor subsidiaries. *Id.* ¶ 33. As of December 31, 2023, $6.48 billion of the debt from unsecured notes remained outstanding, while all $5.25 billion of the debt from the secured notes remained outstanding. *Id.* ¶¶ 31, 32.

DBS used the proceeds from the secured notes to make an intercompany loan to DISH Network pursuant to a Loan and Security Agreement dated November 26, 2021 (the "InterCo Loan"). *Id.* ¶ 35. The InterCo Loan generated interest income for DBS and was secured by the cash proceeds of the InterCo Loan and an interest in any wireless spectrum licenses acquired by DISH Network using those proceeds. *Id.* DBS excluded the InterCo Loan from the definition of "Collateral" in the security agreement for the above-described DBS secured notes. *Id.* ¶ 37. And in turn, holders of DBS secured notes agreed to subordinate their right to repayment to holders of the DBS unsecured notes with respect to the proceeds of the InterCo Loan. *Id.* The InterCo Loan was a significant development for investors and for rating agencies in their evaluation of the credit quality of DBS and the value of the unsecured notes. *Id.* ¶ 36.

Due to the issuance of DISH Network notes, the DBS unsecured notes, and the DBS secured notes, DISH Network and its indirect subsidiary DBS had incurred over $20 billion in debt. *Id.* ¶ 38. Plaintiff U.S Bank Trust Company, National Association is a national banking association and appears solely in its capacity as trustee under indentures for DBS secured notes and certain unsecured notes—in other words, Plaintiff represents some DBS creditors. *Id.* ¶ 13. Plaintiff alleges that prior to January 10, 2024, trade values of certain DISH Network notes

indicated that the market believed such notes would not be repaid in full. *Id.* ¶ 40. Likewise, DBS's funded debt was also trading well below par prior to January 10, 2024. *Id.* ¶ 41.

**B.  The Merger and January 2024 Asset Transfers**

On August 8, 2023, DISH Network and EchoStar entered into an agreement to re-merge the two companies and their subsidiaries. *Id.* ¶ 42. The original plan was for DISH Network to acquire EchoStar as a wholly owned subsidiary. *Id.* All outstanding EchoStar stock would be converted into the right to receive DISH Network stock of equivalent value. *Id.* However, on October 2, 2023, the parties entered an agreement reversing the original merger's structure. *Id.* ¶ 43. Under the amended agreement, EchoStar would acquire DISH Network as a wholly owned subsidiary. *Id.* DISH Network stock would be converted into EchoStar Stock. *Id.* The amended merger was executed on December 31, 2023. *Id.* Plaintiff alleges that the reversal of the original merger was a scheme to avoid repaying creditors of DBS and DISH Network, by ensuring that none of EchoStar's value would be available to pay creditors of DISH Network and its subsidiaries, including DBS. *Id.* ¶ 44.

On January 10, 2024, EchoStar issued a press release setting forth a series of transactions that occurred as part of the restructuring (the "Asset Transfers"). *Id.* ¶ 45. The release announced that these transactions were to "further unlock incremental strategic, financial and operating flexibility" for the business. *Id.* ¶ 44 (emphasis omitted). The Asset Transfers included the following transactions (*id.* ¶ 46 and n.6):

- DISH Network transferred certain unencumbered wireless spectrum licenses to EchoStar Wireless Holding, L.L.C., a direct wholly owned subsidiary of EchoStar (the "DISH Network Spectrum Transfer").

- DBS designated DBS InterCo Sub as an unrestricted subsidiary for the purposes of the indentures governing such entities. Unrestricted subsidiaries are not subject to the terms of the relevant indentures. Usually, unrestricted subsidiaries' income and results of operations are not counted in the calculation of the indenture financial covenants. DBS then transferred a portion of the receivable from the InterCo Loan owed by DISH Network (valued at about $4.7 billion) to DBS Interco Sub. DBS InterCo Sub then assigned its rights as lender to EchoStar Receivable, a direct wholly owned subsidiary of EchoStar (the "InterCo Loan Transaction"). In other words, the InterCo Loan Transaction resulted in DBS transferring an approximately $4.7 billion asset to a new subsidiary of EchoStar.

- DBS transferred approximately three million DISH TV subscribers to a newly formed subsidiary, DBS Issuer. DBS designated DBS Issuer as an unrestricted subsidiary for purposes of relevant indentures (both the transfer and the designation, the "DBS Subscriber Designation").

- DBS designated the Sling TV Subsidiaries, which appear to hold the Sling TV business, as unrestricted subsidiaries for the purposes of relevant indentures (the "Sling TV Designation").

Plaintiff alleges that these Asset Transfers and the amended merger were part of a broader scheme designed to enrich shareholders to the detriment of the creditors. *Id.* ¶ 66.

Specifically, Plaintiff alleges that the DISH Network Spectrum Transfer transferred high value spectrum licenses to an EchoStar subsidiary for no consideration, despite the fact that DISH Network owes DBS billions of dollars. *Id.* ¶ 68. Plaintiff alleges that the InterCo Loan Transaction, also without consideration, massively reduces the assets available to satisfy the

DBS notes. *Id.* ¶ 69. Plaintiff alleges that the DBS Subscriber Designation resulted in the placement of substantial assets—three million customers—beyond the reach of DBS creditors. *Id.* ¶ 70. This transfer of customers "destroys value due to both the revenue loss and the disaggregation of the subscriber base." *Id.* ¶ 71. Similarly, Plaintiff alleges that the Sling TV Designation further reduces the amount of assets from which Plaintiff can recover. *Id.* Plaintiff notes that on January 16, 2024, S&P downgraded DBS's credit rating and stated: "We believe controlling shareholder Charlie Ergen has placed the interests of equity holders, including himself, above that of creditors." *Id.* ¶ 75 (internal citation omitted).

Based on the significant amount of asset transfer and reports by the S&P, including a creditor rating that reflects a "potential for a comprehensive debt restructuring," Plaintiff also alleges that the Asset Transfers rendered DBS insolvent. *Id.* ¶¶ 77–88.

**C.  The January 2024 Exchange Offers**

On January 12, 2024, EchoStar announced that it had commenced offers (the "EchoStar Exchange Offer") to exchange any and all of the DISH Network convertible notes for 10% senior secured notes due 2030 to be issued by EchoStar (the "EchoStar Notes"). *Id.* ¶ 48. The EchoStar Exchange Offer was conditioned upon, among other things, at least a majority of the outstanding principal amount of the applicable notes being validly tendered before the offer expired. *Id.* ¶ 49. EchoStar stated that the purpose of the EchoStar Exchange Offer was to "further advance[] EchoStar's objective of realizing on the synergistic opportunities of the combined business to utilize its valuable portfolio of spectrum and other assets to optimize its capital structure to position the business to execute on its strategic goal of becoming the premier provider of terrestrial mobile, satellite connectivity, and content services." *Id.* ¶ 50 (internal citation omitted). But Plaintiff alleges that the EchoStar Exchange Offer was in reality an attempt to avoid

repaying existing creditors "by taking assets away and holding them hostage." *Id.* Because the majority of noteholders had refused to participate in the exchange, EchoStar terminated the EchoStar Exchange Offer. *Id.* ¶ 51.

On January 16, 2024, EchoStar and DBS Issuer announced an exchange offer by DBS Issuer to issue new senior secured notes in exchange for DBS's unsecured notes (the "DBS Exchange Offer" and, collectively with the EchoStar Exchange Offer, the "Exchange Offers"). *Id.* ¶ 52. The DBS Issuer notes would have been secured by the assets of DBS Issuer, including the approximately three million DISH TV subscribers that DBS had transferred to DBS Issuer. *Id.* ¶ 54. DBS Issuer offered to exchange up to $1 billion aggregate principal amount of 5.875% senior unsecured notes due 2024 for 10% senior secured notes due 2030, and up to $3 billion aggregate principal amount of 7.75%, 7.327%, and 5.125% senior unsecured notes due 2026, 2028, and 2029 for 10% senior secured notes due 2034. *Id.* ¶ 53. The DBS Exchange Offer contemplated that the later-dated DBS unsecured notes would be exchanged at a significant discount to par, which, according to Plaintiff, reflects that DBS was insolvent and unable to pay those debts as they come due. *Id.* Moreover, the offer prices for the later-dated DBS unsecured notes were significantly lower than the trading prices of those notes the day before the Asset Transfers were announced. *Id.* Plaintiff alleges that the DBS Exchange Offer was priced specifically to take advantage of the drops in price caused by the Asset Transfers. *Id.*

During the DBS Exchange Offer, EchoStar, through DBS Issuer, solicited consents from DBS unsecured notes holders to amend the terms of the notes and their indentures. *Id.* ¶ 55. EchoStar solicited the consents to "eliminate certain events of default[,] including any defaults related to any payment default or acceleration of certain indebtedness and defaults related to the bankruptcy of DBS and substantially all of the covenants . . . ." *Id.* (internal citation omitted).

The consents would have eliminated several provisions of the indentures, including sections on reports and compliance certificates, limitations on payments and transactions and liens, asset sales, payments for consent, and merger and consolidation. *Id.* Notes could only be tendered for the DBS Exchange Offer if holders consented to the proposed amendments. *Id.* ¶ 56. On January 29, 2024, after the market had reacted negatively to the exchange offer, EchoStar terminated the DBS Exchange Offer. *Id.* ¶ 57.

### D. The Advances from DBS to DISH Network

In EchoStar's 10-K filing for the 2023 fiscal year, EchoStar disclosed that, together with subsidiaries, it had about $2.4 billion in cash and cash equivalents as of December 2, 2023. *Id.* ¶ 58. However, because EchoStar had about $2 billion of debt maturing in 2024, it was forecasting negative cash flows in 2024. *Id.* EchoStar disclosed that it did not have committed financing to fund its operations for the next twelve months, and therefore substantial doubt existed about EchoStar's ability to continue as a going concern. *Id.* ¶ 59. Plaintiff states that both EchoStar and auditors lacked confidence that DBS had access to the liquidity to pay its debts as they become due. *Id.*

In the fourth quarter of 2023, DBS made advances for DISH Network totaling approximately $421 million. *Id.* ¶ 60. Then in the first quarter of 2024, DBS made additional advances of about $555 million to DISH Network, totaling $976 million (the "Advances"). *Id.* The Advances were recorded as "Advances to affiliates," and according to Plaintiff, DBS did not disclose sufficient information about the Advances for observers to understand the effects of the Advances. *Id.* ¶ 61. Plaintiff alleges that these Advances and omissions about their details were part of the overall scheme to hinder, delay, and defraud creditors. *Id.* Plaintiff additionally alleges

that the Advances, made while insolvent, were not ordinary course or common transactions for DBS and were made to siphon value away from DBS. *Id.* ¶ 62.

On April 26, 2024, Plaintiff filed the original complaint in this lawsuit. *Id.* ¶ 63. Plaintiff amended the complaint to include allegations about the unlawfulness of the Advances. *Id.* Plaintiff alleges that for more than eight months, DBS failed to provide any disclosure to creditors regarding the nature of the Advances or how, if ever, they might be repaid. *Id.* ¶ 64. In its second quarter 2024 report, DBS provided additional disclosures about the Advances and recharacterized them as long-term obligations memorialized by an intercompany loan agreement. *Id.* According to Plaintiff, these disclosures reveal that the Advances bear a below-market, non-cash interest rate and an August 2028 maturity, which does not reflect fair value for DBS's cash and instead reflects and off-market deal for DISH Network and Ergen. *Id.*

DBS also announced that it advanced an additional $526 million to DISH Network in the second quarter of 2024, and more recently, advanced $483 million (combined with the earlier advances, the "Advances"). *Id.* ¶ 65. As of January 2025, the total amount transferred from DBS to DISH Network via the Advances totaled about $2 billion. *Id.* Plaintiff alleges that these Advances are Ergen's systematic and fraudulent attempt to siphon all available cash from DBS to fund other businesses that do not benefit creditors of DBS. *Id.*

### E. The DBS Indentures Provisions

Plaintiff alleges that the Asset Transfers and the Advances caused DBS to breach DBS indentures governing Plaintiff's notes (the "DBS Indentures"). Specifically, Plaintiff alleges violations of Section 4.07 and Section 5.01. *Id.* ¶¶ 89–106.

### 1. Section 4.07

First, DBS Indentures prohibit DBS from transferring assets to entities that are not bound to repay the DBS notes with certain exceptions. *Id.* ¶ 90. One exception, called the "builder basket" exception, allows transfer of limited amounts that grow over time as DBS generates value. *Id.* Plaintiff states that the DBS Indentures required the use of the "builder basket" for certain restricted payments ("Restricted Payments") such as the Asset Transfers. *Id.* ¶ 91.

In order to use the builder basket, Section 4.07 of the Indentures required that the Indebtedness to Cash Flow Ratio of DBS could not exceed 8 to 1 after giving effect to the Restricted Payments. *Id.* The Cash Flow Ratio is calculated using the Consolidated Cash Flow of the company and is primarily based on its Consolidated Net Income. *Id.* ¶¶ 92–93. The calculation of the Consolidated Net Income must exclude (i) any income associated with assets held by unrestricted subsidiaries or assets transferred away through the Asset Transfers and (ii) for each DBS Indenture, interest income derived from the net proceeds of the sale of the notes governed by that DBS Indenture. *Id.* ¶¶ 91, 94.

DBS obtained an officers' certificate dated April 9, 2024, that purports to certify that DBS complied with the 8 to 1 Indebtedness to Cash Flow Ratio for the Asset Transfers (the "Officers' Certificate"). *Id.* ¶ 97. Plaintiff, however, alleges that the Officers' Certificate is flawed and failed to disclose the flawed assumptions that underpinned its conclusions. *Id.* According to Plaintiff, these flaws and flawed assumptions included (among other things):

- The inclusion of interest income derived from the InterCo Loan, in violation of the terms setting forth how the Consolidated Cash Flow should be calculated;

- The use of a projection of the amount lost in certain Asset Transfer transactions, instead of historical last-twelve-months amounts, which resulted in an understatement of the Consolidated Cash Flow contribution of the assets transferred;

- The failure to conform to Generally Accepted Accounting Principles, which resulted the overstatement of a factor that directly affected the calculation of the Consolidated Cash Flow;

- The failure to account for the cumulative effect of accounting rules changes; and

- The failure to provide support for the allocation of certain costs related to the Asset Transfers and for the incremental costs associated with the Asset Transfers.

*Id.* Plaintiff alleges that after accounting for these errors and flaws, the Indebtedness to Cash Flow Ratio exceeded 8 to 1 at the time of the Asset Transfers, meaning that the Asset Transfers breached Section 4.07. *Id.* ¶ 98. For the same reasons, Plaintiff alleges that the Advances breached Section 4.07. *Id.* ¶ 100.

## 2. Section 5.01

Second, Section 5.01 of the DBS Indentures states: "[DBS] shall not consolidate or merge with or into (whether or not [DBS] is the surviving entity), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, another Person[.]" *Id.* ¶ 102 (alterations in original). Plaintiff alleges that this covenant looks only to DBS assets when evaluating transfers, and that DBS's only assets were (a) its equity interests in several fully encumbered subsidiaries and (b) the InterCo Loan. *Id.* ¶ 103. According to Plaintiff, at the time of the Asset Transfers, those equity interests had little economic value due to the significant debts that were trading at a significant discount. *Id.* ¶ 104. Moreover, the InterCo Loan was a fundamental asset that backed the DBS unsecured notes. *Id.* Plaintiff thus claims that DBS's transfer of its interest in the InterCo Loan constitutes a transfer of all or substantially all of DBS's assets to "other Persons" in violation of the DBS Indentures. *Id.* ¶ 105.

**F. September 2024 Transactions**

On September 30, 2024, EchoStar filed a public disclosure announcing certain completed transactions and other contemplated transactions and exchange offers involving DBS, DISH Network, and other EchoStar subsidiaries. *Id.* ¶ 107. Defined and described below, these transactions are the DBS Issuer Financing, the DBS Acquisition Exchanges, and the DBS Acquisition.

**1. DBS Issuer Financing & AG Intercompany Loan Facility**

On September 29, 2024, DBS Issuer, the unrestricted subsidiary holding three million DISH TV subscribers from the Asset Transfers, entered into an amended and restated limited liability company agreement. *Id.* ¶¶ 46, 109. Through this agreement, DBS Issuer issued to certain members redeemable preferred equity interests with an aggregate liquidation preference of $200 million. *Id.* ¶ 109. DBS Issuer also entered into a loan and security agreement, in which DBS Issuer incurred an aggregate principal debt amount of $2.30 billion. *Id.* ¶ 110. These loans are purportedly secured by a lien on all of DBS Issuer's assets, including the assets that DBS transferred to it in the DBS Subscriber Designation as a part of the Asset Transfers. *Id.* ¶¶ 46, 110. The proceeds from the loan were then to be distributed to DBS (the AG Intercompany Loan Facility). *Id.* ¶ 112. Most proceeds from the AG Intercompany Loan Facility went to repay DBS debt on the unsecured notes due in 2024. *Id*. According to Plaintiff, proceeds from the loans will be passed along to DISH Network, with DBS receiving inadequate consideration. *Id.* ¶¶ 112–13.

**2. DBS Acquisition Exchanges**

DBS launched offers to exchange its existing notes for new DBS notes that would eventually be mandatorily exchanged for notes issued by DirecTV Financing, LLC and DirecTV Financing Co-Obliger, Inc. (the "DTV Notes"). *Id.* ¶ 114. To participate in the new exchange,

holders would have to amend the existing notes to eliminate substantially all of the covenants and certain events of default, release all guarantees and all collateral securing the secured notes, and permit any required action in connection with DTV's and DBS's reorganization and restructuring plans. *Id.* ¶ 115. The exchange would only be effective if, among other things, two-thirds of the holders agreed to participate and DBS captured at least $1.568 billion in aggregate principal discount. *Id.* ¶ 116. The exchange was not completed. *Id.*

### 3. DBS Acquisition

On September 29, 2024, DirecTV Holdings LLC ("DTV") agreed to purchase all of DBS for $1.00. *Id.* ¶ 117. DTV has the right to terminate their obligation to purchase DBS if the DBS Acquisition Exchanges do not result in reducing DBS's liabilities by over $1.5 billion. *Id.* ¶ 118. As a part of the acquisition, DBS is required to forgive all intercompany balances between it and DISH Network and/or EchoStar, resulting in DBS losing over $7.6 billion in accrued company receivables and $2 billion in advances to DISH Network. *Id.* ¶ 122. The acquisition also permits DISH Network to transfer an additional $1.7 billion in cash to DISH Network before DTV takes ownership. *Id.* The acquisition has since been abandoned.

## II. Procedural History

Plaintiff filed its original complaint in New York state court on April 26, 2024. ECF No. 1-2. On May 13, 2024, Defendants removed to this Court. ECF No. 1. Defendants moved to dismiss the Complaint on June 27, 2024, after which Plaintiff filed the First Amended Complaint on July 18, 2024. ECF Nos. 20, 24. Defendants moved to dismiss the First Amended Complaint on August 15, 2024, and Plaintiff filed opposing briefing. ECF Nos. 29, 37.

On November 21, 2024, Plaintiff sought leave to amend the Complaint once more. ECF No. 43. Because the motion was unopposed, the Court granted Plaintiff's request. ECF No. 48.

On January 22, 2025, Plaintiff filed the Second Amended Complaint ("SAC"), which is the operative complaint. ECF No. 50. The SAC seeks declaratory judgment under the New York Civil Practice Law & Rules ("CPLR") § 3001 for breach of contract, damages for actual intent fraudulent transfer under the Colorado Uniform Fraudulent Transfer Act ("CUFTA") § 105(1)(a), and damages for constructive fraudulent transfer under CUFTA §§ 105(1)(b), and 106(1). Specifically, the SAC alleges that the Asset Transfers and Advances breached Section 4.07 of the DBS Indentures, that the InterCo Loan Transaction breached Section 5.01 of the DBS Indentures, and that the Asset Transfers, Advances, and September 2024 Transactions amounted to actual intent and constructive fraudulent transfers.

On February 18, 2025, Defendants moved to dismiss the SAC in its entirety. ECF No. 61 ("Mot."). Plaintiff opposes. ECF No. 65 ("Opp."). The Court held oral argument on August 6, 2025.

## LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and

common sense." *Id*. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678. If a complaint does not state a plausible claim for relief, it must be dismissed. *Id*. at 679.

## DISCUSSION

This section proceeds in three parts. First, the Court finds that Plaintiff has stated a breach of contract claim for breach of Indentures Section 4.07. Second, Plaintiff has likewise stated a breach of Indentures Section 5.01. Finally, Plaintiff has stated claims for fraudulent transfer, both actual intent and constructive, regarding the January 2024 Asset Transfers and the Advances, but not for the September 2024 Transactions.

## I.     Plaintiff States Claims for Breach of Indentures Section 4.07

Plaintiff claims that the January 2024 Asset Transfers and the Advances from DBS to DISH Network breached Section 4.07 of the DBS Indentures. "It is a well-established rule in this Circuit that the interpretation of Indenture provisions is a matter of basic contract law." *Bank of N.Y. Trust Co. v. Franklin Advisers, Inc.*, 726 F.3d 269, 276 (2d Cir. 2013) (internal quotation marks and citation omitted). To state a claim for breach of contract under New York law,[1] a plaintiff must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Sequi*, 91 F.3d 337, 348 (2d Cir. 1996). At the motion to dismiss stage, a court must resolve contractual ambiguities in favor of the plaintiff. *Cisco Sys., Inc. v. Synamedia Ltd*., 557 F. Supp. 3d 464, 471 (S.D.N.Y. 2021). In other words, "if the pleading is sufficient and the plaintiff has an arguable claim under the contract, then the claim should not be dismissed." *Axiom Inv. Advisors,*

_____

[1] The parties agree that New York law governs the issue. Mot. at 14–23; Opp. at 11–20.

*LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 533 (S.D.N.Y. 2017).

Plaintiff has alleged the existence of an agreement—the DBS Indentures—and adequate performance and damages are not at issue. *See* Mot. at 14–19. The question is whether DBS has breached Section 4.07 of the Indentures through the Asset Transfers and the Advances.

## A. The Asset Transfers

Section 4.07 prohibits DBS from transferring assets to entities that are not bound to repay the DBS notes with certain exceptions. SAC ¶ 90. One exception, called the "builder basket" exception, allows transfer of limited amounts that grow over time as DBS generates value. *Id.* In order to use the builder basket, Section 4.07 required that the Indebtedness to Cash Flow Ratio of DBS could not exceed 8 to 1 after giving effect to the Restricted Payments (the "8-1 Ratio Requirement"). *Id.* The Cash Flow Ratio is calculated using the Consolidated Cash Flow of the company and is primarily based on its Consolidated Net Income. *Id.* ¶¶ 92–93. The calculation of the Consolidated Net Income must exclude (i) any income associated with assets held by unrestricted subsidiaries or assets transferred away through the Asset Transfers and (ii) for each DBS Indenture, interest income derived from the net proceeds of the sale of the notes governed by that DBS Indenture. *Id.* ¶¶ 91–92, 94.

The parties do not dispute that DBS Indentures required the use of the "builder basket" for Restricted Payments such as the Asset Transfers. *Id.* ¶ 91; *see* Mot. at 14–17. Instead, Defendants contend that the Asset Transfers adhered to the 8-1 Ratio Requirement, as evidenced by the Officers' Certificate incorporated by Plaintiff's original complaint. Mot. at 15. The Officers' Certificate, issued on April 9, 2024, purports to certify that DBS complied with the 8-1 Ratio Requirement. SAC ¶ 97. Plaintiff, however, alleges that the Officers' Certificate is flawed

and failed to disclose the flawed assumptions that underpinned its conclusions. *Id.* According to

Plaintiff, these flaws and flawed assumptions include:

- The inclusion of interest income derived from the InterCo Loan, in violation of the terms setting forth how the Consolidated Cash Flow should be calculated;

- The use of a projection of the amount lost in certain Asset Transfer transactions, instead of historical last-twelve-months amounts, which resulted in an understatement of the Consolidated Cash Flow contribution of the assets transferred;

- The failure to conform to Generally Accepted Accounting Principles, which resulted the overstatement of a factor that directly affected the calculation of the Consolidated Cash Flow;

- The failure to account for the cumulative effect of accounting rules changes; and

- The failure to provide support for the allocation of certain costs related to the Asset Transfers and for the incremental costs associated with the Asset Transfers.

*Id.* Plaintiff alleges that after accounting for these errors and flaws, the Indebtedness to Cash

Flow Ratio exceeded 8 to 1 at the time of the Asset Transfers, meaning that the Asset Transfers

breached Section 4.07. *Id.* ¶ 98.

Defendants argue that Plaintiff's allegations that the Officers' Certificate is flawed are

conclusory, failing to "offer an alternative calculation or otherwise identify the mathematical

impact of any purported flaws in DBS's calculation of the 8-1 Leverage ratio." Mot. at 15.

Defendants challenge the sufficiency of Plaintiff's allegations about the Officers' Certificate

flaws on the following grounds:

- Interest income derived from the InterCo Loan is *not* "interest income derived from the proceeds of the Offering" of the DBS notes, and therefore were appropriately included in the DBS ratio calculation.

- DBS calculations were based on historical Consolidated Cash Flow, as evidenced by a memorandum accompanying the DBS Exchange Offer.

- The Indentures do not require the Officers' Certificate to comply with GAAP, and the Officers' Certificate did comply with GAAP; moreover, Plaintiff fails to allege how GAAP was disregarded.

- The Indentures do not require the Officers' Certificate to affirm compliance with GAAP, and the Officers' Certificate did in fact account for changes to the accounting rules.

- The Indentures do not require the Officers' Certificate to provide support for allocation of shared costs, and all costs were appropriately allocated and accounted for in the Officers' Certificate.

- The Officers' Certificate accounted for allocable costs and included appropriate disclosure in collection with the DBS Exchange Offer.

Mot. at 16–17. In essence, Defendants' challenges about the sufficiency of Plaintiff's allegations fall into one of three categories: (1) challenges about the proper interpretation of the Indentures and what they required of 8-1 Ratio Requirement calculations; (2) challenges relying on evidence not contained or incorporated in the SAC; and (3) challenges about the factual detail underlying the Officers' Certificate calculations. But none of these are appropriate consider here.

First, Plaintiff and Defendants' disputes about (1) whether the income derived from the InterCo Loan should be included in the DBS calculations and (2) what the Indentures require of the calculations in terms of affirmations of compliance with GAAP are essentially disputes over the interpretation of the Indentures. Both parties have put forth at least some reasonable explanations for why the Indentures should be interpreted as they claim. *See* SAC ¶¶ 91–97; Mot. at 16. The proper interpretation of a contractual provision cannot be decided on a motion to dismiss so long as both parties offer reasonable interpretations, *McBeth v. Porges*, 171 F. Supp. 3d 216, 229 (S.D.N.Y. 2016).

Second, Defendants ask the Court to consider the Offering Memorandum accompanying the DBS Exchange Offer and the Supplement for the Offering Memorandum. Defendants do not

show why it would be proper for the Court to consider these unincorporated materials outside the pleadings for this issue. *See Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir. 2006).

And finally, the Court disagrees that Plaintiff's allegations are merely conclusory. "A plaintiff need only allege enough facts to raise a right to relief above the speculative level and state a claim to relief that is plausible on its face." *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir. 2010). Here, Plaintiff has alleged that proper calculations under the Indenture provisions result in an excessive ratio, and Plaintiff has alleged six reasons why the Officers' Certificate wrongfully shows otherwise. SAC ¶ 98. Plaintiff has plausibly alleged an excess of the 8-1 Ratio Requirement and therefore a breach of this provision. Nothing more is required. Defendants' requested resolution of a myriad of factual disputes—including whether the Officers' Certificate complies with GAAP and whether all costs were properly allocated for—are inappropriate at the motion to dismiss stage. *See Cyber Apps World, Inc. v. EMA Fin., LLC,* 645 F. Supp. 3d 281, 289 (S.D.N.Y. 2022). As such, Plaintiff has adequately stated that the Asset Transfers breached Section 4.07.

## B. The Advances

Plaintiff alleges that the Advances breached Section 4.07 because they were Restricted Payments made when the 8-1 Ratio Requirement was not satisfied. *Id.* ¶ 100. Defendants contend that the Advances are not a Restricted Payment subject to the 8-1 Ratio Requirement. Mot. at 18.

Specifically, Defendants note that Section 4.07 permits DBS to make "[i]nvestments in the form of intercompany debt with any direct or indirect parent company" without regard to the 8-1 Ratio or builder baskets for investments "incurred in the ordinary course of business and used [by the recipient] in a business described in Section 4.16." ECF Nos. 60-2 § 4.07(8), 60-3 §

4.07(7). Section 4.16 describes business activities such as "developing, owning, engaging in and dealing with . . . media, entertainment, electronics or communications, and reasonably related extensions thereof[.]" ECF Nos. 60-2, 60-3 § 4.16.

Plaintiff, however, alleges that the Advances were not ordinary course or common transactions for DBS. SAC ¶ 62. Plaintiff supports this allegation with factual allegations that (1) DBS failed to provide any disclosure to creditors regarding the nature of the Advances or how, if ever, they might be repaid; (2) the Advances were made while DBS was likely insolvent, based on knowledge about the Asset Transfers and market reports; and (3) the Advances bear a below-market, non-cash interest rate and an August 2028 maturity, which does not reflect fair value for DBS's cash and instead reflects and off-market deal for DISH Network and Ergen. *Id.* ¶¶ 62–64. Ultimately, Plaintiff alleges that the Advances were a fraudulent transfer part of a broader scheme to defraud them. *Id.* ¶ 62. And as discussed below, Plaintiff has plausibly alleged that the Advances constitute fraudulent transfers. Because fraudulent transfers cannot be considered ordinary course transactions, Plaintiff has plausibly alleged that the Advances do not fall under the Section 4.07 ordinary course exception. Plaintiff has plausibly alleged, as discussed above, that the 8-1 Ratio Requirement was not met at the time of the Advances. Therefore, Plaintiff has plausibly alleged that the Advances breached Section 4.07 of the Indentures.

## II.     Plaintiff States a Claim for Breach of Indentures Section 5.01

Plaintiff also claims that the InterCo Loan Transaction that occurred as a part of the Asset Transfers breached Section 5.01 of the DBS Indentures. Section 5.01 states that DBS "shall not consolidate or merge with or into . . . or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets," subject to certain exceptions. ECF Nos. 60-2, 60-3 § 5.01.

### A. Successor Obligor Clauses

Defendants first argue that successor obligor clauses such as Section 5.01 are not intended to apply to internal reorganizations such as the InterCo Loan Transaction. Mot. at 19–20. Plaintiff contends that the general purpose of other successor obligor clauses should not be applied to Section 5.01, which does not contain language exempting internal reorganizations. Opp. at 19–20. Plaintiff also argues that the InterCo Loan Transaction was not an internal reorganization. *Id.*

The Second Circuit has indeed held that "[s]uccessor obligor clauses are 'boilerplate' or contractual provisions which are standard in a certain genre of contracts." *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982). Thus, "[s]uch boilerplate provisions] must be distinguished from contractual provisions which are peculiar to a particular indenture and must be given a consistent, uniform interpretation." *Id.* That said, even assuming that Section 5.01 is a boilerplate successor obligor clause, Defendants' cited cases do not stand for the proposition that such clauses categorically exempt internal restructuring transactions from noteholder approval. Mot. at 19–20. To the contrary, these cases appear to consistently look to the purpose of successor obligor clauses, leading to an inquiry on whether "all or substantially all" of the company's assets have been transferred.

Primarily, Defendants cite to *Bank of New York v. Tyco International Grp., S.A.*, 545 F. Supp. 2d 312 (S.D.N.Y. 2008). In *Tyco*, the court, on summary judgment, observed that "[s]uccessor obligor provisions have two purposes: 'to leave the borrower free to merge, liquidate or to sell its assets in order to enter a wholly new business free of public debt' and to assure the lender 'a degree of continuity of assets.'" *Id.* at 322 (quoting *Sharon Steel,* 691 F.2d at

1050). Accordingly, *Tyco* asked whether lenders were denied "the requisite degree of continuity of assets" through the asset transfers. *Id.*

Defendants point to *Tyco's* comment that "[t]here is no indication that successor obligor clauses were intended to require consent from the noteholders for such internal restructuring, even when coupled with a spin-off of some of the obligor's assets." *Id.* at 321. But *Tyco* made this statement for the purposes of distinguishing itself from *Sharon Steel,* which notably held that "boilerplate successor obligor clauses do not permit assignment of the public debt to another party in the course of a liquidation unless 'all or substantially all' of the assets of the company at the time the plan of liquidation is determined upon are transferred to a single purchaser." *Sharon Steel,* 691 F.2d at 1051. Specifically, *Tyco* found that *Sharon Steel's* holding about assessing assets "at the time the plan of liquidation is determined" did not apply to an instance of restructuring where debts and assets all remain in the same conglomerate. *Tyco*, 545 F. Supp. 2d at 320.

Thus, both *Sharon Steel* and *Tyco* were fundamentally concerned with the continuity of assets: In a *Sharon Steel* scenario, debt cannot be assigned to another external entity unless substantially all assets are also assigned, because otherwise creditors are left without continuity of assets. *Id.* But in *Tyco*, debt and assets were not being assigned to another external entity— debt was retained by the original company Tyco, and assets were being restructured within the conglomerate. *Tyco*, 545 F. Supp. 2d at 320–21. The ultimate question tackled by *Tyco* was still whether "all or substantially all" of the assets of the debtor company were taken away from lenders, depriving them of "the requisite degree of continuity" of assets. *Id.* at 322.

Like *Tyco* and *Sharon Steel,* Defendants' other cited cases—including those about statutory law rather than successor obligor provisions—also center the "continuity of assets"

question by reaching the inquiry of whether "all or substantially all" assets were transferred away from the debtor company. *See Resnick v. Karmax Camp Corp.*, 540 N.Y.S.2d 503, 504 (2d Dep't 1989) (finding that the transfer of assets to subsidiaries did not violate statutory law because the company still retained ownership of the assets, meaning not "all or substantially all" were disposed); *Gimbel v. Signal Co., Inc.*, 316 A.2d 599, 605 (Del. Ch. 1974) (finding that not "every" restructuring violates statute; only those that result in the sale of "all or substantially all" assets); *Roseton OL, LLC v. Dynegy Holdings Inc.*, C.A. No. 6689-VCP, 2011 WL 3275965, at *13 (Del. Ch. July 29, 2011) (finding that because company would still retain ownership of assets after internal transfer, it likely cannot be said that company transferred away its assets "substantially as an entirety"). In accordance with these cases, regardless of whether the InterCo Loan Transaction was an internal reorganization, the Court must still examine whether it qualifies as a transfer of "all or substantially all" of DBS's assets.

## B.  All or Substantially All

"In determining whether a company has sold 'substantially all' of its assets, New York courts . . . look to both qualitative and quantitative factors." *Roseton OL, LLC*, 2011 WL 3275965, at *13 n.95 (collecting cases); *see also HFTP Investments, L.L.C. v. Grupo TMM, S.A.*, No. 602925/2003, 2004 WL 5641710 (N.Y. Sup. Ct. June 4, 2004). "The qualitative analysis may focus on factors such as the overall effect of the transaction on the company, whereas the quantitative analysis may focus on the economic value and number of assets to be transferred in comparison to the assets retained." *Roseton OL, LLC*, 2011 WL 3275965, at *13 (footnote omitted).

Under a qualitative analysis, courts consider "the overall effect of the transaction on the company," *id.,* whether "the sale substantially changed the nature or character of the entity's

business," *HFTP Investments,* 2004 WL 5641710, whether "the sale was one not in the normal and regular course of the entity's business," *id.,* and whether the sale "involved primarily the entity's operating assets, rather than its liquid assets . . . ." *Id.*

Under a quantitative analysis, courts look to both book value and market value, as well as the income-producing nature of the assets at issue. *In re BankAtlantic Bancorp, Inc. Litig.,* 39 A.3d 824, 838–42 & n.7 (Del. Ch. 2012) (applying New York law). Some courts have found that 75% of total assets were not necessarily "substantially all" assets absent qualitative considerations, *HFTP Investments,* 2004 WL 5641710, and that a transaction involving 51% of the book value of all assets was not "even close" to satisfying "all or substantially all," *Sharon Steel,* 691 F.2d at 1051, while others have found that more than 60% of assets could constitute "substantially all" assets. *Thorpe v. Cerbco, Inc.*, C.A. No. 11713, 1995 WL 478954, at *9–10 (Del. Ch. Aug. 9, 1995), *aff'd in part, rev'd in part on other grounds sub nom. Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436 (Del. 1996). However, all of these cases were assessed at or after the summary judgment stage, with evidence for the court to weigh. In one motion for a preliminary injunction, a court determined that 51% of a company's assets could amount to "substantially all" assets when coupled with qualitative factors. *Katz v. Bregman*, 431 A.2d 1274, 1276 (Del. Ch. 1981)

Defendants contend that quantitatively, the InterCo Loan Transaction valued at $4.7 billion represented only 63% of a single asset—the InterCo Loan. Mot. at 21. And they contend that qualitatively, "DBS's existence, purpose and business are fundamentally the same" after the transfer. Mot. at 21–22. Defendants only raise issues to dispute after discovery is complete. At this preliminary stage, Plaintiff has alleged that at the time of the InterCo Loan Transaction, the InterCo Loan was the only asset with significant economic value to creditors. SAC ¶ 104–05.

Quantitatively, Plaintiff has alleged that 63% of the assets were transferred. *Id.* ¶ 104. Qualitatively, Plaintiff has alleged that the InterCo Loan Transaction was a gratuitous transfer that was not a normal and regular course of business and substantially changed the nature of DBS by rendering it insolvent. *Id.* ¶¶ 69, 77. It is plausible that combining both quantitative and qualitative factors, the InterCo Loan Transaction violated Section 5.01 as a transfer of "substantially all" DBS assets. *See Katz,* 431 A.2d at 1276.

## III. Plaintiff States Most Claims for Fraudulent Transfer

Plaintiff brings claims for actual intent fraudulent transfer and constructive fraudulent transfer under the Colorado Uniform Fraudulent Transfer Act ("CUFTA"), COLO. REV. STAT. ANN. §§ 38-8-105 and 38-8-106 (1) (West 2025).

Actual fraudulent transfer claims are subject to the heightened pleading standards of Rule 9(b). *See* Fed. R. Civ. P. 9(b); *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) ("As actual intent to hinder, delay, or defraud constitutes fraud, it must be pled with specificity, as required by [Rule] 9(b).") (internal quotation marks and citation omitted). To plead an actual fraudulent transfer claim, a complaint must allege that each of the subject transfers was made with the "actual intent to hinder, delay, or defraud [a] creditor . . . ." CUFTA § 38-8-105(1)(a); *see also In re Blair*, 594 B.R. 712, 741 (Bankr. D. Colo. 2018) ("[A] cause of action for 'actual intent to hinder, delay, or defraud' commonly is referred to as a claim for 'actual fraud.'") (quoting *Coder v. Arts*, 213 U.S. 223, 242 (1909)). Such fraud "can be established circumstantially," and Section 105(2) of CUFTA provides a list of factors—often referred to as the "badges of fraud"—that a court may consider to determine if there are sufficient grounds to infer intent. *Blair,* 594 B.R. at 742 (internal citation omitted); CUFTA § 38-8-105(2); *see also Schempp v. Lucre Mgmt. Grp., LLC*, 75 P.3d 1157, 1165 (Colo. App. 2003) ("[T]he intent to hinder, delay, or defraud creditors

must be established by the creditor, typically by showing a number of 'badges of fraud.'"). This list is not exhaustive or exclusive. *Schempp,* 75 P.3d at 1162. "Notably, Section 105(2) of the CUFTA makes clear that the Court has wide discretion." *Blair,* 594 B.R. at 742. "The exercise is holistic, and the Court should consider 'all the relevant circumstances[.]'" *Id.* (citing *Schempp,* 75 P.3d at 1162).

Plaintiff alleges an encompassing scheme in which Charles Ergo has spent the past years engaging "in a systematic attempt to siphon DBS's cash and most valuable assets away from creditors." SAC ¶ 1. Plaintiff alleges that Ergen "first fraudulently transferred key assets [away from DBS] to other entities under his control and subsequently offered to transfer those assets back within the reach of creditors in exchange for billions in coerced debt forgiveness." *Id.* Plaintiff alleges that ultimately, Ergen "proposed a coercive merger transaction that would allow him to walk away with billions in value, all conditioned on creditors agreeing to forgive billions of dollars of debts." *Id.*

Within this encompassing scheme, Plaintiff specifically challenges three sets of transactions as fraudulent: The January 2024 Asset Transfers, the Advances, and the September 2024 Transactions.

### A. The January 2024 Asset Transfers

Plaintiff alleges that the InterCo Loan Transaction and the DBS Subscriber Designation, whereby DBS transferred $4.7 billion worth of assets in the form of the InterCo Loan proceeds to EchoStar and whereby DBS transferred 300 million subscribers to a newly formed unrestricted subsidiary DBS Issuer, were fraudulent transfers.

As background, these Asset Transfers came about as a result of the restructuring of DISH Network and EchoStar. SAC ¶¶ 42–44. Plaintiff alleges that this restructuring came around the

time that DBS's funded debt was trading "well below par." *Id.* ¶ 41. According to Plaintiff, the initial merger agreement contemplated by the companies, where DISH Network would acquire EchoStar as a wholly owned subsidiary, was reversed as "a scheme to avoid repaying creditors of DBS and DISH Network" by ensuring that "none of EchoStar's value would be available to pay creditors of DISH Network and its subsidiaries (including DBS)." *Id.* ¶ 44. Plaintiff then alleges the four Asset Transfers—the two challenged transfers along with the DISH Network Spectrum Transfer and the Sling TV Designation—each played a role in a part of a broader scheme to enrich shareholders to the detriment of the creditors. *Id.* ¶ 66.

Specifically, Plaintiff alleges that the DISH Network Spectrum Transfer transferred high value spectrum to an EchoStar subsidiary for no consideration, despite the fact that DISH Network owes DBS billions of dollars. *Id.* ¶ 68. Plaintiff alleges that the InterCo Loan Transaction, also without consideration, massively reduces the assets available to satisfy the DBS notes, *id.* ¶ 69, and as the Court has already analyzed, Plaintiff adequately states that the InterCo Loan Transaction may have been a transfer of "substantially all" of DBS assets. *See supra*, Section II(B). Plaintiff alleges that the DBS Subscriber Designation resulted in the placement of substantial assets—three million customers—beyond the reach of DBS creditors. *Id.* ¶ 70. This transfer of customers "destroys value due to both the revenue loss and the disaggregation of the subscriber base." *Id.* ¶ 71. Similarly, Plaintiff alleges that the Sling TV Designation further reduces the amount of assets from which Plaintiff can recover. *Id.*. Based on the significant amount of asset transfer and reports by the S&P, including a creditor rating that reflects a "potential for a comprehensive debt restructuring," Plaintiff also alleges that the Asset Transfers rendered DBS insolvent. *Id.* ¶¶ 77–88.

By way of further background, Plaintiff later alleges that while DBS's assets were impacted by these transactions, EchoStar and DBS Issuer announced an exchange offer by DBS Issuer to issue new senior secured notes in exchange for DBS's unsecured notes (the DBS Exchange Offer). *Id.* ¶¶ 52–53. Plaintiff alleges that the DBS Exchange Offer was priced specifically to take advantage of the drops in price caused by the Asset Transfers. *Id.* ¶ 53. And Plaintiff alleges that during the DBS Exchange Offer, Defendants solicited consents from DBS unsecured notes holders to amend the terms of the notes and their indentures—amendments that would eliminate a substantial number of key indenture covenants. *Id.* ¶ 55. Plaintiff alleges that the notes could only be tendered for the DBS Exchange Offer if holders consented to the proposed amendments. *Id.* Altogether, Plaintiff alleges that the Asset Transfers, followed by the Exchange Offer and the consent solicitations, amounted to a scheme by Ergen to "fraudulently transfer[] key assets [away from DBS] to other entities under his control and subsequently offer[] to transfer those assets back within the reach of creditors in exchange for billions in coerced debt forgiveness." *Id.* ¶ 1.

Plaintiff has satisfied the pleading standard for actual intent fraudulent transfer for the InterCo Loan Transaction and the DBS Subscriber Designation Asset Transfers. In terms of badges of fraud, Plaintiff's iteration of factual allegations sufficiently alleges that the transfer of these assets were between insiders owned by Ergen, that the transfers were substantially all of DBS's assets, that these transfers were made for no consideration, that these transfers were made while DBS held substantial debt, and that DBS became insolvent after the transfers were made. *See* CUFTA § 38-8-105(2). Specifically, in alleging insolvency, Plaintiff has alleged that the Asset Transfers amounted to the disposal of substantially all of DBS assets. *See supra*, Section II(B). And Plaintiff has cited to multiple market reports and price indicators that after the Asset

Transfers, DBS was "highly vulnerable to nonpayment" with "potential for a comprehensive debt restructuring," with on S&P report noting that "the company's debt obligations are unsustainable." SAC ¶¶ 84, 86; *see also id.* ¶¶ 77–86. While these might not be all the badges of fraud, Plaintiff is not required to plead all badges, and in this holistic exercise, Plaintiff has pled motive, means, and the method to defraud. *Blair,* 594 B.R. at 742.

Defendants' contentions that Plaintiff's allegations are merely conclusory are unavailing. Mot. at 30–40. While Defendants may ultimately have legitimate defenses against these allegations, the arguments they put forth in their motion are meant for consideration on summary judgment or at trial. The Court notes that especially regarding the allegations of solvency and insolvency, the number of factual defenses made during oral argument alone—several of which were based on facts not alleged in the Complaint—indicate that this issue is inappropriate for resolution on a motion to dismiss. Indeed, Defendants' factual arguments on the insufficiency of insolvency pleadings rely exclusively on citations to cases at the summary judgment stage. *See* Mot. at 30–33 (citing predominantly to *In re Blair*, 594 B.R. 712 (Bankr. D. Colo. 2018) and *CB Richard Ellis, Inc. v. CLGP, LLC,* 251 P.3d 523 (Colo. App. 2010), both decisions on summary judgment, to argue that Plaintiff's allegations are not sufficient to show insolvency).

**B. The Advances**

Plaintiff alleges that the Advances made from DBS to DISH Network were also fraudulent transfers.

As additional background, Plaintiff alleges that in EchoStar's 10-K filing for the 2023 fiscal year, EchoStar disclosed that, together with subsidiaries (including DBS), it had about $2.4 billion in Cash on Hand as of December 2, 2023. *Id.* ¶ 58. However, because EchoStar had about $2 billion of debt maturing in 2024, it was forecasting negative cash flows in 2024. *Id.* Plaintiff

states that both EchoStar and auditors lacked confidence that DBS had access to the liquidity to pay its debts as they become due. *Id.* ¶ 59.

Plaintiff alleges that the Advances between DBS and DISH Network were made beginning in the fourth quarter of 2023, and then at every quarter thereafter. *Id.* ¶¶ 60, 65. These Advances totaled $2 billion. *Id.* ¶ 65. Plaintiff alleges that the Advances were initially recorded as "Advances to affiliates" and that DBS did not disclose sufficient information about the Advances for observers to understand the effects of the Advances. *Id.* ¶ 60. Plaintiff alleges that it was not until some time after they filed their original complaint in this lawsuit, eight months after the first Advance, that DBS provided additional disclosure about the Advances and recharacterized them as long term obligations memorialized by an intercompany loan agreement. *Id.* ¶¶ 63–64. According to Plaintiff, these disclosures reveal that the Advances bear a below-market, non-cash interest rate and an August 2028 maturity, which does not reflect fair value for DBS's cash and instead reflects and off-market deal for DISH Network and Ergen. *Id.* ¶ 64.

Plaintiff alleges that these Advances, made while DBS was insolvent, and the initial eight-month concealment of their details are Ergen's systematic and fraudulent attempt to siphon all available cash from DBS. *Id.*

For all the same reasons as the preceding section, Plaintiff has satisfied the pleading standard for actual intent fraudulent transfer for the Advances. In terms of badges of fraud, Plaintiff sufficiently alleges that the transfer of these assets were between insiders owned by Ergen, that information about the transfers were concealed, that these transfers were made while DBS held substantial debt, and that these transfers were made while DBS was insolvent. *See* CUFTA § 38-8-105(2). Once again, in the context of all the facts alleged, Plaintiff has pled

motive, means, and the method to defraud. *Blair,* 594 B.R. at 742. And once again, Defendants'
contentions to the contrary are arguments that should be left for summary judgment or trial.

### C.  The September 2024 Transactions

Plaintiff claims that the September 2024 Transactions, specifically the DBS Issuer
Financing and the AG Intercompany Loan Facility, were fraudulent transfers.

Plaintiff alleges that DBS Issuer, the unrestricted subsidiary holding three million DISH
TV subscribers from the Asset Transfers, issued to certain members redeemable preferred equity
interests with an aggregate liquidation preference of $200 million. *Id.* ¶¶ 46, 109. DBS Issuer
also entered into a loan and security agreement, in which DBS Issuer incurred an aggregate
principal debt amount of $2.30 billion. *Id.* ¶ 110. The loan is purportedly secured by a lien on all
of DBS Issuer's assets, including the assets that DBS transferred to it in the DBS Subscriber
Designation as a part of the Asset Transfers. *Id.* ¶ 110. The proceeds from the loan were then
distributed to DBS. *Id.* ¶ 112. Most proceeds from the AG Intercompany Loan Facility went to
repay DBS debt on the unsecured notes due in 2024. *Id*. According to Plaintiff, other proceeds
from the loans will be passed along to DISH Network, with DBS receiving inadequate
consideration. *Id.* ¶¶ 112–13.

Plaintiff has failed to allege that these transactions by DBS Issuer amount to actual intent
fraudulent transfer. Plaintiff's framing in the Complaint is that Ergen, through these transactions,
encumbered the fraudulently transferred assets that were transferred in the DBS Subscriber
Designation. *Id.* ¶ 108. These allegations may be relevant to supporting the claim that the DBS
Subscriber Designation was a fraudulent transfer, but the encumbrance itself is not a transfer. The
only transfer at issue here appears to be the AG Intercompany Loan Facility. But out of that
transfer, Plaintiff has only alleged that the proceeds went to repay DBS's debt and that the

proceeds *will* be passed along to DISH Network in another asset transfer. *Id.* ¶¶ 112–13. Plaintiff makes no argument for how the repayment of debt can be fraudulent, and neither can the Court identify one. And Plaintiff cannot state a legal claim based on speculation of what will or will not happen. Although Plaintiff can use the facts of the September 2024 Transactions to support allegations of a broader scheme, Plaintiff has not adequately alleged that the September 2024 Transactions themselves were fraudulent transfers.

To be clear, because the basis of this determination is that Plaintiff has not stated a legal claim based on speculation of what will happen, the basis of dismissal is lack of standing. *See Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 70 (2d Cir. 2001) (reiterating that constitutional standing requires injury in fact, which is an injury that is not conjectural or hypothetical). Accordingly, this dismissal is without prejudice. *See Harty v. W. Point Realty, Inc*., 28 F.4th 435, 445 (2d Cir. 2022) (holding that a dismissal for lack of standing must be without prejudice).

### D. Constructive Fraudulent Transfer

"Constructive fraud connotes something less than actual fraud and does not require actual intent to defraud." *In re Blair*, 594 B.R. at 757. "Instead, the statutory focus is on the debtor receiving less than reasonably equivalent value in exchange for the disputed transfer." *Id*. Here, Plaintiff must plead (1) either that DBS's remaining assets after the allegedly fraudulent transfers "were unreasonably small in relation to [each] transaction" or that DBS "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due" and (2) that there was a lack of "reasonably equivalent value." *Id.* at 758 (cleaned up). Constructive fraud claims do not have to be pled with particularity. *See In re Sharp Int'l Corp.*, 403 F.3d 43, 53 (2d Cir. 2005).

For the Asset Transfers and Advances, the Court has already determined that Plaintiff adequately pled that they occurred in the context of insolvency and a transfer of substantially all assets under the heightened actual intent fraudulent transfer standard. The Court has also determined that Plaintiff adequately pled that DBS received nothing of value in exchange for the Asset Transfers. As for the Advances, Plaintiff does not explicitly allege that DBS received no equivalent value, but Plaintiff has alleged that the Advances were made to siphon value away from DBS, inferring that the Advances lacked an exchange of equivalent value. SAC ¶ 62. At this stage, the Court is required to draw all inferences in favor of Plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff has stated constructive fraudulent transfer claims for both the Asset Transfers and the Advances.

However, for the same reasons stated *supra* in Section III(C), Plaintiff has not stated a claim for constructive fraudulent transfer for the September 2024 Transactions, and that claim is similarly dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED in part and GRANTED in part. Plaintiff's fraud claims relating to the September 2024 Transactions are DISMISSED without prejudice. The Clerk of Court is directed to terminate ECF No. 59.


Dated: August 21, 2025
       New York, New York

                                        SO ORDERED.

                                        JESSICA G. L. CLARKE
                                        United States District Judge