UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, solely in its capacities as Trustees,

                Plaintiff,

-against-

DISH DBS CORPORATION; DISH NETWORK L.L.C.; ECHOSTAR INTERCOMPANY RECEIVABLE COMPANY L.L.C.; DISH DBS ISSUER L.L.C.; DBS INTERCOMPANY RECIEVABLE L.L.C.; and DISH NETWORK CORPORATION,

                Defendants.

24-CV-3646 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

      The Court assumes familiarity with the underlying facts and procedural history of this case, which the Court recounted in detail in its August 21 Opinion and Order. *See* ECF No. 98 at 1–14. At issue here are five discovery disputes, which the Court will address in turn. First, Plaintiff seeks production of communications among Defendants DISH Network, EchoStar, and their respective counsel regarding merger negotiations and certain asset transfers. Second, Defendants seek production of documents that underpin Plaintiff's claim that DISH DBS Corporation, or "DBS," maintained an indebtedness-to-cash-flow ratio that exceeded the permitted 8-to-1 limit. Third, the parties dispute whether the presence of certain DISH employees at board meetings waives privilege. Fourth, the bondholders and Defendants dispute whether the bondholders must be subject to Rule 30(b)(6) depositions. And fifth, Plaintiff asks the Court to order Defendants, their employees, and their board members to appear for depositions. For the reasons stated below, the Court compels the production of merger negotiation communications

where third parties were involved; directs Defendants to produce additional communications made between August 2023 and December 2023 that are not legal in nature and concern merger negotiations; permits Defendants to serve on Plaintiff a contention interrogatory for Plaintiff to provide the basis for its allegation that DBS's Leverage Ratio exceeded 8-to-1, and orders Plaintiff to provide Defendants with any non-privileged documents supporting the same; orders Defendants to produce documents sent to Chris Ergen, Katie Flynn, and Kevin Murray, but not to Adam Kratzer; directs the bondholders to comply with Defendants' Rule 30(b)(6) subpoenas; and orders Defendants to appear for their depositions.

## I. Some Communications Between DISH, EchoStar, and Counsel Are Not Privileged, While Others May Be

First, Plaintiff seeks production of communications among DISH Network, EchoStar, and their respective counsel relating to: (1) "merger negotiations between DISH Network and EchoStar" and (2) "negotiating and structuring certain asset transfers." ECF Nos. 92, 93. Defendants contend that both sets of communications are privileged communications. *Id.* The parties dispute whether New York or Colorado law should govern the issue, *see* ECF No. 92, as well as when White & Case began to represent whom, *see* ECF Nos. 96, 97, 101.

At the outset, the Court decides which state law governs. Then, the Court addresses whether merger negotiation communications are covered by the common interest doctrine and whether communications made between jointly represented parties on the topic of the joint representation are privileged.

### A. New York Law Applies

"[A] federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state." *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018) (internal citations and quotation marks omitted); *see* ECF No. 50, Second Amended Complaint ("SAC")

2

¶ 123. Here in New York, "the first step in a choice of law analysis is to determine whether an actual conflict exists between the laws of the jurisdictions involved." *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012) (citing *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993)). If a conflict exists, "New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997) (internal citation omitted).

Plaintiff asks the Court to apply New York law because the communications involve New York attorneys working in New York-based law firms and the engagement letter with counsel agreed their relationship would be governed by New York law. ECF No. 92 at 1. Defendants argue that Colorado law should apply because "the parties are based in Colorado, they anticipated that their communications would be governed by Colorado law, and the discovery [sought] comes . . . from custodians in Colorado." *Id.* at 4. While Plaintiff contends that no actual conflict exists between New York and Colorado law, both parties predominantly cite to cases from their respective states that appear to have no precise equivalent in the other jurisdiction. The Court must accordingly determine "the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *Martin Hilti Fam. Tr. v. Knoedler Gallery, LLC*, 386 F. Supp. 3d 319, 350 (S.D.N.Y. 2019) (quoting *Lazard Freres & Co.*, 108 F.3d at 1539).

In New York choice of law cases involving attorney-client privilege, courts have consistently applied the law of the state where counsel was based. *See Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 470 (S.D.N.Y. 1993) ("Since the attorney-client relationship between [the defendant] and its counsel appears to have been based in New York, we look to the law of that state."); *Stenovich v. Wachtell, Lipton, Rosen & Katz*, 756 N.Y.S.2d 367,

3

374 (Sup. Ct. 2003) ("Furthermore, when a discovery dispute involves an attorney-client relationship with a New York attorney, New York privilege law applies." (internal citation omitted)); *Hyatt v. State Franchise Tax Bd.*, 962 N.Y.S.2d 282, 295 (2013) (finding that New York law applied where the documents at issue were created in New York to depose New York attorneys, despite the plaintiff's alleged Nevada residency during the relevant period); *Lego v. Stratos Lightwave, Inc.,* 224 F.R.D. 576, 579 n.10 (S.D.N.Y. 2004) (collecting cases throughout the states, including four where the court applied the law of the state where counsel was based). These cases often cite to the principle that "[t]he general rule is that the law of the place where the testimony is to be heard governs its admissibility." *Application of Walsh*, 243 N.Y.S.2d 325, 326 (1963) (internal citation omitted); *see also Lego*, 224 F.R.D. at 579 ("In cases requiring a choice of privilege law, the interest analysis usually has led New York courts to apply the law of the jurisdiction in which the assertedly privileged communications were made, which in most of the cases was also the jurisdiction in which the party that made the communications resided."). Here, then, under New York choice of law principles, the Court must apply New York law to communications between Defendants and their counsel.

However, the common interest doctrine, which keeps certain communications privileged, can also implicate communications made between Defendants without the presence of counsel. *See, e.g.*, *Fox News Network, LLC v. U.S. Dep't of the Treasury*, 739 F. Supp. 2d 515, 563 (S.D.N.Y. 2010). There is thus some merit to Defendants' argument that Colorado law should apply because many of the communications surrounding the merger negotiation itself occurred between the companies in Colorado, perhaps without the involvement of counsel. This argument implicates the underlying principle of the aforementioned cases—that courts should apply the law of the jurisdiction in which the assertedly privileged communications were made.

4

But in this situation, doing so would lead to an incongruous result. To credit Defendants' argument that the jurisdiction where the communications were made should govern, the Court would have to apply New York law to communications between Defendants where counsel was involved, but Colorado law to communications where counsel was not present—even though the Colorado communications can only claim privilege *arising from the New York relationship*. Because privilege over the Colorado communications can only be asserted out of an attorney-client relationship based in New York, the Court finds that New York is the state "with the most significant interest in, or relationship to, the dispute." *Martin Hilti Fam. Tr.*, 386 F. Supp. 3d at 350 (internal citation omitted). Accordingly, New York law applies.[1]

### B. Communications on Merger Negotiations Are Not Covered by the Common Interest Doctrine

Defendants asserted privilege through the common interest doctrine over communications on merger negotiations between August 2023 and December 2023—that is, between the time of the merger agreement and the merger consummation.[2] Defendants contended that once merger negotiations resulted in an agreement to merge, Defendants had a common legal interest to work together towards common goals, "which included identifying potentially more advantageous merger structures than the initial agreement." ECF No. 92 at 4–5.

---

[1] Defendants note that the Court previously determined Colorado law applies to issues of privilege and should remain consistent with that ruling. ECF No. 92 at 5. However, the prior communications at issue were made in Colorado between Defendants in Colorado and accountants in Colorado. *See* ECF No. 81. That ruling is inapplicable here, where the privileged relationship is between Defendants and New York attorneys.

[2] Plaintiff originally represented that Defendants were asserting privilege over communications that occurred before the merger agreement in August 2023. ECF No. 92 at 1. Defendants clarified, however, that the *common interest* privilege arose only "when the parties executed the merger agreement" on August 8, 2023. ECF No. 101 at 7–8; *see also* ECF No. 92 at 3. For now, the Court will leave the parties to resolve disputes over the pre-agreement documents.

The common interest doctrine "is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege." *Fox News Network, LLC*, 739 F. Supp. 2d at 563 (internal citation omitted). "There are two elements of the common interest rule[:] (1) the party who asserts the rule must share a common legal interest with the party with whom the information was shared and (2) the statements for which protection is sought were designed to further that interest." *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, 252 F.R.D. 163, 171 (S.D.N.Y. 2008).

The nature of a common legal interest must be "identical, not similar, and be legal, not solely commercial." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 284 F.R.D. 132, 139 (S.D.N.Y. 2012) (internal citation and quotation marks omitted). "For courts to find such a common legal interest, the parties must have come to an agreement, though not necessarily in writing, embodying a cooperative and common enterprise towards an identical legal strategy." *Id.* (internal citations and quotation marks omitted). The interest also exists where "the parties have been, or may potentially become, co-parties to a litigation[,] or have formed a coordinated legal strategy." *Fox News Network, LLC*, 739 F. Supp. 2d at 563 (cleaned up) (citing *In re Subpoena Duces Tecum Served on N.Y. Marine & Gen. Ins. Co.*, No. M 8–85 (MHD), 1997 WL 599399, at *4 (S.D.N.Y. Sept. 26, 1997)).

"As is true for any privilege, the common interest rule is narrowly construed." *Allied Irish Banks*, 252 F.R.D. at 171 (S.D.N.Y. 2008). The party asserting that a privilege exists by virtue of the common interest doctrine bears the burden of establishing each element necessary to demonstrate its applicability. *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466, 472 (S.D.N.Y. 2003). "Such a showing must be based on competent evidence, usually through the admission of affidavits, deposition testimony or other admissible evidence." *Id.*

"New York courts uniformly reject[] efforts to expand the common interest doctrine to communications that do not concern pending or reasonably anticipated litigation." *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 27 N.Y.3d 616, 627 (2016) (collecting cases) (reversing First Department decision reaching contrary conclusion as to these requirements); *see also Bank of Am., N.A. v. Terra Nova Ins. Co.*, 211 F. Supp. 2d 493, 498 (S.D.N.Y. 2002). That is because "[w]hen two or more parties are engaged in or reasonably anticipate litigation in which they share a common legal interest, the threat of mandatory disclosure may chill the parties' exchange of privileged information and therefore thwart any desire to coordinate legal strategy." *Ambac*, 27 N.Y.3d at 628. The common interest doctrine accounts for that barrier and permits parties to properly coordinate a legal strategy. However, "when businesses share a common interest in closing a complex transaction, their shared interest in the transaction's completion is already an adequate incentive for exchanging information necessary to achieve that end," rendering the common interest doctrine inapplicable in the absence of pending or reasonably anticipated litigation. *Id.* at 629.

The New York Court of Appeals addressed the common interest doctrine specifically with regard to communications made during merger negotiations in *Ambac*. There, the party asserting the privilege, Bank of America, argued that "highly regulated financial institutions constantly face a threat of litigation and that the protection of their shared communications is necessary to facilitate better legal representation, ensure compliance with the law and avoid litigation." *Id.* at 628. Defendants make essentially the same argument here. However, *Ambac* observed that there is no evidence that sharing privileged communications outside the context of litigation is necessary to achieve those objectives. *Id.* To the contrary, *Ambac* noted that "any benefits that may attend to an expansion of the doctrine [covering merger communications] are outweighed by

the substantial loss of relevant evidence, as well as the potential for abuse." *Id.* at 629. "Even advocates of a more expansive approach admit that 'in a nonlitigation setting the danger is greater that the underlying communication will be for a commercial purpose rather than for securing legal advice.'" *Id.* (quoting James M. Fischer, *The Attorney-Client Privilege Meets the Common Interest Arrangement: Protecting Confidences While Exchanging Information for Mutual Gain*, 16 REV. LITIG. 631, 642 (1997)). Indeed, in *Ambac*—as in this case—the plaintiff alleged that "the very communications Bank of America withheld from disclosure would have revealed that the merging entities structured their transaction to conceal . . . fraudulent dealings." *Id.* at 630. And given the potential for abuse and the limited accompanying benefits, *Ambac* held that communications made while companies were in the process of merging can only benefit from the common interest privilege if there is pending or anticipated litigation. *Id.* at 629–30.

The Court sees no reason to deviate from *Ambac*'s holding. The facts here are essentially identical to those in *Ambac,* with Defendants claiming privilege on the grounds that the merger came with a host of legal issues. However, Defendants fail to show the requisite evidence that there was any pending or reasonably anticipated litigation. *See Gulf Islands Leasing, Inc.*, 215 F.R.D. at 472 (requiring "competent evidence, usually through the admission of affidavits, deposition testimony or other admissible evidence" for the privilege to apply). Neither do Defendants offer any New York case law to defend their position. Defendants cursorily claim that *Ambac* is the minority view but do not support this claim. It appears that Defendants are referring to the acknowledgement in *Ambac* that some federal courts have taken a different view of the privilege doctrines, *see Ambac*, 27 N.Y.3d at 631–32, but federal privilege doctrine is not at issue here. *Ambac* is the traditional narrow construction of the New York courts and is controlling here. *See id.* at 632.

The common interest doctrine does not cover communications regarding merger negotiations. Defendants may still assert privilege over confidential communications between parties and their own attorneys under attorney-client privilege, but Defendants must produce merger negotiation communications where third parties were involved.

### C. Defendants Must Produce Communications Made Between August and December 2023 That Are Not Legal in Nature and Concern Merger Negotiations

Defendants also assert attorney-client privilege over communications concerning negotiations and structuring of certain asset transfers, representing that White & Case has been providing legal advice to both DISH and EchoStar as clients. *See* ECF No. 93.

For the attorney-client privilege to apply to communications, the communication from attorney to client or clients must be made "for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship." *Rossi v. Blue Cross & Blue Shield of Greater New York*, 73 N.Y.2d 588, 593 (1989). "The privilege does not extend to business advice, even when given by an attorney." *William Tell Servs., LLC v. Cap. Fin. Plan., LLC*, 999 N.Y.S.2d 327, 332 (Sup. Ct. 2014). The common interest doctrine also extends this privilege over communications made between clients who are jointly represented or are co-clients. *See Ambac,* 27 N.Y.3d at 630–31. That is because "[i]n the joint client or co-client setting . . . the clients indisputably share a complete alignment of interests in order for the attorney, ethically, to represent both parties." *Id.* at 631. Accordingly, in that scenario, "there is no question that the clients share a common identity and all joint communications will be in furtherance of that joint representation." *Id.* Thus, "the fact of joint representation alone is often enough to establish a congruity of interests" for the purposes of the common interest doctrine. *Id.*

Defendants state that White & Case's engagement letter authorized it "to perform legal services on [DISH's] behalf in connection with certain liability management transactions,

9

including representing DISH's affiliate EchoStar Corporation and its subsidiaries." ECF Nos. 93 at 5, 101 at 4. Defendants represent that White & Case had a separate and pre-existing letter for general corporate advice, distinguishing the relevant legal letter as an engagement for legal purposes. ECF No. 93 at 5 n.8. And Defendants have submitted a declaration that White & Case was providing legal advice, as opposed to general corporate advice, on the transactions to DISH since May 2023 and to both DISH and EchoStar since October 2023. ECF No. 96 at 4–6 ("Ergen Decl.") ¶ 9; *see also* ECF No. 101 at 2. Taking these representations at face value, Defendants' legal communications with White & Case concerning negotiations and structuring of certain asset transfers after October 2023 are undeniably privileged.

Plaintiff, however, contends that the interests that Defendants had in the transactions were not actually legal in nature. ECF No. 93 at 2–3. Plaintiff also argues that Defendants continue to alter their explanations about "whom White & Case represented throughout 2023, and for what purpose" to suit their latest arguments—resulting in a privilege log that "squarely conflict[s]" with Defendants' averred timeline. ECF No. 97 at 1–2. As just one example, Plaintiff highlights that "Defendants claim White & Case *never* represented DISH with respect to merger negotiations but then withhold as attorney-client privileged White & Case's communications with DISH regarding exactly that topic." *Id.*; *compare id.* at 2 n.3 (listing White & Case log entries that withhold communications based on "Merger negotiations") *with* ECF No. 101 at 3 (Defendants explaining that "White & Case did not represent DISH on the subject of the merger.").

This leaves the Court at a crossroads. On the one hand, the Court does not, as Plaintiff suggests it should, treat Defendants' representations and Ergen's sworn declaration with "skepticism." *See* ECF No. 97 at 6; FED. R. CIV. P. 11(b). On the other hand, the Court cannot

simply ignore Plaintiff's protestations highlighting potentially non-privileged materials. To address Plaintiff's concerns while allowing Defendants to protect privileged documents, the Court directs Defendants to produce any communications made between August 2023 and December 2023—that is, between the time of the merger agreement and the merger consummation—which (1) are not legal in nature, and (2) concern merger negotiations, not transactions. As above, the Court will also leave the parties to resolve disputes over the pre-agreement documents. *See supra* I.B at 5 n.2.

## II. The Work Product Doctrine Does Not Protect Plaintiff's Leverage Ratio Calculations

Next, the parties dispute whether Plaintiff must produce documents that support its assertion that Defendant DBS's indebtedness-to-cash-flow ratio (or "Leverage Ratio") exceeded the 8-to-1 limit set by its indentures. *See* ECF No. 104; SAC ¶¶ 97–98, 129–65. Plaintiff claims that these materials are protected by the work product doctrine. ECF No. 104 at 3–5. Defendants contend that Plaintiff waived those protections by putting its Leverage Ratio calculations "at issue" in its complaint. *Id.* at 1–2. Defendants also stress their "substantial need" for these materials. *Id.* at 2–3.

The work product doctrine, codified in Federal Rule of Civil Procedure 26(b), provides that "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." FED. R. CIV. P. 26(b)(3)(A); *see also Am. Oversight v. U.S. Dep't of Just.*, 45 F.4th 579, 590 (2d Cir. 2022). However, a "party waives the work product protection . . . by placing privileged documents 'at issue' in a litigation." *New York Times Co. v. U.S. Dep't of Just.*, 939 F.3d 479, 494 (2d Cir. 2019) (citing *John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003)). The purpose of the work product doctrine is "to ensure a vital adversarial process." *Am. Oversight*, 45 F.4th at 593.

11

So when a party "advances a claim to a court or jury . . . while relying on its privilege to withhold from a litigation adversary materials that the adversary might need to effectively contest or impeach the claim," it loses the benefits of that privilege. *New York Times Co.*, 939 F.3d at 495 (cleaned up).

Here, Plaintiff's allegation that DBS's Leverage Ratio exceeded 8-to-1 necessarily depends on its calculations of that Ratio. And although Plaintiff's communications demonstrating how its attorneys calculated the Ratio may be protected work product, the factual underpinnings of those calculations are not. Instead, Plaintiff's—and Plaintiff's attorneys'—calculations of DBS's Leverage Ratio are quintessential materials that their "adversary [DBS] might need to effectively contest or impeach the claim" that DBS's Leverage Ratio exceeded the indentures' 8-to-1 limit. *New York Times Co.*, 939 F.3d at 495. Accordingly, the Court permits Defendants to, within one week of this Order, serve on Plaintiff a contention interrogatory for Plaintiff to provide the basis for its allegation that DBS's Leverage Ratio exceeded 8-to-1. Plaintiff must also provide Defendants with any non-privileged documents supporting the same. Because Plaintiff must provide Defendants with the aforementioned materials, the Court need not address Defendants' "substantial need" argument.

### III. Defendants Waived Privilege by Sending Documents to Chris Ergen, Katie Flynn, and Kevin Murray, Not Adam Kratzer

Third, Plaintiff seeks production of documents that were shared with certain individuals who attended EchoStar and DISH board meetings—namely, (1) Chris Ergen, Katie Flynn, and Kevin Murray (the "Board Observers"), senior DISH employees and Charles Ergen's adult children;[3] and (2) Adam Kratzer ("Kratzer"), Charles Ergen's Chief of Staff (according to

---

[3] Charles Ergen was the Chairman of the Board of Directors at both EchoStar and DISH. *See* ECF No. 96 at 1. Kevin Murray is Charles Ergen's son-in-law. ECF No. 105 at 1.

Plaintiff) or Executive Assistant (according to Defendants). *See* ECF No. 105. Plaintiff argues that because these third parties were present at EchoStar and DISH board meetings and received legal advice sent to the EchoStar and DISH boards, Defendants waived the attorney-client privilege that would have otherwise attached to those communications. *Id.* at 1–3. Defendants counter that the communications remain privileged because sharing information with senior employees and "board observers," or "assistants who facilitate communications," does not vitiate the attorney-client privilege. *Id.* at 3–5.

As explained above, the attorney-client privilege applies "for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship." *Rossi*, 73 N.Y.2d at 593. The privilege "is intended to encourage full and frank communications between a client and counsel, which in turn promotes an understanding of and compliance with the law and the administration of justice." *GMO Gamecenter USA, Inc. v. Whinstone US, Corp.*, No. 22-CV-5974 (JPC) (KHP), 2025 WL 1763262, at *4 (S.D.N.Y. June 25, 2025) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). "In order to balance this protection of confidentiality with the competing value of public disclosure, however, courts 'apply the privilege only where necessary to achieve its purpose' and 'construe the privilege narrowly because it renders relevant information undiscoverable.'" *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (quoting *In re County of Erie,* 473 F.3d 413, 418 (2d Cir. 2007)) (cleaned up). The party asserting the privilege not only "bears the burden of showing that it applies," but also "of showing that privilege was not waived." *Kleeberg v. Eber*, No. 16-CV-9517 (LAK) (KHP), 2019 WL 2085412, at *7 (S.D.N.Y. May 13, 2019) (internal citations omitted).

Generally, a privilege holder waives the attorney-client privilege by "disclos[ing] or consent[ing] to disclosure of privileged communications to a third party." *Id.* (internal citations

13

omitted). But exceptions apply. When the third party is an "agent of the attorney or client," for example, "then the disclosure may not result in a waiver." *Id.* (citing *Netherby Ltd. v. G.V. Trademark Invs., Ltd.*, 689 N.Y.S.2d 488, 489 (1st Dep't 1999)). "The scope of this exception is not to be defined by a third party's employment or function"; instead, under New York law, "the party asserting the agency exception must show: (1) a reasonable expectation of confidentiality under the circumstances, and (2) that disclosure to the third party was *necessary* for the client to obtain informed legal advice." *GMO Gamecenter USA, Inc.*, 2025 WL 1763262, at *5 (quoting *Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 12-CV-7319 (JFK) (JLC), 2017 WL 4676806, at *5 (S.D.N.Y. Oct. 17, 2017)). Under the second element of this test, "the party asserting privilege must demonstrate 'that the involvement of the third party [was] nearly indispensable or serve[d] some specialized purpose in facilitating the attorney-client communications.'" *Kleeberg*, 2019 WL 2085412, at *7 (alterations in original) (quoting *Ross v. UKI Ltd.*, No. 02-CV-9297 (WHP) (JCF), 2004 WL 67221, at *3 (S.D.N.Y. Jan. 15, 2004)); *see also Richards v. Kallish*, No. 22-CV-9095 (CS) (VR), 2023 WL 8111831, at *6 (S.D.N.Y. Nov. 22, 2023) (explaining that "the presence of a third party, who serves as an agent of either the attorney or the client, does not destroy attorney-client privilege if the agent's presence is necessary to facilitate the communications between the attorney and client" (internal citation omitted)).

      The third-party waiver doctrine also "applies differently in the corporate context." *Scott v. Chipotle Mexican Grill, Inc.*, 94 F. Supp. 3d 585, 598 (S.D.N.Y. 2015) (collecting cases). "Therefore, although dissemination of privileged information to third parties generally waives attorney-client privilege, the distribution within a corporation of legal advice received from its counsel does not, by itself, vitiate the privilege." *Strougo v. BEA Assocs.*, 199 F.R.D. 515, 519–

20 (S.D.N.Y. 2001) (citing *Upjohn,* 449 U.S. at 391–92; *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 442 (S.D.N.Y. 1995)). However, "[c]ourts determining whether dissemination of a document to employees amounts to waiver of an entity's attorney-client privilege apply a 'need to know' standard: did the recipient need to know the content of the communication in order to perform her job effectively or to make informed decisions concerning, or affected by, the subject matter of the communication?" *E.B. v. New York City Board of Educ.,* No. 02-CV-5118 (CPS) (MDG), 2007 WL 2874862, at *4 (E.D.N.Y. Sept. 27, 2007) (cleaned up). When counsel discloses a communication "to employees of the corporation who are not in a position to act or rely on the legal advice contained in the communication"— who did not need to know—the attorney-client privilege may be waived. *Scott*, 94 F. Supp. 3d at 598 (citing *JA Apparel Corp. v. Abboud*, No. 07-CV-7787 (THK), 2008 WL 111006, at *2 (S.D.N.Y. Jan. 10, 2008) ("[I]f McMullen is a low-level employee to whom the legal advice in the Cowan Memo would have had no significance, his presence [at the board meeting where the memo was disclosed] may have constituted a waiver of the privilege.")).

      Defendants stress that it "is a fundamental principle of law that where a corporation is the recipient of legal advice, as here, the attorney-client privilege necessarily extends to employees within that corporation." ECF No. 105 at 3–4 (citing *Stock v. Schnader Harrison Segal & Lewis LLP*, 35 N.Y.S.3d 31, 35 (1st Dep't 2016)). And they attest that, "[g]iven their roles and responsibilities at DISH, all three [B]oard [O]bservers were 'in a position to act or rely on the legal advice contained in the' challenged communications or otherwise 'needed to be aware of' information relating to those topics." ECF No. 105 at 4 (citing *Compass Prods. Int'l LLC v. Charter Commc'ns, Inc.*, No. 18-CV-12296 (VM) (BCM), 2020 WL 3448012, at *3 (S.D.N.Y. June 24, 2020)).

15

But they do nothing more than make such conclusory representations. Chris Ergen's title at DISH was "Wireless Innovation Manager," Katie Flynn's was "Director, Boost Infinite Product," and Kevin Murray's was "Senior Corporate Development Analyst." ECF No. 105 at 3 n.10. The legal advice at issue, according to Defendants, "most notably" dealt with DISH and EchoStar's "anticipated merger and regulatory filings." ECF No. 105 at 4. Defendants claim that this advice "had to be shared with managers and directors" like the Board Observers because it "impacted the Companies' structure and business operations." *Id.* But Defendants fail to explain—as the party asserting the privilege must—how legal advice concerning an "anticipated merger and regulatory filings" might be germane to the daily work of a Wireless Innovation Manager, Director of Boost Infinite Product, or Senior Corporate Development Analyst.

Defendants do not demonstrate that the Board Observers "need[ed] to know the content of the communication[s] in order to perform [their] job[s] effectively," *E.B.*, 2007 WL 2874862, at *4, or that the Board Observers were in any "position to act or rely on the legal advice contained in the communication[s]," *Scott*, 94 F. Supp. 3d at 598. Defendants do not establish that the Board Observers could "put into effect the client corporation's policy" or "ensure their client's compliance with the law." *Upjohn*, 449 U.S. at 392. And Defendants certainly do not show that the Board Observers' involvement was "nearly indispensable or serve[d] some specialized purpose in facilitating the attorney-client communications" in question. *Kleeberg*, 2019 WL 2085412, at *7. Because the Board Observers did not "need to know" the legal advice in question, therefore, the communications they received are not covered by the attorney-client privilege and must be disclosed.

The same cannot be said of the emails sent to Adam Kratzer.[4] Irrespective of his title—Plaintiff refers to him as Charles Ergen's Chief of Staff, while Defendants call him Ergen's Executive Assistant—his presence does not destroy the attorney-client privilege afforded to those communications. As an assistant, Kratzer was "necessary to facilitate the communications between the attorney and client." *Richards*, 2023 WL 8111831, at *6; *see also United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999) ("[T]he inclusion of a third party in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client.").

Indeed, the agency exception that Plaintiff argues waives the attorney-client privilege for these communications was expressly designed to include assistants. The exception derives from *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961), and its progeny. *GMO Gamecenter USA, Inc.*, 2025 WL 1763262, at *5. And in *Kovel*, the Second Circuit underscored that "secretaries, file clerks, telephone operators, messengers, clerks not yet admitted to the bar, and aides of other sorts" are those types of agents who are so "indispensable to [a lawyer's] work" that "the privilege must include" them. *Kovel*, 296 F.2d at 922. Similarly, the agency exception would not apply if Kratzer's responsibilities encompassed all of those undertaken by a Chief of Staff—which are unquestionably "indispensable" and "necessary" to facilitate attorney-client communications.

For these reasons, the Court compels the production of documents sent to Chris Ergen, Katie Flynn, and Kevin Murray, but not those sent to Adam Kratzer.

---

[4] *See* ECF No. 105-1, Nos. P3-02252, P3-00422, P3-00324, P3-02199. Of course, those emails sent to Kratzer alongside the Board Observers must still be disclosed.

### IV. The Bondholders Are Subject to Rule 30(b)(6) Depositions

Next, the bondholders and Defendants dispute whether the bondholders—who directed that this suit be filed—must be subject to Rule 30(b)(6) depositions. ECF No. 106. The Court finds that they must.

The bondholders argue that Defendants' subpoenas should be quashed because the bondholders possess only "irrelevant" information. *Id.* at 1–2. But, as Defendants rightly highlight, the Second Amended Complaint pleads that the bondholders "directed" Plaintiff to "bring this lawsuit" in the first place. *Id.* at 3; *see also* SAC ¶ 13. Defendants are thus "entitled to examine the parties asserting claims against them." ECF No. 106 at 4. Moreover, the information that Defendants hope to ascertain is hardly irrelevant—they seek "information about the basis for the allegations in the SAC, the Bondholders' standing to direct [Plaintiff], and the documents [the bondholders] have and should produce in this case." *Id.* at 3. This information may be central to Defendants' case, and is information that Defendants are entitled to seek through depositions.

The bondholders also argue that Defendants' subpoenas are unduly burdensome. ECF No. 106 at 2–3. That argument is unconvincing. As Defendants make clear, each of the bondholders is a "well-capitalized financial institution that would not be burdened by being deposed in their case seeking billions of dollars for them." ECF No. 106 at 5 (citing SAC ¶¶ 11, 227). Their testimony is distinct from that of Plaintiff, as they are "separate entities with their own independent analysis of the allegations in the SAC." *Id.* Ultimately, the burden that nine depositions might impose upon them is not undue; it is justified. The bondholders are directed to comply with Defendants' Rule 30(b)(6) subpoenas.

V. **Defendants Must Appear for Depositions**

Finally, Plaintiff urges the Court to order Defendants to sit for depositions. ECF No. 110 at 1–3. Defendants argue that they need not sit for depositions until the Court rules on the above discovery disputes and the parties complete the necessary document productions. *Id.* at 3–5. This Order, which addresses all outstanding discovery disputes in this case, largely moots Defendants' argument. With the discovery disputes now resolved, Defendants are ordered to appear for their depositions. The parties need not wait for all of the documents to be produced to begin taking depositions.

Dated: November 18, 2025
       New York, New York

SO ORDERED.

*Jessica Clarke*

JESSICA G. L. CLARKE
United States District Judge